UNITED STATES DISTRICT COURTFOR
THE SOUTHERN DISTRICT OF NEW YORK (White Plains)
--------------------------------------------------------------x

DONALD P. ROSENDALE                        :
                                           :
                    Plaintiff              :
V.                                         :          **19 cv 9263**
                                           :
MR. COOPER GROUP INC. f/k/a/               :
NATIONSTAR MORTGAGE LLC  Directly and :
As  Loan Servicer for an Unspecified       :
Nationstar HECM  Acquisition Trust         :
       :                                   :
                                           :
                    Defendant              :
--------------------------------------------------------------x

DONALD P. ROSENDALE  complains as follows:

## NATURE OF THE CASE

1.  Plaintiff is an 83-year-old cancer survivor supplementing his Social

Security  by farming his property at 4848 Route  44, Amenia, N.Y. Dutchess

County, N.Y.

2.  In  June of 2009, he took a  HECM   "reverse mortgage" with

MetLife Home Loans, subsidiary of MetLife Bank, secured by the equity in his

home . MetLife advertised at the time that under the HECM program, a borrower

could never lose his home in foreclosure. The loan was eventually sold to

Champion Mortgage Company, a subsidiary of Nationstar LLC.

3. Four times in the last 12 months, Nationstar [1] has taken funds from his line of Credit secured by the equity in his home to "pay" insurance or taxes that were not due or had been paid directly by Mr. Rosendale beforehand, most recently and egregiously in August of 2019. Yesterday, the straw that broke the camel's back, he received a notice from Nationstar claiming that his hazard insurance had lapsed (When it had not) and threatening in bold face type: **"Because hazard insurance if required on your property. We plan to buy insurance for your property."** The funds for that purchase would come from Mr. Rosendale's line of credit, and if it is not sufficiently funded, throw him into foreclosure.

4. With all five of those actions, Nationstar attached Notices that he was in danger of <u>foreclosure</u> and losing his home of almost 40 years, when in fact he was not in any such danger. These letters frightened Mr. Rosendale to the point that he made phone calls to the National Suicide Prevention Lifeline and discussed with a priest the sinfulness of taking his own life.

5. To justify its actions, Nationstar produced in September of 2019 a copy of his mortgage materially different than the one he signed in 2019, dramatically expanding its lien.

---

[1] In August of 2019, Nationstar changed its name to "Mr. Cooper." According press reports, it did so because it had such a bar image it wish to spear "friendlier." In the ease of comprehension, the names "Nationstar" or "Champion" are used throughout.

6. It made blatantly untruthful statement in letters it wrote in an effort to cover up its illegal taking of Mr. Rosendale's equity and failed to disclose that his loan had been sold and was securitized in a Trust.

7. He alleges in this lawsuit that its actions in August of 2019 in taking funds from his line of credit secured by the equity in his home without notifying him and giving him an opportunity to cure the supposed default violated New York RPP 280 (a) and 3 NYCRR 79.9; aside from this incident, he alleges that it failed to establish a tax escrow pursuant to 3 NYCRR 79.9, that it failed to provide him a necessary "Lender's Limited Waiver of the Right of Foreclosure" as part of his mortgage as required by 3 NYCRR 79.7; that together with the alteration it voided the mortgage by false completion, that in "stonewalling" him in answer to Qualified Written Questions and failing to correct its error within 30 days, it violated 12 USC 2605 (e) (1) (a), that these actions and constant false threats of "acceleration" and "foreclosure" when in fact he was not in default rose to the level of infliction of emotional distress. He further alleges that whatever Trust which acquired his loan, sued here as "Nationstar HECM Acquisition Trust," violated 15 USC 1641 (g) by failing to notify him within 30 days of such action. Finally, he asks a Declaratory Judgment that because the mortgage was altered after the time he sold it is not a lien securing the note/

## JURISDICTION

8.  This court has jurisdiction pursuant to 28 USC 1331 because it involves statutes of the United States. (TILA and RESPA). Alternatively, this court has jurisdiction under 28 USC 1332 because the plaintiff and all parties are citizens of different states and the amount in controversy is more than $85,000.

## PARTIES

9.  The plaintiff, Donald P. Rosendale, resides at 4848 Route 44, Amenia, Dutchess County, New York. Mr. Rosendale is a "consumer' as identified by New York law.

10. The defendant, Mr. Cooper Group Inc. ("Nationstar") has a principal office at 8950 Cypress Waters Blvd., Coppell, TX.

11. The actual name and address of the trust sued here as "an Unspecified Nationstar HECM Acquisition Trust" is currently unknown but will be determined on discovery, and in any event, Nationstar is its loan servicer.

## FACTUAL ALLEGATIONS

12. As described by the FHA itself, "The Home Equity Conversion Mortgage program is FHA's reverse mortgage program that enables seniors who have equity in their homes to withdraw a portion of the accumulated equity. The intent of the Home Equity Conversion Mortgage program is to ease the financial burden on elderly homeowners facing increased health, housing, and subsistence

4

costs at a time of reduced income." (Federal Register, 2017.)  Unlike conventional mortgages, the borrower does not pay interest against a line of credit, but interest accumulates until he dies or sells the property.

13. At the June 4, 2009 closing, counsel for the lender provided a inaccurate property description which as well as describing other property which was not secured by the loan; when Rosendale objected , it was removed, and the mortgage was signed without a property description. Mr. Rosendale's copy of the mortgage as he was given on June 4, 2009 is attached as Exhibit A. It indicates that the property description follows Page 10, but there are no following pages.

14. In September of 2019, Nationstar sent him a copy of the mortgage containing the property description that had been removed in 2009. (Exhibit B) Illustrating that it was inserted into the mortgage at some point after Mr. Rosendale signed it, the property description appears on the wrong page sequence, Page 2, not at the send of the mortgage. The result of this, in part, is to encumber land which is in excess of the five acres pledged for his HECM loan in violation of 3 NYCRR 79.5.

15. In September of 2012, an assignment of mortgage was recorded with the Dutchess County Clerk from the original lender, MetLife to a Champion Mortgage Co. [2] Nationstar Mortgage LLC of Delaware ("Nationstar") d/b/a Champion

---

[2] The Delaware Secretary of State lists a Champion Mortgage Company, Inc.

Mortgage Company ("Champion") is one of the largest mortgage servicers in the United States, with a servicing portfolio in excess of $400 billion and more than 2.4 million customers. Champion is a division of Nationstar and specializes in servicing reverse mortgage products. No assignment of Mr. Rosendale's mortgage after 2012 is recorded.

16. On knowledge and belief, while calling itself a "lender," Nationstar does not hold any reverse mortgage loans but merely services these loans after selling them to various trusts. These have names like "Nationstar HECM Acquisition Trust 2015."

17. Because he was never informed of the sale of his mortgage from Nationstar, Mr. Rosendale does not know specifically *which* "Nationstar Acquisition Trust" actually owns his mortgage, while Nationstar through its Champion name acts as servicer for the real owner.

16. The "Helping American Families Save Their Homes Act," (15 USC §1641 (g)) is part of TILA. It requires that "in addition to other disclosures required by this subchapter, not later than 30 days after the date on which a mortgage loan is sold or otherwise transferred or assigned to a third party, the creditor that is the new owner or assignee of the debt shall notify the borrower in writing of such transfer, including the identity, address, telephone number of the new creditor; the date of transfer; how to reach an agent or party having authority

to act on behalf of the new creditor; <u>the location of the place where transfer of ownership of the debt is recorded;</u> and any other relevant information regarding the new creditor." [Emphasis added]

17. Mr. Rosendale has never received the notice required by 1641 (g) to any of the unspecified Nationstar HECM Acquisition Trusts.

18. In September of 2018 , after claiming that Mr. Rosendale has not paid his hazard insurance premium, Nationstar withdrew $2,789 from his line of credit to "slam" him into an expensive forced placed insurance policy.  Mr. Rosendale at all times had such insurance and  his insurance carrier had timely  notified Nationstar.  The servicer eventually   credited his account with the  $2,789 it had taken from his line of credit, but apparently not the interest and MIP [3] which had been charged. This transaction was accompanied on three occasions  by threats of "foreclosure" from Nationstar.  In February of 2019, Nationstar  deducted $7,800 from Mr. Rosendale's  line of credit to pay a tax bill which he had already paid. The $7,800 was eventually refunded to Mr. Rosendale's account after the County returned the check, but Nationstar ·did not fund the interest  and MIP which had been charged. This transaction was again accompanied by threats of "foreclosure."

19. In May of 2019, Nationstar once again  took $7,800  from Mr.

---

[3]  .  "MIP" is the mortgage insurance Nationstar charges Mr. Rosendale which in effect, protects the lender from loss if the property value should fall below the loan amount.

Rosendale's line of credit to pay a tax bill which wasn't due. The $7,800 was

eventually refunded to Mr. Rosendale's account after the municipality returned

the check, but did not refund the interest and MIP which had been charged This

transaction was accompanied by threats of "foreclosure" from Nationstar.

20. On September 2, 2019, Mr. Rosendale received a letter from

Champion  (Exhibit C) dated August 23, 2019 stating as follows:

> "We previously sent you notice that we have not received proof that your
> property taxes and/or property insurance…were current….Because we did
> not receive proof that the property taxes and/or insurance were current, we
> were required to advance the funds to pay them on your behalf.…**The total
> amount that has been advanced to date on your behalf is $0.00. You
> must take immediate action to resolve this matter or your loan may be
> declared 'Due & Payable.'** If your loan is declared 'Due and Payable' it
> could result in a foreclosure action on your home." [Bold face in original]

21. It was accompanied by ominous letters urging Mr. Rosendale to contact

HUD counselors to "avoid foreclosure." Mr. Rosendale alleges there was no need

to send these threatening forms because he was not delinquent in his obligations,

and that their purpose was to frighten him and intimidate him.

22. Immediately on receipt of that letter, on September 2, 2019, Mr.

Rosendale "faxed" proof that his insurance was paid and his property taxes were

not in default (Exhibit D) and thought nothing more of it.

23. In September, a tree came down wiping out the power lines to his home

and damaging the pole to which they were attached. The necessary repairs were

not covered by insurance and so on September 9, 2019 he sent a fax to Champion

asking for a $5,000 advance from his line of credit secured by the equity in his home. It was only a week or so later when the $5,000 was not deposited in his account that Mr. Rosendale learned that Nationstar had dissipated all but a few hundred dollars in his credit line by paying taxes which were nor due. Without the requested advance he has not been able to fully restore heat and power to his property.

24.  Simultaneous with learning that Nationstar had wiped out his credit lines by paying taxes which were not in default, Mr. Rosendale received a letter from Kausur Begum, a customer relations specialist for Champion  (Exhibit E) dated September18, 2019 stating:

> "..[o]n August 22, 2019, funds of $7,473.60 were advanced from  the  Line of Credit to Dutchess County Commissioner's Office. A Property Charge Delinquency Notice dated August 23, 2019 was mailed to you."

25. Presumably, this refers to Exhibit C, above.  Ms. Begum's letter has attached to it five letters from 2018 warning him that  Champion would impose forced places insurance  on his loan  a year ago unless he provided proof of insurance. ***There were no warning letters attached  concerning advance payment his school taxes, and in fact, other than Exhibit C, which was sent after the fact, there were none.***

26. Mr. Rosendale alleges that the discussion of Champion's 2018 insurance

fiasco and attaching the notice sent concerning insurance non-payment is an

attempt to distract from the lack of required warnings in 2019 before pre-paying

his taxes.

27. Because Mr. Rosendale was over 70 years of age at the time he

took the loan, it is governed by New York RPP 280 (a). That rule is interpreted by

3 NYCRR 79, which holds in Para. 9 (i):

> "If the mortgagor(s) fails to pay taxes or maintain all required insurance,
> then the lender must within 10 business days of learning of such event, give
> written notice of such failure to the mortgagor(s) and the third-party, if any,
> designated by the mortgagor(s) to receive notice of any event that could lead
> to termination. The lender must give the mortgagor(s) 30 calendar days to
> cure such failure...."

28. This situation is exacerbated because not only did Champion not give

Mr. Rosendale prior notice that it intended to, there was no delinquency in the first

place.

29. In researching RPP 280 (a) which is intended to protect seniors from

abuses in foreclosure actions, Mr. Rosendale noted that the statute seemed to

require Nationstar to create an escrow account.[4]

30. In order to find out whether that requirement applied to him, Mr.

---

[4] See RPP 280 (a) Para. (e) holding that the "lender shall maintain an escrow account for the purposes of paying real property taxes, insurance premiums of the property securing the reverse mortgage loan...."

Rosendale sent an e-mail to the New York State Department of Financial Services (DFS) and on September 19, 2019 , a Qualified Written Request pursuant to 12 USC 2605 to Nationstar by fax. (Exhibit F).

31. On the evening of September 25, 2019, Mr. Rosendale received a telephone call from a Chandler Williams of Nationstar. According to social media, Mr. Williams is the director of customer relations for the servicer. Mr. Williams said he had been contacted directly by the DFS because the agency was concerned about the issues raised in Rosendale's e-mail to it.

32. Mr. Williams conceded that Nationstar had acted improperly in taking funds from Mr. Rosendale's secured line of credit without notifying him in advance, that Nationstar wished to "fix things . [5] Asked about the escrow, he said that Nationstar had never established an escrow in any reverse mortgage.

33. Mr. Rosendale then received in response to his QWR asking for an accounting of the trust an incomprehensible letter [Exhibit G] dated September 21, 2019. It reads as follows: **"We have received your request to update the account with authorization of the Estate of the borrower(s). This letter is to inform you that your request has been denied.** The request has been denied due to Incomplete Documentation." [Bold face in original].

34. Mr. Rosendale told the Mr. Williams that if he really wanted

---

[5] Since Nationstar records all incoming calls from borrower, it is likely that a transcription of this call exists

to "fix things" the first step would be to restore the funds taken from his account

so that he could draw down $5,000 to make the emergency repairs to his property.

As of today he has received no funds nor any further explanation of how

Nationstar intends to "fix things."

35. On October 3, 2019, Mr. Rosendale received a letter from Nationstar

dated September 27, 2019 falsely alleging he did not have property insurance and

that Nationstar intended to buy forced placed insurance. (Exhibit H). On opening

the notice in front of a USPS rural delivery postman, Mr. Rosendale broke into

tears.

36. This fifth notice proves to be "déjà vu all over again." Mr. Rosendale has

had hazard insurance at all times (Exhibit I) and his insurance company advised

him that it had notified Nationstar, just as it did in 2018.

### AS AND FOR A FIRST CAUSE OF ACTION
### As Against Nationstar
### Violation of RESPA - 12 USC 2605

37 Plaintiff repeats and re-alleges the allegations set forth above as if more

fully set forth below.

38. A "Qualified Written Request" pursuant to 12 USC 2605 (e) is written

correspondence that "includes, or otherwise enables the servicer to identify, the

name and account of the borrower; and includes a statement of the reasons for the

belief of the borrower ... that the account is in error or provides sufficient detail to

the servicer regarding other information sought by the borrower." Any reasonably stated written request for account information can be a qualified written request.

38. Mr. Rosendale's September 2, 2019 fax did not in fact allege that the account was in error, because at that time he didn't even know the funds had been stripped from his reserve. That notwithstanding, Ms. Begum appears to have treated it as a QWR. The five business days to respond to a QWR had expired at the time Ms. Begum had written her letter and the 30-day clock which begins upon receipt of a "notice of error" (i.e., a QWR in which the borrower "asserts an error relating to the servicing of a mortgage loan," (See 12 CFR 1024.35)), the servicer must "make appropriate corrections in the account of the borrower, including the crediting of any late charges or penalties" expired on October 2, 2019.

39. Since Ms. Begum implicitly admitted Nationstar had taken monies out of Mr. Rosendale's line of credit without prior notice  (By conceding that it had taken the funds out of his line of credit on August 22, 2019 when the "notice to cure" came a day after the funds had already  been removed) and Mr. Williams in his phone call explicitly admitted the same thing, the "appropriate correction" would have been to restore the funds  to the plaintiff's account, which has not happened.

40.   Given the ordinary meaning of "investigation" and the purposes of RESPA, § 2605 (e)  (2) (B)-(C) imposes a substantial obligation of mortgage servicers  to conduct a reasonably thorough investigation before responding to a borrower's QWR. See "Regulation X."

41. Ms. Begum's response established that funds were taken from Mr. Rosendale's line of credit secured by the equity in his home. It obfuscates this error by a lengthy, irrelevant  discussion of the force-placed insurance imposed  in 2018, attaching warnings letters from that incident  without  any warning letters for the August 2019 taking,  provides no explanation the authority for taking the funds without first contacting  Mr. Rosendale, and offers no plan to correct the error.

42.  In Nationstar's answer  to Mr. Rosendale's more formal QWR (concerning an escrow)received on  September 21, 2019) is  not only incomprehensible  gobbledygook, but alibis that he did not provide enough information.

43.  However,  12 CFR 1024.35 governing Qualified Written Requests holds that a the servicer cannot  "Determine that no error occurred because the borrower failed to provide any requested information without conducting a reasonable investigation pursuant to paragraph (e)(1)(i)(B) of this section."

44.  Taken together, these show a "pattern or practice of noncompliance"

with RESPA's requirement § 2605(f)(1)(B) allowing Mr. Rosendale to collect

damages in a private right of action. See12 U.S.C. §§ 2605[f][1], 2605[f][3]).

45. Mr. Rosendale's "damages" in this regard are Nationstar's failure to

refund the prematurely withdrawn funds to his account in a timely fashion to

enable emergency repairs on his home and he has struggled for weeks  without

heat and water to the main part of his home.

## AS AND FOR A SECOND CAUSE OF ACTION
### As Against Unspecified Nationstar HECM Acquisition Trust
### Violation of TILA

43. Plaintiff repeats and re-alleges the allegations set for above as if more

fully set forth below.

44.The "Helping American Families Save Their Homes Act," (15 USC

§1641 (g)) is part of TILA. It requires that "in addition to other disclosures

required by this subchapter, not later than 30 days after the date on which a

mortgage loan is sold or otherwise transferred or assigned to a third party, the

creditor that is the new owner or assignee of the debt shall notify the borrower in

writing of such transfer, including the identity, address, telephone number of the

new creditor; the date of transfer; how to reach an agent or party having authority

to act on behalf of the new creditor; the location of the place where transfer of

ownership of the debt is recorded; and any other relevant information regarding the

new creditor."

45. The last recorded assignment of Mr. Rosendale's mortgage was in 2012, from MetLife to Champion Mortgage Company. The SEC requires publicly listed companies such as the Mr. Cooper group to quarterly publish the details of its activities. On August 2, 2019 The Mr. Cooper Group filed a Form 10-k outlining its recent activities and reorganization. It can be found on-line at https://seekingalpha.com/filing/4587404

46. The 10Q explains that Nationstar does not own any HECM reverse mortgages but merely services them through its subsidiary, Champion Mortgage, writing that "The Company's reverse mortgage interests are primarily comprised of HECM loans that are insured by FHA and guaranteed by Ginnie Mae upon securitization."

47. "Securitization" is the bundling of mortgage loans which are then sold to investors/

48. Nationstar calls these securitized loans "HECM Backed Mortgage Securities" or "HMBS' and describes them further in their 10Q as follows:

> "The Company does not own these loans, but due to HMBS program buyout requirements, such interests are consolidated on the Company's balance sheet. The Company does not originate reverse mortgages, but during the six months ended June 30, 2019 and 2018, a total of $149 and $174 in UPB associated with new draws on existing loans was transferred to GNMA and securitized by the Company and Predecessor, respectively." [Emphases added]

49. Since Nationstar does not own any reverse mortgages, it follows that Mr. Rosendale's mortgage at some point has necessarily been assigned to another entity, and Mr. Rosendale was never notified.

50. Pursuant to 15 USC 1640 (2) (A), Mr. Rosendale is entitled "twice the amount of any finance charge in connection with the transaction" because of the failure to notify him.

### AS AND FOR A THIRD CAUSE OF ACTION –
### As Against Nationstar – Gross Negligence

51. Plaintiff repeats and re-alleged the allegations set forth above as if more fully set forth below.

52. Nationstar as loan service owes a duty to Mr. Rosendale. Department of Financial Security rule § 419.2 titled " Servicer duty of fair dealing" hold that " A Servicer has a duty of good faith and fair dealing in its communications, transactions, and course of dealings with each borrower in connection with the servicing of the borrower's mortgage loan. This includes, but is not limited to, the duty to: (a) Safeguard and account for any money handled for the borrower; (b) Follow reasonable and lawful instructions from the borrower consistent with the underlying note and mortgage; [and] (c) Act with reasonable skill, care and diligence..."

53. Ms. Begum states that Nationstar [Exhibit E, cited earlier] "because we did not receive proof that the property taxes were current...in order to protect

our interest in the property, if property taxes become delinquent, then we are at risk of having the County place a lien against the property."

53. There is no language in the mortgage which would support Ms. Begum's contention that because Nationstar is "a risk" it might advance monies for property taxes that are not due without giving Mr. Rosendale the prior notice required by New York's Real Property Law.

54. In other words, despite the requirements of § 419 to "safeguard" Mr. Rosendale's secured line of credit, Nationstar took an action to protect itself without notifying him in advance in violation of New York law and the contract deducted funds out of his secured credit line to pay taxes which weren't due.

### AS AND FOR A FOURTH CASE OF ACTION
#### As Against Nationstar – Breach of the Covenant of Good Faith and Fair Dealing in Contract

55. Plaintiff repeats and re-alleges the allegations set forth above as if more fully set forth below.

56. In New York, every contract carries with it an implied covenant of good faith and fair dealing. UCC 1-304. The covenant is breached when a party acts in a manner that deprives the other party of the right to receive benefits under their agreement. While the mortgage contract is between Mr. Rosendale and the unknown HMBS, Nationstar is clearly "the agent for one who is in privity of contract with him. . . . ."

18

57. The allegations here are essentially the same as those in the Third

Cause Of action, as above, also noting that the DFS imposes such a requirement.

## AS AND FOR A FIFTH CAUSE OF ACTION
### As Against Nationstar and the
### Unspecified Nationstar HECM Trust
### A Declaratory Judgment that because of the alteration
### The mortgage does not secure the Note

58. Plaintiff repeats and re-alleges the allegations set forth above as if

more fully set forth below.

59. As described above,  at the June 2009 closing, the lender's lawyer

submitted an inaccurate property description.   The title search presented by

counsel for the lender was seriously inaccurate in two respects. First, it attributed

to Mr. Rosendale "…that parcel of land…as being the ceded portion therein

designate as 'abandoned road.'"  The "abandoned road"  was the early  20th century

route of Dutchess Route 44, which the country had moved slightly to the north.   It

then was supposed to cede the abandoned section to Mr. Rosendale but never did,

which he had discovered in trying to subdivide the property.[6]

60. Second, a HECM loan is limited by an appraisal only of the residence

and  5 acres of land.  Anything else  is  "excess property. NYCRR 79.5(g)  states

that "All lenders shall be prohibited from using or attaching any property or asset

---

[6]  Dutchess County finally corrected this error in around March of 2019. If the mortgage is
corrected  he will be free to sell or otherwise encumber his land. As it now stands, if he sold any
of his exceed property it would trigger foreclosure.

of the mortgagor except the real property securing the reverse mortgage loan in satisfaction of a reverse mortgage. obligation." [Emphasis added] The lender was attempting to place a lien on a larger parcel of land than the five acres pledged.

60. Because of Mr. Rosendale's objections, the inaccurate property description was removed. It reappears *in the wrong place* in the copy of the mortgage sent to Mr. Rosendale I n August of 2019.

61. It illustrate that the Property Description into the mortgage at some point *after the closing* the court is respectfully asked to examine the bar code and numbering on the mortgage (Exhibit A) which Ms. Begum produced in 2019, It will note that the page numbering begins with "1,5," that is, the fifth page of the document being produced.

62. The purported "property description" is the second page 1.6, and the rest of the mortgage follows through in order to end at 1,15, which states "See attached Schedule A." There is no Page "1.17." Exhibit B, the copy of the mortgage Mr. Rosendale was given at the closing, does not have "Attachment A." Further, the Notary Public's stamp does not appear on Mr. Rosendale's copy of the mortgage. [7]

---

[7] The notary's attestation does not follow the required form of RPP 309-a which became effective in September of 1999.

63. New York RPP 288 (1) requires that "The acknowledgment or proof, within this state, of a conveyance of real property situate in this state may be made...(before) a notary public."

64. The mortgage is notarized, but not while it included the property description relied on by Ms. Begum in 2019. As such, there is conveyance of Mr. Rosendale's property to secure the note.

**AS A SIXTH CAUSE OF ACTION**
**As Against Nationstar**
**Infliction of Emotional Distress**

65. Plaintiff repeats and re-alleges the allegations set forth above as if more fully set forth below.

66. Nationstar has been guilty of conduct which a person of normal sensibilities would find "outrageous" --- five different acts within a single year in which it made threats to foreclosure on Mr. Rosendale's home unless he paid bills which (on three of those occasions) if it had investigated would have found he'd already paid.

67. Nationstar is in a position of power relative to Mr. Rosendale. It has demonstrated it can take money from his line of credit secured by the equity in his home without notifying him. He is emotionally vulnerable, not just because of his age and because his emotional state after recent radiation treatment for metastasized prostate cancer in January of 2019. During this period Nationstar has

been engaged in repetitive, continuing conduct that might have been tolerable when committed once but became intolerable when committed numerous times, and threatened economic harm to his home.

68. The result of this has been severe depression in which Mr. Rosendale has been driven to counseling with suicide prevention hotlines.

## SUMMARY

69. There is no question that as an octogenarian on Social Security, Mr. Rosendale has struggled to pay his property taxes. But he's always paid them, and he has never allowed his hazard insurance to lapse. That notwithstanding, Nationstar four times in one year Nationstar has taken funds representing the equity in his home when there was no delinquency and is threatening to do the same thing now. It has to be stopped as Mr. Rosendale does not believe can emotionally handle yet another foreclosure threat.

70. Wherefore, Mr. Rosendale asks as follows:

(a) Payment of actual, statutory and (where permitted) punitive damages to be set by the court, but in no instance, less than $1,000,000.

(b) A declaratory judgment that because no property description was attached to the mortgage when Mr. Rosendale signed it and it was notarized, the Mortgage he executed in June of 2009 is not security for the Note in this action.

(c) Together with such other and further relief as the court deems just.

A jury trial is demanded.

Respectfully,

Donald Rosendale   October 4, 2019

# EXHIBIT A

# REVERSE MORTGAGE
# (HOME EQUITY CONVERSION)

Record and Return to:
MetLife Home Loans, a Division of MetLife Bank, N.A.
P.O. Box 8157
Edmond, OK 73083-8157

**FHA Case Number: 371-4056898-952/255**
**1902002494**

---

**State of New York**    ## ADJUSTABLE RATE REVERSE MORTGAGE

THIS MORTGAGE ("Security Instrument") is given on June 04, 2009. The mortgagor is **Donald P. Rosendale**, whose address is **4848 Route 44, AMENIA, NY 12501** ("Borrower"). This Security Instrument is given to **MetLife Home Loans, a Division of MetLife Bank, N.A.**, which is organized and existing under the laws of **the United States of America**, and whose address is **501 U.S. Highway 22 (1-W COPS), Bridgewater, NJ 08807** ("Lender"). Borrower has agreed to repay to Lender amounts which Lender is obligated to advance, including future advances, under the terms of a Home Equity Conversion Loan Agreement dated the same date as this Security Instrument ("Loan Agreement"). The agreement to repay is evidenced by Borrower's Note dated the same date as this Security Instrument ("Note"). This Security Instrument secures to Lender: (a) the repayment of the debt evidenced by the Note, including all future advances, with interest at a rate subject to adjustment, and all renewals, extensions and modifications of the Note, up to a maximum principal amount of **Eight Hundred Sixty-Two Thousand Five Hundred and 00/100 Dollars (U.S.$862,500.00)**; (b) the payment of all other sums, with interest, advanced under Paragraph 5 to protect the security of this Security Instrument or otherwise due under the terms of this Security Instrument; and (c) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. The full debt, including all amounts described in (a), (b), and (c) above, if not paid earlier, is due and payable on **June 26, 2086.** For this purpose, Borrower does hereby mortgage, grant and convey to Lender, with power of sale, the following described property located in **Dutchess** County, New York, which has the address of:

**4848 Route 44, AMENIA, NY, 12501**, and is described more fully on Exhibit A attached to and hereby incorporated into this Mortgage ("Property Address").

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, rights, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

**CREDIT LINE MORTGAGE**
This Security Instrument secures the debt described in the Security Instrument, Note and Loan Agreement and contemplates a series of advances which will be advanced from time to time from and after the date of this Security Instrument not to exceed in the aggregate at any one time the maximum principal amount stated in the Security Instrument, the Note and the Agreement.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

New York 1st Mortgage
Page 1

1. **Payment of Principal and Interest.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note.

2. **Payment of Property Charges.** Borrower shall pay all property charges consisting of taxes, ground rents, flood and hazard insurance premiums, and special assessments in a timely manner, and shall provide evidence of payment to Lender, unless Lender pays property charges by withholding funds from monthly payments due to the Borrower or by charging such payments to a line of credit as provided for in the Loan Agreement.

3. **Fire, Flood and Other Hazard Insurance.** Borrower shall insure all improvements on the Property, whether now in existence or subsequently erected, against any hazards, casualties, and contingencies, including fire. This insurance shall be maintained in the amounts, to the extent and for the periods required by Lender or the Secretary of Housing and Urban Development ("Secretary"). Borrower shall also insure all improvements on the Property, whether now in existence or subsequently erected, against loss by floods to the extent required by the Secretary. All insurance shall be carried with companies approved by Lender. The insurance policies and any renewals shall be held by Lender and shall include loss payable clauses in favor of, and in a form acceptable to, Lender.

In the event of loss, Borrower shall give Lender immediate notice by mail. Lender may make proof of loss if not made promptly by Borrower. Each insurance company concerned is hereby authorized and directed to make payment for such loss to Lender, instead of to Borrower and Lender jointly. Insurance proceeds shall be applied to restoration or repair of the damaged Property, if the restoration or repair is economically feasible and Lender's security is not lessened. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied first to the reduction of any indebtedness under a Second Note and Second Security Instrument held by the Secretary on the Property and then to the reduction of the indebtedness under the Note and this Security Instrument. Any excess insurance proceeds over an amount required to pay all outstanding indebtedness under the Note and this Security Instrument shall be paid to the entity legally entitled thereto.

In the event of foreclosure of this Security Instrument or other transfer of title to the Property that extinguishes the indebtedness, all right, title and interest of Borrower in and to insurance policies in force shall pass to the purchaser.

4. **Occupancy, Preservation, Maintenance and Protection of the Property; Borrower's Loan Application; Leaseholds.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence after the execution of this Security Instrument and Borrower (or at least one Borrower, if initially more than one person are Borrowers) shall continue to occupy the Property as Borrower's principal residence for the term of the Security Instrument. "Principal residence" shall have the same meaning as in the Loan Agreement.

Borrower shall not commit waste or destroy, damage or substantially change the Property or allow the Property to deteriorate, reasonable wear and tear excepted. Borrower shall also be in default if Borrower, during the loan application process, gave materially false or inaccurate information or statements to Lender (or failed to provide Lender with any material information) in connection with the loan evidenced by the Note, including, but not limited to, representations concerning Borrower's occupancy of the Property as a principal residence. If this Security Instrument is on a leasehold, Borrower shall comply with the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and fee title shall not be merged unless Lender agrees to the merger in writing.

5. **Charges to Borrower and Protection of Lender's Rights in the Property.** Borrower shall pay all governmental or municipal charges, fines and impositions that are not included in Paragraph 2. Borrower shall pay these obligations on time directly to the entity which is owed the payment. If failure to pay would adversely affect Lender's interest in the Property, upon Lender's request Borrower shall promptly furnish to Lender receipts evidencing these payments. Borrower shall promptly discharge any lien which has priority over this Security Instrument in the manner provided in Paragraph 12(c).

If Borrower fails to make these payments or the property charges required by Paragraph 2, or fails to perform any other covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, for condemnation or to enforce laws or regulations), then Lender may do and pay whatever is necessary to protect the value of the Property and Lender's rights in the Property, including payment of taxes, hazard insurance and other items mentioned in Paragraph 2.

To protect Lender's security in the Property, Lender shall advance and charge to Borrower all amounts due to the Secretary for the Mortgage Insurance Premium ("MIP") as defined in the Loan Agreement as well as all sums due to the loan servicer for servicing activities ("Servicing Fee") as defined in the Loan Agreement.  Any amounts disbursed by Lender under this Paragraph shall become an additional debt of Borrower as provided for in the Loan Agreement and shall be secured by this Security Instrument.

**6. Inspection.**  Lender or its agent may enter on, inspect or make appraisals of the Property in a reasonable manner and at reasonable times provided that Lender shall give the Borrower notice prior to any inspection or appraisal specifying a purpose for the inspection or appraisal which must be related to Lender's interest in the Property.  If the Property is vacant or abandoned or the loan is in default, Lender may take reasonable action to protect and preserve such vacant or abandoned Property without notice to the Borrower.

**7. Condemnation.**  The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation, or other taking of any part of the Property, or for conveyance in place of condemnation shall be paid to Lender. The proceeds shall be applied first to the reduction of any indebtedness under the Second Note and Second Security Instrument held by the Secretary on the Property, and then to the reduction of the indebtedness under the Note and this Security Instrument. Any excess proceeds over an amount required to pay all outstanding indebtedness under the Note and this Security Instrument shall be paid to the entity legally entitled thereto.

**8. Fees.**  Lender may collect fees and charges authorized by the Secretary.

**9. Grounds for Acceleration of Debt.**
(a) **Due and Payable.**  Lender may require immediate payment in full of all sums secured by this Security Instrument if:
    (i)  A Borrower dies and the Property is not the principal residence of at least one surviving Borrower; or

    (ii) All of a Borrower's title in the Property (or his or her beneficial interest in a trust owning all or part of the Property) is sold or otherwise transferred and no other Borrower retains (a) title to the Property in fee simple, (b) a leasehold under a lease for not less than 99 years which is renewable or a lease having a remaining period of not less than 50 years beyond the date of the 100th birthday of the youngest Borrower, or (c) a life estate in the Property (or retains a beneficial interest in a trust with such an interest in the Property).

(b) **Due and Payable with Secretary Approval.**  Lender may require immediate payment in full of all sums secured by this Security Instrument, upon approval by an authorized representative of the Secretary, if:
    (i)  The Property ceases to be the principal residence of a Borrower for reasons other than death and the Property is not the principal residence of at least one other Borrower; or

    (ii) For a period of longer than twelve (12) consecutive months, a Borrower fails to physically occupy the Property because of physical or mental illness and the Property is not the principal residence of at least one other Borrower; or

    (iii)  An obligation of the Borrower under this Security Instrument is not performed.

(c) **Notice to Lender.**  Borrower shall notify Lender whenever any of the events listed in subparagraphs Paragraph 9(a)(ii) and (b) occur.
(d) **Notice to Secretary and Borrower.**  Lender shall notify the Secretary and Borrower whenever the loan becomes due and payable under Paragraph 9(a)(ii) and (b).  Lender shall not have the right to commence foreclosure until Borrower has had thirty (30) days after notice to either:
    (i)  Correct the matter which resulted in the Security Instrument coming due and payable; or

    (ii)    Pay the balance in full; or

    (iii)   Sell the Property for the lesser of the balance or 95% of the appraised value and apply the net proceeds of the sale toward the balance; or

    (iv)   Provide the Lender with a deed in lieu of foreclosure.

(e) **Trusts.**  Conveyance of a Borrower's interest in the Property to a trust which meets the requirements of the Secretary, or conveyance of a trust's interests in the Property to a Borrower, shall not be considered a conveyance for purposes of this Paragraph 9. A trust shall not be considered an occupant or be considered as having a principal residence for purposes of this Paragraph 9.

(f) **Mortgage Not Insured.**  Borrower agrees that should this Security Instrument and the Note not be eligible for insurance under the National Housing Act within eight (8) months from the date hereof, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. A written statement of any authorized agent of the Secretary dated subsequent to eight (8) months from the date hereof, declining to insure this Security Instrument and the Note, shall be deemed conclusive proof of such ineligibility. Notwithstanding the foregoing, this option may not be exercised by Lender when the unavailability of insurance is solely due to Lender's failure to remit a mortgage insurance premium to the Secretary.

**10. No Deficiency Judgments.**  Borrower shall have no personal liability for payment of the debt secured by this Security Instrument. Lender may enforce the debt only through sale of the Property. Lender shall not be permitted to obtain a deficiency judgment against Borrower if the Security Instrument is foreclosed. If this Security Instrument is assigned to the Secretary upon demand by the Secretary, Borrower shall not be liable for any difference between the mortgage insurance benefits paid to Lender and the outstanding indebtedness, including accrued interest, owed by Borrower at the time of the assignment.

**11. Reinstatement.**  Borrower has a right to be reinstated if Lender has required immediate payment in full. This right applies even after foreclosure proceedings are instituted. To reinstate this Security Instrument, Borrower shall correct the condition which resulted in the requirement for immediate payment in full. Foreclosure costs and reasonable and customary attorneys' fees and expenses properly associated with a foreclosure proceeding shall be added to the principal balance. Upon reinstatement by Borrower, this Security Instrument and the obligations that it secures shall remain in effect as if Lender had not required immediate payment in full. However, Lender is not required to permit reinstatement if:(i) Lender has accepted reinstatement after the commencement of foreclosure proceedings within two (2) years immediately preceding the commencement of a current foreclosure proceeding, (ii) reinstatement will preclude foreclosure on different grounds in the future, or (iii) reinstatement will adversely affect the priority of the Security Instrument.

**12. First Lien Status**

(a) **Modification.**  Borrower agrees to extend this Security Instrument in accordance with this Paragraph 12(a). If Lender determines that the original lien status of the Security Instrument is jeopardized under state law (including but not limited to situations where the amount secured by the Security Instrument equals or exceeds the maximum principal amount stated or the maximum period under which loan advances retain the same lien priority initially granted to loan advances has expired) and state law permits the original lien status to be maintained for future loan advances through the execution and recordation of one or more documents, then Lender shall obtain title evidence at Borrower's expense. If the title evidence indicates that the Property is not encumbered by any liens (except this Security Instrument, the Second Security Instrument described in Paragraph 13(a) and any subordinate liens that the Lender determines will also be subordinate to any future loan advances), Lender shall request the Borrower to execute any documents necessary to protect the priority of the lien status of future loan advances. Borrower agrees to execute such documents. If state law does not permit the original lien status to be extended to future loan advances, Borrower will be deemed to have failed to have performed an obligation under this Security Instrument.

(b) **Tax Deferral Programs.**  Borrower shall not participate in a real estate tax deferral program, if any liens created by the tax deferral are not subordinate to this Security Instrument.

(c) **Prior Liens.** Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender; (b) contests in good faith the lien by, or defends against enforcement of the lien in, legal proceedings which in the Lender's opinion operate to prevent the enforcement of the lien or forfeiture of any part of the Property; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to all amounts secured by this Security Instrument. If Lender determines that any part of the Property is subject to a lien which may attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Borrower shall satisfy the lien or take one or more of the actions set forth above within ten (10) days of the giving of notice.

**13. Relationship to Second Security Instrument.**

(a) **Second Security Instrument.** In order to secure payments which the Secretary may make to or on behalf of Borrower pursuant to Section 255(i)(1)(A) of the National Housing Act and the Loan Agreement the Secretary has required Borrower to execute a Second Note and a Second Security Instrument on the Property.

(b) **Relationship of First and Second Security Instruments.** Payments made by the Secretary shall not be included in the debt under the Note unless:

    (i) This Security Instrument is assigned to the Secretary; or

    (ii) The Secretary accepts reimbursement by the Lender for all payments made by the Secretary.

If the circumstances described in (i) or (ii) occur, then all payments by the Secretary, including interest on the payments but excluding late charges paid by the Secretary, shall be included in the debt under the Note.

(c) **Effect on Borrower.** Where there is no assignment or reimbursement as described in (b)(i) or (ii) and the Secretary makes payments to Borrower, then Borrower shall not:

    (i) Be required to pay amounts owed under the Note, or pay any rents and revenues of the Property under Paragraph 19 to Lender or a receiver of the Property, until the Secretary has required payment in full of all outstanding principal and accrued interest under the Second Note; or

    (ii) Be obligated to pay interest or shared appreciation under the Note at any time, whether accrued before or after the payments by the Secretary, and whether or not accrued interest has been included in the principal balance under the Note.

(d) **No Duty of the Secretary.** The Secretary has no duty to Lender to enforce covenants of the Second Security Instrument or to take actions to preserve the value of the Property, even though Lender may be unable to collect amounts owed under the Note because of restrictions in this Paragraph 13.

**14. Forbearance by Lender Not a Waiver.** Any forbearance by Lender in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy.

**15. Successors and Assigns Bound; Joint and Several Liability.** The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender. Borrower may not assign any rights or obligations under this Security Instrument or under the Note, except to a trust that meets the requirements of the Secretary. Borrower's covenants and agreements shall be joint and several.

**16. Notices.** Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address all Borrowers jointly designate. Any notice to Lender shall be given by first class mail to Lender's address stated herein or any address Lender designates by notice to Borrower. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this Paragraph 16.

**17. Governing Law; Severability.** This Security Instrument shall be governed by Federal law and the law of the jurisdiction in which the Property is located. In the event that any provision or clause of this Security Instrument or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Note are declared to be severable.

**18. Borrower's Copy.** Borrower shall be given one conformed copy of the Note and this Security Instrument.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**19. Assignment of Rents.** Borrower unconditionally assigns and transfers to Lender all the rents and revenues of the Property. Borrower authorizes Lender or Lender's agents to collect the rents and revenues and hereby directs each tenant of the Property to pay the rents to Lender or Lender's agents. However, prior to Lender's notice to Borrower of Borrower's breach of any covenant or agreement in the Security Instrument, Borrower shall collect and receive all rents and revenues of the Property as trustee for the benefit of Lender and Borrower. This assignment of rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of breach to Borrower: (a) all rents received by Borrower shall be held by Borrower as trustee for benefit of Lender only, to be applied to the sums secured by this Security Instrument; (b) Lender shall be entitled to collect and receive all of the rents of the Property; and (c) each tenant of the Property shall pay all rents due and unpaid to Lender or Lender's agent on Lender's written demand to the tenant.

Borrower has not executed any prior assignment of the rents and has not and will not perform any act that would prevent Lender from exercising its rights under this Paragraph 19.

Lender shall not be required to enter upon, take control of or maintain the Property before or after giving notice of breach to Borrower. However, Lender or a judicially appointed receiver may do so at any time there is a breach. Any application of rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of rents of the Property shall terminate when the debt secured by this Security Instrument is paid in full.

**20. Foreclosure Procedure. If all of the conditions stated in subparagraphs (a), (b), and (c) of this Paragraph 20 are met, Lender may require Borrower to pay immediately the entire amount then remaining unpaid under the Note and under this Security Instrument. Lender may do this without making any further demand for payment ("Immediate Payment in Full").**

**If Lender requires Immediate Payment in Full, Lender may bring a lawsuit to take away all of Borrower's remaining rights in the Property and have the Property sold. At this sale, Lender or another person may acquire the Property. This is known as "Foreclosure and Sale". In any lawsuit for Foreclosure and Sale, Lender will have the right to collect all costs and disbursements and additional allowances allowed by applicable law and will have the right to add all reasonable attorneys' fees to the amount Borrower owes Lender, which fee shall become part of the sums secured by this Security Instrument.**

Lender may require Immediate Payment in Full under this Paragraph 20 only if all of the following conditions are met:

(a) Borrower fails to keep any promise or agreement made in this Security Instrument, the Note or the Loan Agreement, including, but not limited to, the promises to pay the Sums Secured when due, or if another default occurs under this Security Instrument;

(b) Lender sends to Borrower, in the manner described in Paragraph 16 of this Security Instrument, a notice that states:

    (i)    The promise or agreement that borrower failed to keep or the default that has occured;

    (ii)    The action that Borrower must take to correct that default;

    (iii)  **A date by which Borrower must correct the default. That date will be at least 30 days from the date on which the notice is given;**

    (iv)  **That if Borrower does not correct the default by the date stated in the notice, Lender may require Immediate Payment in Full, and Lender or another person may acquire the Property by means of Foreclosure and Sale;**

    (v)  **That if Borrower meets the conditions stated in Paragaph 11 of this Security Instrument, Borrower will have the right to have Lender's enforcement of this Security Instrument stopped and to have the Note and this Security Instrument remain fully effective as if immediate payment in full had never been required; and**

    (vi)  **That Borrower has the right in any lawsuit for Foreclosure and Sale to argue that Borrower did keep his or her promises and agreements under the Note, under this Security Instrument or under the Loan Agreement, and to present any other defenses that Borrower may have; and**

**(c)  Borrower does not correct the default stated in the notice from Lender by the date stated in that notice.**

**21.  Lien Priority.**  The full amount secured by this Security Instrument shall have the same priority over any other liens on the Property as if the full amount had been disbursed on the date the initial disbursement was made, regardless of the actual date of any disbursement. The amount secured by this Security Instrument shall include all direct payments by Lender to Borrower and all other loan advances permitted by this Security Instrument for any purpose. This lien priority shall apply notwithstanding any State constitution, law or regulation, except that this lien priority shall not affect the priority of any liens for unpaid State or local governmental unit special assessments or taxes.

**22.  Adjustable Rate Feature.**  Under the Note, the initial stated interest rate of **Three and 066/1000** percent **(3.066%)** which accrues on the unpaid principal balance ("Initial Interest Rate") is subject to change, as described below. When the interest rate changes, the new adjusted interest rate will be applied to the total outstanding principal balance. Each adjustment to the interest rate will be based upon the One-Month London Interbank Offered Rate ("LIBOR") as made available in the "Money Rates" section of the Wall Street Journal ("Index") plus a margin.. If the Index is no longer available, Lender will be required to use any index prescribed by the Department of Housing and Urban Development. The new index will have a historical movement substantially similar to the original index, and the new index and margin will result in an annual percentage rate that is substantially similar to the rate in effect at the time the original index becomes unavailable.

Lender will perform the calculations described below to determine the new adjusted interest rate. The interest rate may change on the first day of **SEPTEMBER 1, 2009,** and on __ that day of each succeeding year   **X**   the first day of each succeeding month ("Change Date") until the loan is repaid in full.

The value of the Index will be determined, using the most recent Index figure available thirty (30) days before the Change Date ("Current Index"). Before each Change Date, the new interest rate will be calculated by adding a margin to the Current Index. The sum of the margin plus the Current Index, subject to the rate limitations below, will be called the "Calculated Interest Rate" for each Change Date. The Calculated Interest Rate will be compared to the interest rate in effect immediately prior to the current Change Date (the "Existing Interest Rate").

    ___      **Annually Adjusting Variable Rate Feature** - The Calculated Interest Rate will never increase or decrease by more than two percentage points (2.0%) on any single Change Date. The interest rate will never be more than five percentage points (5.0%) higher or lower than the Initial Interest Rate stated in Paragraph 2 of the Note.

    **X**      **Monthly Adjusting Variable Rate Feature** - The Calculated Interest Rate will never increase above **13.066%**.

The Calculated Interest Rate will be adjusted if necessary to comply with the rate limitation(s) described above and will be in effect until the next Change Date. At any Change Date, if the Calculated Interest Rate equals the Existing Interest Rate, the interest rate will not change.

**23. Lender's Obligation to Discharge this Security Instrument.** When Lender has been paid all amounts due under the Note and under this Security Instrument, Lender will discharge this Security Instrument by delivering a certificate stating that this Security Instrument has been satisfied. Borrower will pay all costs of recording the discharge in the proper official records. If Lender so requires, Lender may require Borrower to pay a fee for the discharge of this Security Instrument but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under applicable law.

**24. Agreements about New York Lien law.** Borrower will receive all amounts lent to borrower by lender subject to the trust fund provisions of Section 13 of the New York Lien Law. If, on the date this Security Instrument is recorded, construction or other work on any building or other improvement located on the Property has not been completed for at least four months, Borrower will: (A) hold all amounts which Borrower receives and which Borrower has a right to receive from Lender under the Note as a "trust fund"; and (B) use those amounts to pay for that construction or work before Borrower uses them for any other purpose. Borrower acknowledges that the fact that Borrower is holding those amounts as a "trust fund" means that for any building or other improvement located on the Property Borrower has a special responsibility under the law to use the amount in the manner described in Paragraph 24.

**25. Borrower's Statement Regarding the Property [check box as applicable].**

☒ This Security Instrument covers real property improved, or to be improved, by a one- or two-family dwelling only.

☐ This Security Instrument covers real property improved principally improved, or to be improved, by one or more structures containing, in the aggregate, not more than six residential dwelling units with each dwelling unit having its own separate cooking facilities.

☐ This Security Instrument does not cover real property improved as described above.

**26. Notice of Foreclosure.** If Lender intends to start a lawsuit for foreclosure and sale of the Property, Borrower requests that Lender notify this person:

_____

Name

_____

_____

Address

**27. Obligatory Loan Advances.** Lender's responsibility to make Loan Advances under the terms of the Loan Agreement, including Loan Advances of principal to Borrower as well as Loan Advances for interest, MIP, Servicing Fees, and other charges shall be obligatory.

**28. Riders to this Security Instrument.** If one or more riders are executed by Borrower and recorded together with this Security Instrument, the covenants of each such rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Security Instrument as if the rider(s) were in a part of this Security Instrument. [Check all riders that are applicable].

|  | Condominium Rider |  | PUD Rider |
|---|---|---|---|
|  | Shared Appreciation Rider |  | Other |

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with it.

Witnesses: _____

_____

_____

**DONALD P. ROSENDALE (Borrower)**

State of New York        )
                         ) ss:
County of Dutchess       )

On the _____ 4th _____ day of ___June___, 2009, before me, the undersigned, personally appeared **Donald P. Rosendale**, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
                                    Notary Public

## EXHIBIT A

Exhibit A to the Mortgage given on **June 04, 2009,** by **Donald P. Rosendale** ("Borrower") to MetLife Home Loans, a Division of MetLife Bank, N.A. ("Lender").  The Property is located in the county of **Dutchess**, state of NY, and is described as follows:

Description of Property

See Attached Schedule "A"

# EXHIBIT B

*[handwritten: PY272350 Dutchess County TOWN OF AMENIA GRID# 7067-00-42820 (01)]*

## REVERSE MORTGAGE
## (HOME EQUITY CONVERSION)

Record and Return to:
MetLife Home Loans, a Division of MetLife Bank, N.A.
P.O. Box 8157
Edmond, OK 73083-8157

**FHA Case Number: 371-4056898-952/255**
**1902002494**

---

**State of New York**     # ADJUSTABLE RATE REVERSE MORTGAGE

THIS MORTGAGE ("Security Instrument") is given on June 04, 2009. The mortgagor is **Donald P. Rosendale**, whose address is **4848 Route 44, AMENIA, NY 12501** ("Borrower"). This Security Instrument is given to **MetLife Home Loans, a Division of MetLife Bank, N.A.**, which is organized and existing under the laws of **the United States of America**, and whose address is **501 U.S. Highway 22 (I-W COPS), Bridgewater, NJ 08807** ("Lender"). Borrower has agreed to repay to Lender amounts which Lender is obligated to advance, including future advances, under the terms of a Home Equity Conversion Loan Agreement dated the same date as this Security Instrument ("Loan Agreement"). The agreement to repay is evidenced by Borrower's Note dated the same date as this Security Instrument ("Note"). This Security Instrument secures to Lender: (a) the repayment of the debt evidenced by the Note, including all future advances, with interest at a rate subject to adjustment, and all renewals, extensions and modifications of the Note, up to a maximum principal amount of **Eight Hundred Sixty-Two Thousand Five Hundred and 00/100 Dollars (U.S.$862,500.00)**; (b) the payment of all other sums, with interest, advanced under Paragraph 5 to protect the security of this Security Instrument or otherwise due under the terms of this Security Instrument; and (c) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. The full debt, including all amounts described in (a), (b), and (c) above, if not paid earlier, is due and payable on **June 26, 2086.** For this purpose, Borrower does hereby mortgage, grant and convey to Lender, with power of sale, the following described property located in **Dutchess County**, New York, which has the address of:

**4848 Route 44, AMENIA, NY, 12501**, and is described more fully on Exhibit A attached to and hereby incorporated into this Mortgage ("Property Address").

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, rights, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

### CREDIT LINE MORTGAGE

This Security Instrument secures the debt described in the Security Instrument, Note and Loan Agreement and contemplates a series of advances which will be advanced from time to time from and after the date of this Security Instrument not to exceed in the aggregate at any one time the maximum principal amount stated in the Security Instrument, the Note and the Agreement.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

New York 1st Mortgage
Page 1

*[vertical text, right margin: 171132.1-NNNN-14304037?-1.5]*

# PRIMARY LAND SERVICES, LLC

### Title No. PY21235D

### S C H E D U L E   A

Amended  04-16-2009

ALL that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Town of Amenia, County of Dutchess and State of New York, being a part of the Deul land and formerly occupied by Milton C. Hoag, now deceased, bounded and described as follows, viz:

BEGINNING at the northeast corner of said farm in the south line of the turnpike and in the west line of Egbert Barton's land, thence on said Barton's line, South 8 1/2 degrees West 22 chains 95 links, thence South 86 1/2 degrees East 13 chains 39 links, thence South 1/4 degree East 9 chains 71 links to junction or corner of stone wall, thence along Bird's line, South 65 degrees 50 minutes West 13 chains 64 links, thence continuing on said Bird's line, South 58 degrees 41 minutes West 16 chains 57 links, thence South 31 degrees 30 minutes East 1 chain 6 links on said Bird's line; thence along the lands of James B. Sisson, South 74 degrees West 2 chains 38 links to a stake and stones, thence on said Sisson's line, North 5 degrees 18 minutes West 43 chains 9 links; thence North 19 degrees 25 minutes West 1 chain 69 links to a corner on the southeast side of Turnpike; thence along the southerly side of turnpike, North 40 degrees 15 minutes East 3 chains 76 links, thence North 67 degrees 50 minutes East 3 chains 45 links, thence North 81 degrees 45 minutes East 1 chain 51 links; thence South 86 degrees East 3 chains 6 links; thence South 78 degrees 30 minutes East 3 chains 40 links, thence South 85 degrees 25 minutes East 9 chains 66 links to the place of beginning, the last six courses following the south line of the turnpike.

ALSO ALL, that parcel of land as shown on map on file in the Dutchess County Clerk's Office bearing No. 2871 entitled State of New York, Department of Public Works, Division of Highways, District No. 8, Poughkeepsie, Lithgow-Amenia C.H. 1006-R.C. 1790, Dutchess County and being the ceded portion thereon designated "abandoned road."

Less than and excepting thereform any portion of the property acquired via appropriation by the people of the State of New York in Notice of Appropriation dated 8/29/03 recorded 8/29/03 in Document No. 02-2008-7040, Dutchess County Clerk.

**FOR CONVEYANCING ONLY**

The policy to be issued under this report will insure the title to such buildings and improvements erected on the premises which by law constitute real property.

TOGETHER with all the right, title and interest of the party of the first part, of, in and to the land lying in the street in front of and adjoining said premises.

Page 1

**1. Payment of Principal and Interest.** Borrower shall pay when due the principal of, and interest on. the debt evidenced by the Note.

**2. Payment of Property Charges.** Borrower shall pay all property charges consisting of taxes, ground rents. flood and hazard insurance premiums, and special assessments in a timely manner, and shall provide evidence of payment to Lender, unless Lender pays property charges by withholding funds from monthly payments due to the Borrower or by charging such payments to a line of credit as provided for in the Loan Agreement.

**3. Fire, Flood and Other Hazard Insurance.** Borrower shall insure all improvements on the Property. whether now in existence or subsequently erected, against any hazards, casualties, and contingencies, including fire. This insurance shall be maintained in the amounts, to the extent and for the periods required by Lender or the Secretary of Housing and Urban Development ("Secretary"). Borrower shall also insure all improvements on the Property, whether now in existence or subsequently erected, against loss by floods to the extent required by the Secretary. All insurance shall be carried with companies approved by Lender. The insurance policies and any renewals shall be held by Lender and shall include loss payable clauses in favor of, and in a form acceptable to. Lender.

In the event of loss, Borrower shall give Lender immediate notice by mail. Lender may make proof of loss if not made promptly by Borrower. Each insurance company concerned is hereby authorized and directed to make payment for such loss to Lender. instead of to Borrower and Lender jointly. Insurance proceeds shall be applied to restoration or repair of the damaged Property, if the restoration or repair is economically feasible and Lender's security is not lessened. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied first to the reduction of any indebtedness under a Second Note and Second Security Instrument held by the Secretary on the Property and then to the reduction of the indebtedness under the Note and this Security Instrument. Any excess insurance proceeds over an amount required to pay all outstanding indebtedness under the Note and this Security Instrument shall be paid to the entity legally entitled thereto.

In the event of foreclosure of this Security Instrument or other transfer of title to the Property that extinguishes the indebtedness. all right, title and interest of Borrower in and to insurance policies in force shall pass to the purchaser.

**4. Occupancy, Preservation, Maintenance and Protection of the Property; Borrower's Loan Application; Leaseholds.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence after the execution of this Security Instrument and Borrower (or at least one Borrower. if initially more than one person are Borrowers) shall continue to occupy the Property as Borrower's principal residence for the term of the Security Instrument. "Principal residence" shall have the same meaning as in the Loan Agreement.

Borrower shall not commit waste or destroy, damage or substantially change the Property or allow the Property to deteriorate. reasonable wear and tear excepted. Borrower shall also be in default if Borrower, during the loan application process, gave materially false or inaccurate information or statements to Lender (or failed to provide Lender with any material information) in connection with the loan evidenced by the Note, including, but not limited to, representations concerning Borrower's occupancy of the Property as a principal residence. If this Security Instrument is on a leasehold, Borrower shall comply with the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and fee title shall not be merged unless Lender agrees to the merger in writing.

**5. Charges to Borrower and Protection of Lender's Rights in the Property.** Borrower shall pay all governmental or municipal charges, fines and impositions that are not included in Paragraph 2. Borrower shall pay these obligations on time directly to the entity which is owed the payment. If failure to pay would adversely affect Lender's interest in the Property, upon Lender's request Borrower shall promptly furnish to Lender receipts evidencing these payments. Borrower shall promptly discharge any lien which has priority over this Security Instrument in the manner provided in Paragraph 12(c).

If Borrower fails to make these payments or the property charges required by Paragraph 2, or fails to perform any other covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, for condemnation or to enforce laws or regulations), then Lender may do and pay whatever is necessary to protect the value of the Property and Lender's rights in the Property, including payment of taxes, hazard insurance and other items mentioned in Paragraph 2.

To protect Lender's security in the Property, Lender shall advance and charge to Borrower all amounts due to the Secretary for the Mortgage Insurance Premium ("MIP") as defined in the Loan Agreement as well as all sums due to the loan servicer for servicing activities ("Servicing Fee") as defined in the Loan Agreement. Any amounts disbursed by Lender under this Paragraph shall become an additional debt of Borrower as provided for in the Loan Agreement and shall be secured by this Security Instrument.

**6. Inspection.** Lender or its agent may enter on, inspect or make appraisals of the Property in a reasonable manner and at reasonable times provided that Lender shall give the Borrower notice prior to any inspection or appraisal specifying a purpose for the inspection or appraisal which must be related to Lender's interest in the Property. If the Property is vacant or abandoned or the loan is in default, Lender may take reasonable action to protect and preserve such vacant or abandoned Property without notice to the Borrower.

**7. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation, or other taking of any part of the Property, or for conveyance in place of condemnation shall be paid to Lender. The proceeds shall be applied first to the reduction of any indebtedness under the Second Note and Second Security Instrument held by the Secretary on the Property, and then to the reduction of the indebtedness under the Note and this Security Instrument. Any excess proceeds over an amount required to pay all outstanding indebtedness under the Note and this Security Instrument shall be paid to the entity legally entitled thereto.

**8. Fees.** Lender may collect fees and charges authorized by the Secretary.

**9. Grounds for Acceleration of Debt.**
**(a) Due and Payable.** Lender may require immediate payment in full of all sums secured by this Security Instrument if:
　　(i) A Borrower dies and the Property is not the principal residence of at least one surviving Borrower; or

　　(ii) All of a Borrower's title in the Property (or his or her beneficial interest in a trust owning all or part of the Property) is sold or otherwise transferred and no other Borrower retains (a) title to the Property in fee simple, (b) a leasehold under a lease for not less than 99 years which is renewable or a lease having a remaining period of not less than 50 years beyond the date of the 100th birthday of the youngest Borrower, or (c) a life estate in the Property (or retains a beneficial interest in a trust with such an interest in the Property).
**(b) Due and Payable with Secretary Approval.** Lender may require immediate payment in full of all sums secured by this Security Instrument, upon approval by an authorized representative of the Secretary, if:
　　(i) The Property ceases to be the principal residence of a Borrower for reasons other than death and the Property is not the principal residence of at least one other Borrower; or

　　(ii) For a period of longer than twelve (12) consecutive months, a Borrower fails to physically occupy the Property because of physical or mental illness and the Property is not the principal residence of at least one other Borrower; or

　　(iii)　An obligation of the Borrower under this Security Instrument is not performed.
**(c) Notice to Lender.** Borrower shall notify Lender whenever any of the events listed in subparagraphs Paragraph 9(a)(ii) and (b) occur.
**(d) Notice to Secretary and Borrower.** Lender shall notify the Secretary and Borrower whenever the loan becomes due and payable under Paragraph 9(a)(ii) and (b). Lender shall not have the right to commence foreclosure until Borrower has had thirty (30) days after notice to either:
　　(i)　Correct the matter which resulted in the Security Instrument coming due and payable; or

(ii)    Pay the balance in full; or

(iii)   Sell the Property for the lesser of the balance or 95% of the appraised value and apply the net proceeds of the sale toward the balance; or

(iv)    Provide the Lender with a deed in lieu of foreclosure.

(e)  **Trusts.**  Conveyance of a Borrower's interest in the Property to a trust which meets the requirements of the Secretary, or conveyance of a trust's interests in the Property to a Borrower, shall not be considered a conveyance for purposes of this Paragraph 9.  A trust shall not be considered an occupant or be considered as having a principal residence for purposes of this Paragraph 9.

(f) **Mortgage Not Insured.**  Borrower agrees that should this Security Instrument and the Note not be eligible for insurance under the National Housing Act within eight (8) months from the date hereof, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument.  A written statement of any authorized agent of the Secretary dated subsequent to eight (8) months from the date hereof, declining to insure this Security Instrument and the Note, shall be deemed conclusive proof of such ineligibility.  Notwithstanding the foregoing, this option may not be exercised by Lender when the unavailability of insurance is solely due to Lender's failure to remit a mortgage insurance premium to the Secretary.

**10. No Deficiency Judgments.**  Borrower shall have no personal liability for payment of the debt secured by this Security Instrument.  Lender may enforce the debt only through sale of the Property.  Lender shall not be permitted to obtain a deficiency judgment against Borrower if the Security Instrument is foreclosed.  If this Security Instrument is assigned to the Secretary upon demand by the Secretary, Borrower shall not be liable for any difference between the mortgage insurance benefits paid to Lender and the outstanding indebtedness, including accrued interest, owed by Borrower at the time of the assignment.

**11. Reinstatement.**  Borrower has a right to be reinstated if Lender has required immediate payment in full.  This right applies even after foreclosure proceedings are instituted.  To reinstate this Security Instrument, Borrower shall correct the condition which resulted in the requirement for immediate payment in full.  Foreclosure costs and reasonable and customary attorneys' fees and expenses properly associated with a foreclosure proceeding shall be added to the principal balance.  Upon reinstatement by Borrower, this Security Instrument and the obligations that it secures shall remain in effect as if Lender had not required immediate payment in full.  However, Lender is not required to permit reinstatement if:(i) Lender has accepted reinstatement after the commencement of foreclosure proceedings within two (2) years immediately preceding the commencement of a current foreclosure proceeding, (ii) reinstatement will preclude foreclosure on different grounds in the future, or (iii) reinstatement will adversely affect the priority of the Security Instrument.

**12. First Lien Status**

(a) **Modification.**  Borrower agrees to extend this Security Instrument in accordance with this Paragraph 12(a).  If Lender determines that the original lien status of the Security Instrument is jeopardized under state law (including but not limited to situations where the amount secured by the Security Instrument equals or exceeds the maximum principal amount stated or the maximum period under which loan advances retain the same lien priority initially granted to loan advances has expired) and state law permits the original lien status to be maintained for future loan advances through the execution and recordation of one or more documents, then Lender shall obtain title evidence at Borrower's expense.  If the title evidence indicates that the Property is not encumbered by any liens (except this Security Instrument, the Second Security Instrument described in Paragraph 13(a) and any subordinate liens that the Lender determines will also be subordinate to any future loan advances), Lender shall request the Borrower to execute any documents necessary to protect the priority of the lien status of future loan advances.  Borrower agrees to execute such documents.  If state law does not permit the original lien status to be extended to future loan advances, Borrower will be deemed to have failed to have performed an obligation under this Security Instrument.

(b) **Tax Deferral Programs.** Borrower shall not participate in a real estate tax deferral program, if any liens created by the tax deferral are not subordinate to this Security Instrument.

(c) **Prior Liens.** Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender; (b) contests in good faith the lien by, or defends against enforcement of the lien in, legal proceedings which in the Lender's opinion operate to prevent the enforcement of the lien or forfeiture of any part of the Property; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to all amounts secured by this Security Instrument. If Lender determines that any part of the Property is subject to a lien which may attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Borrower shall satisfy the lien or take one or more of the actions set forth above within ten (10) days of the giving of notice.

13. **Relationship to Second Security Instrument.**

(a) **Second Security Instrument.** In order to secure payments which the Secretary may make to or on behalf of Borrower pursuant to Section 255(i)(1)(A) of the National Housing Act and the Loan Agreement the Secretary has required Borrower to execute a Second Note and a Second Security Instrument on the Property.

(b) **Relationship of First and Second Security Instruments.** Payments made by the Secretary shall not be included in the debt under the Note unless:

    (i) This Security Instrument is assigned to the Secretary; or

    (ii) The Secretary accepts reimbursement by the Lender for all payments made by the Secretary.

If the circumstances described in (i) or (ii) occur, then all payments by the Secretary, including interest on the payments but excluding late charges paid by the Secretary, shall be included in the debt under the Note.

(c) **Effect on Borrower.** Where there is no assignment or reimbursement as described in (b)(i) or (ii) and the Secretary makes payments to Borrower, then Borrower shall not:

    (i) Be required to pay amounts owed under the Note, or pay any rents and revenues of the Property under Paragraph 19 to Lender or a receiver of the Property, until the Secretary has required payment in full of all outstanding principal and accrued interest under the Second Note; or

    (ii) Be obligated to pay interest or shared appreciation under the Note at any time, whether accrued before or after the payments by the Secretary, and whether or not accrued interest has been included in the principal balance under the Note.

(d) **No Duty of the Secretary.** The Secretary has no duty to Lender to enforce covenants of the Second Security Instrument or to take actions to preserve the value of the Property, even though Lender may be unable to collect amounts owed under the Note because of restrictions in this Paragraph 13.

14. **Forbearance by Lender Not a Waiver.** Any forbearance by Lender in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy.

15. **Successors and Assigns Bound; Joint and Several Liability.** The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender. Borrower may not assign any rights or obligations under this Security Instrument or under the Note, except to a trust that meets the requirements of the Secretary. Borrower's covenants and agreements shall be joint and several.

16. **Notices.** Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address all Borrowers jointly designate. Any notice to Lender shall be given by first class mail to Lender's address stated herein or any address Lender designates by notice to Borrower. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this Paragraph 16.

New York 1st Mortgage
Page 5



17. **Governing Law; Severability.** This Security Instrument shall be governed by Federal law and the law of the jurisdiction in which the Property is located. In the event that any provision or clause of this Security Instrument or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Note are declared to be severable.

18. **Borrower's Copy.** Borrower shall be given one conformed copy of the Note and this Security Instrument.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

19. **Assignment of Rents.** Borrower unconditionally assigns and transfers to Lender all the rents and revenues of the Property. Borrower authorizes Lender or Lender's agents to collect the rents and revenues and hereby directs each tenant of the Property to pay the rents to Lender or Lender's agents. However, prior to Lender's notice to Borrower of Borrower's breach of any covenant or agreement in the Security Instrument, Borrower shall collect and receive all rents and revenues of the Property as trustee for the benefit of Lender and Borrower. This assignment of rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of breach to Borrower: (a) all rents received by Borrower shall be held by Borrower as trustee for benefit of Lender only, to be applied to the sums secured by this Security Instrument; (b) Lender shall be entitled to collect and receive all of the rents of the Property; and (c) each tenant of the Property shall pay all rents due and unpaid to Lender or Lender's agent on Lender's written demand to the tenant.

Borrower has not executed any prior assignment of the rents and has not and will not perform any act that would prevent Lender from exercising its rights under this Paragraph 19.

Lender shall not be required to enter upon, take control of or maintain the Property before or after giving notice of breach to Borrower. However, Lender or a judicially appointed receiver may do so at any time there is a breach. Any application of rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of rents of the Property shall terminate when the debt secured by this Security Instrument is paid in full.

20. **Foreclosure Procedure. If all of the conditions stated in subparagraphs (a), (b), and (c) of this Paragraph 20 are met, Lender may require Borrower to pay immediately the entire amount then remaining unpaid under the Note and under this Security Instrument. Lender may do this without making any further demand for payment ("Immediate Payment in Full").**

**If Lender requires Immediate Payment in Full, Lender may bring a lawsuit to take away all of Borrower's remaining rights in the Property and have the Property sold. At this sale, Lender or another person may acquire the Property. This is known as "Foreclosure and Sale". In any lawsuit for Foreclosure and Sale, Lender will have the right to collect all costs and disbursements and additional allowances allowed by applicable law and will have the right to add all reasonable attorneys' fees to the amount Borrower owes Lender, which fee shall become part of the sums secured by this Security Instrument.**

Lender may require Immediate Payment in Full under this Paragraph 20 only if all of the following conditions are met:

(a) Borrower fails to keep any promise or agreement made in this Security Instrument, the Note or the Loan Agreement, including, but not limited to, the promises to pay the Sums Secured when due, or if another default occurs under this Security Instrument;

(b) Lender sends to Borrower, in the manner described in Paragraph 16 of this Security Instrument, a notice that states:

    (i)   The promise or agreement that borrower failed to keep or the default that has occured;

    (ii)  The action that Borrower must take to correct that default;

(iii)   A date by which Borrower must correct the default. That date will be at least 30 days from the date on which the notice is given;

(iv)   That if Borrower does not correct the default by the date stated in the notice, Lender may require Immediate Payment in Full, and Lender or another person may acquire the Property by means of Foreclosure and Sale;

(v)   That if Borrower meets the conditions stated in Paragraph 11 of this Security Instrument, Borrower will have the right to have Lender's enforcement of this Security Instrument stopped and to have the Note and this Security Instrument remain fully effective as if immediate payment in full had never been required; and

(vi)   That Borrower has the right in any lawsuit for Foreclosure and Sale to argue that Borrower did keep his or her promises and agreements under the Note, under this Security Instrument or under the Loan Agreement, and to present any other defenses that Borrower may have; and

(c)  Borrower does not correct the default stated in the notice from Lender by the date stated in that notice.

**21.  Lien Priority.**  The full amount secured by this Security Instrument shall have the same priority over any other liens on the Property as if the full amount had been disbursed on the date the initial disbursement was made, regardless of the actual date of any disbursement. The amount secured by this Security Instrument shall include all direct payments by Lender to Borrower and all other loan advances permitted by this Security Instrument for any purpose. This lien priority shall apply notwithstanding any State constitution, law or regulation, except that this lien priority shall not affect the priority of any liens for unpaid State or local governmental unit special assessments or taxes.

**22.  Adjustable Rate Feature.**  Under the Note, the initial stated interest rate of **Three and 066/1000 percent (3.066%)** which accrues on the unpaid principal balance ("Initial Interest Rate") is subject to change, as described below. When the interest rate changes, the new adjusted interest rate will be applied to the total outstanding principal balance. Each adjustment to the interest rate will be based upon the One-Month London Interbank Offered Rate ("LIBOR") as made available in the "Money Rates" section of the Wall Street Journal ("Index") plus a margin.. If the Index is no longer available, Lender will be required to use any index prescribed by the Department of Housing and Urban Development. The new index will have a historical movement substantially similar to the original index, and the new index and margin will result in an annual percentage rate that is substantially similar to the rate in effect at the time the original index becomes unavailable.

Lender will perform the calculations described below to determine the new adjusted interest rate. The interest rate may change on the first day of **SEPTEMBER 1, 2009**, and on ___ that day of each succeeding year __X__ the first day of each succeeding month ("Change Date") until the loan is repaid in full.

The value of the Index will be determined, using the most recent Index figure available thirty (30) days before the Change Date ("Current Index"). Before each Change Date, the new interest rate will be calculated by adding a margin to the Current Index. The sum of the margin plus the Current Index, subject to the rate limitations below, will be called the "Calculated Interest Rate" for each Change Date. The Calculated Interest Rate will be compared to the interest rate in effect immediately prior to the current Change Date (the "Existing Interest Rate").

_____        **Annually Adjusting Variable Rate Feature** - The Calculated Interest Rate will never increase or decrease by more than two percentage points (2.0%) on any single Change Date. The interest rate will never be more than five percentage points (5.0%) higher or lower than the Initial Interest Rate stated in Paragraph 2 of the Note.

__X__        **Monthly Adjusting Variable Rate Feature** - The Calculated Interest Rate will never increase above 13.066%.

The Calculated Interest Rate will be adjusted if necessary to comply with the rate limitation(s) described above and will be in effect until the next Change Date. At any Change Date, if the Calculated Interest Rate equals the Existing Interest Rate, the interest rate will not change.

**23. Lender's Obligation to Discharge this Security Instrument.** When Lender has been paid all amounts due under the Note and under this Security Instrument, Lender will discharge this Security Instrument by delivering a certificate stating that this Security Instrument has been satisfied. Borrower will pay all costs of recording the discharge in the proper official records. If Lender so requires, Lender may require Borrower to pay a fee for the discharge of this Security Instrument but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under applicable law.

**24. Agreements about New York Lien law.** Borrower will receive all amounts lent to borrower by lender subject to the trust fund provisions of Section 13 of the New York Lien Law. If, on the date this Security Instrument is recorded, construction or other work on any building or other improvement located on the Property has not been completed for at least four months, Borrower will: (A) hold all amounts which Borrower receives and which Borrower has a right to receive from Lender under the Note as a "trust fund"; and (B) use those amounts to pay for that construction or work before Borrower uses them for any other purpose. Borrower acknowledges that the fact that Borrower is holding those amounts as a "trust fund" means that for any building or other improvement located on the Property Borrower has a special responsibility under the law to use the amount in the manner described in Paragraph 24.

**25. Borrower's Statement Regarding the Property [check box as applicable].**

☒ This Security Instrument covers real property improved, or to be improved, by a one- or two-family dwelling only.

☐ This Security Instrument covers real property improved principally improved, or to be improved, by one or more structures containing, in the aggregate, not more than six residential dwelling units with each dwelling unit having its own separate cooking facilities.

☐ This Security Instrument does not cover real property improved as described above.

**26. Notice of Foreclosure.** If Lender intends to start a lawsuit for foreclosure and sale of the Property, Borrower requests that Lender notify this person:

_____

Name

_____

_____

_____

Address

**27. Obligatory Loan Advances.** Lender's responsibility to make Loan Advances under the terms of the Loan Agreement, including Loan Advances of principal to Borrower as well as Loan Advances for interest, MIP, Servicing Fees, and other charges shall be obligatory.

**28. Riders to this Security Instrument.** If one or more riders are executed by Borrower and recorded together with this Security Instrument, the covenants of each such rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Security Instrument as if the rider(s) were in a part of this Security Instrument. [Check all riders that are applicable].

| | | | |
|---|---|---|---|
| | Condominium Rider | | PUD Rider |
| | Shared Appreciation Rider | | Other |

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with it.

Witnesses: _____

_____

_____
DONALD P. ROSENDALE (Borrower)

State of New York          )
                           ) ss:
County of Dutchess         )

On the _____ 4th _____ day of _____ June _____, 2009, before me, the undersigned, personally appeared **Donald P. Rosendale**, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
                                                    Notary Public

Maria J. Greco
Notary Public, State of New York
No. 02GR6029857
Qualified in Dutchess County
Commission Expires Aug. 30, 2009

New York 1st Mortgage
Page 9

## .EXHIBIT A

Exhibit A to the Mortgage given on **June 04, 2009**, by **Donald P. Rosendale** ("Borrower") to MetLife Home Loans, a Division of MetLife Bank, N.A. ("Lender").  The Property is located in the county of **Dutchess**, state of **NY**, and is described as follows:

Description of Property

See Attached Schedule "A"

# EXHIBIT C



PO Box 619093
Dallas, TX 75261-9093

08/23/2019



**OUR INFO**
**CUSTOMER SERVICE**
855-683-3095
Mon-Thu      7 a.m. to 7 p.m. (CT)
Fri               7 a.m. to 5 p.m. (CT)
ONLINE
**www.championmortgage.com**

3382  2 MB 0.428   T12 P1   AUTO   153687.1-NNNN-30250233
DONALD P ROSENDALE
4848 ROUTE 44
AMENIA, NY 12501

**YOUR INFO**
LOAN NUMBER
0001028884

PROPERTY ADDRESS
**4848 ROUTE 44**
**AMENIA, NY 12501**

Dear DONALD P ROSENDALE,

We previously sent you notice that we have not received proof that your property taxes and/or property insurance and/or Home Owner's Association (HOA) dues were current. According to the terms and conditions of your reverse mortgage, which is insured by the Department of Housing & Urban Development (HUD), it is your responsibility to maintain any taxes, ground rents, required property insurance, and special assessments in a current status at all times.

Because we did not receive proof that the property taxes and/or insurance were current, we were required to advance the funds to pay for them on your behalf.

If you have maintained your homeowner's insurance policy for hazard, wind, and/or flood, if applicable please send evidence to: www.imcovered.com/championmortgage **OR**

Mail:  **Champion Mortgage – ISAOA**      **OR**      Fax: 866-574-3980
           **PO Box 692399**
           **San Antonio, TX 78269-2399**

If you have maintained your property tax, please send evidence to:

Mail:  Champion Mortgage            **OR**      Fax: 855-493-1943
           PO Box 35605
           Dallas, TX 75235-0605

**The total amount that has been advanced to date on your behalf is $0.00.**

**You must take immediate action to resolve this matter or your loan may be declared "Due & Payable".**

If your loan is declared "Due & Payable" by HUD, it could result in a foreclosure action on your home. Although the loan documents allow for a foreclosure action on the property, both Champion Mortgage and HUD would prefer to work out another solution that will allow you to repay the amount due and retain your home.

**In addition, you are strongly encouraged to contact one of the HUD-approved housing counseling agencies listed on the enclosed attachment for a free counseling session. Your counselor will help you review your financial situation. In addition, your counselor will be able to refer you to resources that might be able to assist you. Do you need additional help? There are options available to you and are strongly encouraged**

**Champion Mortgage is a debt collector. This is an attempt to collect a debt and any information obtained will be used for that purpose. However, if you are currently in bankruptcy or have received a discharge in bankruptcy, this communication is not a demand for payment of the captioned debt to the extent that it is included in your bankruptcy or has been discharged, but is provided for informational purposes only.**

If you are a successor in interest (received the property from a relative through death, devise or divorce, and you are not a borrower on the loan), this communication is for informational purposes only and is not an attempt to collect a debt from you personally.

EXHIBIT D

Don Rosendale
The Oaks Farm
4848 Route 44
Amenia, N.Y. 12501
845.373.9017 DonPR1@aol.com

September 2, 2019

Champion Mortgage
PO Box 619093
Dallas, TX. 75261

Re: Loan 0001028884

Dear Sir or Madam:

I am in receipt of your letters of August 23, 2019. I am somewhat confused as to how to respond because says I have not provided proof that my property taxes have been paid, or that I have hazard insurance, or that I am living on the property. I am also puzzled by your letter because it is a notice of intent to accelerate, it does not comply with the terms of the mortgage. To answer each question individually:

Taxes:: Attached is a screen shot made yesterday showing that my taxes have been paid. You may be confused by New York's property tax schedule.

Insurance: Following is an e-mail from my hazard insurance company indicating I have made the current payment which was due on August 25, 2019. There is no cancellation notice.

In the past 12 months you have billed me for lender processed insurance when in fact my hazard insurance was fully paid; in February billed me for taxes which had been paid; and in May billed me for taxes which were not due. These actions, with the implied threat acceleration and foreclosure have been stressful and damage my health. Call me and I will educate you on New York tax schedules.

Sincerely,

Donald P. Rosendale

# EXHIBIT E



**Reverse Mortgage Servicing Department**

PO Box 612877 Dallas, TX  75261-9093
Toll-Free Customer Service: 855-683-3095
Toll-Free Customer Fax: 866-621-1036

September 18, 2019

Donald P. Rosendale
4848 Route 44
Amenia, NY 12501

RE:   Champion Mortgage Reference Number:  LB-09-19-00447
        Mortgagor: Donald P. Rosendale
        Property Address: 4848 Route 44, Amenia, NY 12501
        Loan Number: 1028884

Dear Donald Rosendale,

Thank you for reaching out to us. We are looking forward to helping you.

**Why am I receiving this letter?**

We received your correspondence on September 2, 2019, and have put together this reply with information that we hope will alleviate your concerns.

Our records show previously the hazard insurance on the property expired on August 5, 2018, and we did not receive evidence that you had obtained new coverage. Therefore, on October 29, 2018, Lender Placed Insurance (LPI) of $2,789.00 was purchased on your behalf. On November 8, 2018, we received a copy of your hazard insurance from Liberty Mutual Insurance and our system was updated with the insurance information. A full refund of $2,789.00 was credited back to the account on November 15, 2018.

Please note, on September 13, 2019, our Insurance Department received a Cancellation Notice from Liberty Mutual Insurance, advising the insurance on the property will be cancelled effective September 25, 2019, unless the premium amount of $275.36 is received. Please be sure to make your payment and send proof of the payment to our Insurance Department by fax at 1.866.574.3980 or by mail to:

Champion Mortgage
Its Successors and/or Assigns
Attn: Insurance Department
PO Box 692399
San Antonio, TX 78269-2399

Champion Mortgage conducts an annual search on property taxes, hazard insurance and any other payments which may be due in the near future. On August 20, 2019, we conducted our property tax search and it was determined the 2018 Dutchess County Taxes for the Independent School District (ISD) were delinquent of $7,473.60. Therefore, on August 22, 2019, funds of $7,473.60 were advanced from the Line of Credit (LOC) to Dutchess County Commissioner Office. A Property Charge Delinquency Notice dated August 23, 2019, was mailed to you advising because we did not receive proof that the property taxes were current, we were required to advance the funds to pay for them on your behalf.

Please be advised Champion Mortgage was within our rights as we confirmed with the county your property taxes were delinquent. In order to protect our interest in the property, if property taxes become delinquent, then we are at

Champion Mortgage is a debt collector. This is an attempt to collect a debt and any information obtained will be used for that purpose. However, if you are currently in bankruptcy or have received a discharge in bankruptcy, this communication is not a demand for payment of the captioned debt to the extent that it is included in your bankruptcy or has been discharged, but is provided for informational purposes only.



risk of having the County place a lien against the property, thereby causing the lien of Champion Mortgage to be placed in second position. According to the terms of the reverse mortgage, which is insured by the Secretary of Housing and Urban Development (HUD), it is the responsibility of the borrower to maintain property taxes and hazard insurance on the property in a current status at all times, and provide the Lender with proof of insurance. If the borrower fails to make these payments or the property charges required, or there is a legal proceeding that may significantly affect the Lender's rights in the Property, the Lender, may do and pay whatever is necessary to protect the value of the property and other items.

We apologize if the notices you have received were perceived as threatening, please note it is not Champion Mortgage's intention to threaten or harass. As of the date of this correspondence your account is in active status, as the funds advanced to pay the property taxes were advanced from your LOC and not against the loan.

Please note, the screen shot that you have provided showing you paid your property taxes is illegible. Please provide us with a copy of your proof of payment showing that you have paid your taxes for review and refund. You may send your proof of payment via fax to 1.866.621.1036 or by mail to:

Champion Mortgage
P.O. Box 619093
Dallas, TX 75261-9741

We regret any inconvenience or frustration you may have experienced regarding this matter. However, overall, no errors were identified during the course of our investigation. You have the right to access the documents relied upon in this investigation. We have included those documents in this letter for your records.

- Reverse Mortgage
- Insurance Notices (5)

We hope this information is helpful and addresses your concerns. Please visit our website at www.championmortgage.com for more information. Here you will find answers to frequently asked questions and a Homeowner Assistance page. Our toll-free fax number is 1.866.621.1036. Our toll-free phone number is 1.855.683.3095. Our Customer Support Team is available to assist you from 7:00 a.m. to 7:00 p.m. (Central), Monday through Thursday and from 7:00 a.m. to 5:00 p.m. (Central) on Friday.

Sincerely,



Kauser Begum
Customer Relations Specialist
Champion Mortgage
P.O. Box 619093
Dallas, TX 75261-9741
Phone: 1.855.683.3095

Enclosures 6
By U.S. Standard Mail

Are you experiencing a financial hardship? Our local non-profit partners can help with financial counseling and other services. Please visit these websites for assistance:

- **Hud.gov**
- **www.benefitscheckup.org**

# EXHIBIT F

Don Rosendale
The Oaks Farm
4848 Route 44
Amenia, N.Y. 12501
845.373.9017 DonPR1@aol.com

September 19, 2019

Champion Mortgage
PO Box 612877
Dallas, TX 75261    by fax

Re: 1028884

Dear Sir or Madam:

    Pursuant to New York RPPP Law 280 (a)(2) (e)  and 3 NYCRR
79.9 (4) you have been required to maintain an escrow account
for the payment of taxes and insurance. Please provide me an
accounting of this escrow account.

Sincerely,

**_Donald P. Rosendale_**

Donald P. Rosendale

# EXHIBIT G



PO Box 619093
Dallas, TX 75261-9093

09/21/2019



**OUR INFO**
**CUSTOMER SERVICE**
855-683-3095
Mon-Thu       7 a.m. to 7 p.m. (CT)
Fri              7 a.m. to 5 p.m. (CT)
ONLINE
**www.championmortgage.com**

|||||||||||||||||||||||||||||||||||||||||||
5062 1 MB 0.428   T15 P1   AUTO   174426.2-NNNN-30262824
DONALD P ROSENDALE
4848 ROUTE 44
AMENIA, NY 12501

**YOUR INFO**
LOAN NUMBER
0001028884

PROPERTY ADDRESS
**4848 ROUTE 44
AMENIA, NY 12501**

Dear DONALD P ROSENDALE,

**We have received your request to update the account with authorizations for the Estate of the borrower(s).**

**This letter is to inform you that your request has been denied**. The request has been denied due to:

Incomplete Document submitted

This does not change the terms of your loan agreement or ways of contacting us.

If you have any questions, please contact our Customer Service Department at 855-683-3095 or via fax at 866-621-1036. Our hours of operation are Monday through Thursday from 7 a.m. to 7 p.m. (CT) and Friday from 7 a.m. to 5 p.m. (CT). Visit our website at www.championmortgage.com for answers to frequently asked questions and a Homeowner Assistance page.

Sincerely,

Champion Mortgage
Customer Support

**New York Residents:** Nationstar Mortgage LLC d/b/a Champion Mortgage is licensed by the New York City Department of Consumer Affairs License Number: 1392003. **If you believe a Loss Mitigation request has been wrongly denied, you may file a complaint with the New York State Department of Financial Services at 1-800-342-3736 or www.dfs.ny.gov.** If you want to know the name of your originating lender or the amount that you owe, please contact our customer service department.

**New York Residents Income Disclosure:** If a creditor or debt collector receives a money judgment against you in court, state and federal laws may prevent the following types of income from being taken to pay the debt: supplemental security income (SSI); social security; public assistance (welfare); spousal support, maintenance (alimony) or child support; unemployment benefits; disability benefits; workers' compensation benefits; public or private pensions; veterans' benefits; federal student loans, federal student grants, and federal work study funds; and ninety percent of your wages or salary earned in the last sixty days.

**Champion Mortgage is a debt collector. This is an attempt to collect a debt and any information obtained will be used for that purpose. However, if you are currently in bankruptcy or have received a discharge in bankruptcy, this communication is not a demand for payment of the captioned debt to the extent that it is included in your bankruptcy or has been discharged, but is provided for informational purposes only.**
If you are a successor in interest (received the property from a relative through death, devise, or divorce, and you are not a borrower on the loan),



# EXHIBIT H



**Champion**
**MORTGAGE®**

ATTN: INSURANCE DEPARTMENT
PO BOX 692399
SAN ANTONIO, TX 78269-2399
www.championmortgage.com

DONALD P ROSENDALE                                    SEPTEMBER 27, 2019
4848 ROUTE 44
AMENIA, NY 12501

Subject: **Please provide insurance information for:**    **4848 ROUTE 44**
                                                          **AMENIA, NY 12501**

Loan Number: 1028884

Dear Borrower:

Our records show that your hazard insurance policy expired and we do not have evidence that you have obtained new coverage. **Because hazard insurance is required on your property, we plan to buy insurance for your property.** You must pay us for any period during which the insurance we buy is in effect but you do not have insurance.

You should immediately provide us with your insurance information. Please ask your agent to either fax us a policy declaration page at (866) 574-3980 or by mail to the address shown below. You may also provide the documentation via the internet at **www.imcovered.com/championmortgage** by entering your unique identifier provided in the bolded box below. Please ensure that the documentation references your loan number listed above and that the Mortgagee-Payee Clause reads:

                CHAMPION MORTGAGE
                ITS SUCCESSORS AND/OR ASSIGNS
                ATTN: INSURANCE DEPARTMENT
                PO BOX 692399
                SAN ANTONIO, TX 78269-2399

The insurance we buy:

- **May be significantly more expensive than the insurance you can buy yourself.**

- **May not provide as much coverage as an insurance policy you buy yourself.**

If you have any questions, please contact us at (866) 646-0433, Monday through Thursday, 7:00 a.m. to 7:00 p.m. and Friday 7:00 a.m. to 5:00 p.m. Central Time.

Thank you,

Champion Mortgage
Insurance Center



EQUAL HOUSING
OPPORTUNITY

(Please see the attached for additional information regarding this request)

# EXHIBIT I



## LibertyGuard Deluxe Homeowner Policy Declarations
## Liberty Insurance Corporation

**FAX:**                    **ATTN:**

**POLICY NUMBER:**        **THESE DECLARATIONS EFFECTIVE**
H37-228-061652-70           08/05/2019

**NAME & ADDRESS**
Donald Rosendale

4848 Route 44
Amenia, NY 12501-5455

**RESIDENCE PREMISES INSURED**    [X] Same as Residence

4848 Route 44
Amenia, NY 12501-5455

**POLICY PERIOD**   08/05/2019 through 08/05/2020

**RESIDENCE PREMISES**
4848 Route 44
Amenia, NY 12501-5455

---

**SECTION I AND II:** COVERAGES AND LIMITS UNDER YOUR LIBERTYGUARD HOMEOWNERS POLICY

| | | |
|---|---|---|
| **I:** COVERAGE A - YOUR DWELLING | $ | 398,700 |
| COVERAGE B - OTHER STRUCTURES ON RESIDENCE PREMISES | $ | 39,870 |
| COVERAGE C - PERSONAL PROPERTY | $ | 299,030 |
| COVERAGE D - LOSS OF USE OF YOUR RESIDENCE PREMISES | Actual Loss Sustained | |
| **II:** COVERAGE E - PERSONAL LIABILITY (EACH OCCURRENCE) | $ | 300,000 |
| COVERAGE F - MEDICAL PAYMENTS TO OTHERS (EACH PERSON) | $ | 1,000 |

**DEDUCTIBLE:** LOSSES COVERED UNDER SECTION I ARE SUBJECT TO A DEDUCTIBLE OF $1,500.
Wind Deductible (if applicable) $1,500

**NET PREMIUM:**  $2,864.00        **PAID IN FULL**   NO

Replacement Cost Coverage   [X] Yes  [ ] No      Expanded Replacement Cost  [X] 25%  [ ] No

Functional Replacement   [ ]

**Mortgagee 1**
CHAMPION MORTGAGE ISAOA ,
Loan #: 1028884

PO Box 692399
San Antonio, TX 78269-2399

President            Secretary

Countersigned by:

Date:  October 03, 2019

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of New York ☐

| | |
|---|---|
| Donald P. Rosendale | ) |
| | ) |
| | ) |
| | ) |
| *Plaintiff(s)* | ) |
| v. | ) Civil Action No. |
| Mr. Cooper Group Inc. f/k/a Nationstar | ) |
| LLC Directly and as Loan Servicer for an | ) |
| Unspecified Nationstar HECM Acquisition Trust | ) |
| | ) |
| *Defendant(s)* | ) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  Mr. Cooper Group Inc.
8950 Cypress Waters Blvd., Coppell, TX.

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

> Donald P. Rosendale, pro se
> 4848 Route 44
> Amenia, N.Y. 12501

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: 

*Signature of Clerk or Deputy Clerk*