UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  9/7/2021
```

---

DONALD P. ROSENDALE,

                                   Plaintiff,

    -against-

MR. COOPER GROUP INC. *d/b/a Nationstar Mortgage*; NATIONSTAR MORTGAGE LLC, directly and as loan servicer for an unspecified Nationstar HECM Acquisition Trust; CHAMPION MORTGAGE; DR. BEN CARSON, *in his capacity as Secretary of the U.S. Department of Housing and Urban Development*,

                                   Defendants.

No. 19-cv-9263 (NSR)
**OPINION & ORDER**

---

NELSON S. ROMÁN, United States District Judge:

      Plaintiff Donald Rosendale ("Plaintiff" or "Rosendale"), a pro se litigant and elderly reverse mortgagor, commenced this action by filing a Complaint on October 7, 2019, asserting various claims against Mr. Cooper Group Inc. ("Mr. Cooper") arising chiefly from alleged misconduct in the servicing of his reverse mortgage.  More recently, on February 26, 2020, Plaintiff filed a nine-count Second Amended Complaint ("SAC") (ECF No. 25) asserting claims against Mr. Cooper, Nationstar Mortgage LLC ("Nationstar") (collectively with Mr. Cooper, "Defendants"), Champion Mortgage ("Champion")[1], and Dr. Ben Carson[2] in his former official capacity as the Secretary of the United States Department of Housing and Urban Development.  In

---

[1] Champion has not appeared in this litigation, and as discussed below, may be a trade name for Nationstar rather than an independent entity.  Frustratingly, Defendants did not raise the nonexistence of Champion Mortgage as a basis to dismiss the claim and the Court does not *sua sponte* address this issue.

[2] Plaintiff subsequently voluntarily dismissed claims against Dr. Ben Carson.  (*See* ECF Nos. 59, 60.)

sum, Plaintiff asserts the following claims: (1) violation of the Real Estate Settlement Procedures Act ("RESPA") § 2605(e) ("Section 2605"); (2) violation of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1641(g) ("Section 1641"); (3) common law conversion; (4) common law gross negligence; (5) breach of the implied covenant of good faith and fair dealing; (6) violation of N.Y. Gen. Bus. Law ("GBL") § 349 ("Section 349"); (7) intentional infliction of emotional distress; and (8) statutory invalidation of a recorded instrument pursuant to N.Y. Real Property Law § 329 ("Section 329").  Presently before the Court is Defendants' motion to dismiss the SAC pursuant to Federal Rules of Civil Procedure 12(b)(6).  (*See* Defendants' Notice of Motion and Memorandum in Support of their Motion to Dismiss ("Defs' Mem.") (ECF No. 32.).)  Plaintiff opposed the motion.  (*See* Plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss ("Pl's Opp.") (ECF No. 34).)  Defendants subsequently replied in further support of their motion.  (*See* Defendants' Memorandum in Further Support of their Motion to Dismiss ("Defs' Reply") (ECF No. 35).)

For the following reasons, Defendants' motion is GRANTED in part, and DENIED in part:(1) the Court dismisses Plaintiff's RESPA, TILA, breach of the implied covenant of good faith and fair dealing, and intentional infliction of emotion distress claims without prejudice; and (2) Defendants' motion is denied with respect to Plaintiff's conversion, gross negligence, Section 329 claim, and one of the Section 349 claims.

## **FACTUAL BACKGROUND**

The following facts are derived from the SAC, exhibits attached to the SAC, and exhibits attached by Plaintiff in opposing Defendants' motion to dismiss, and are accepted as true for the purposes of this motion.

I.        **Execution of the At-Issue Reverse Mortgage in 2009.**

On or around June 4, 2009, Mr. Rosendale entered into a Home Equity Conversion Loan with MetLife Home Loans ("MetLife") and the Secretary of the Department of Housing and Urban Development ("HUD"), wherein Plaintiff was given access to a credit line up to a maximum principal amount of $862,500. (ECF No. 33-1 (the "Note").) The loan was secured through an Adjustable Rate Reverse Mortgage also executed on or around June 4, 2009. (SAC ¶ 26; SAC Ex. A (the "Reverse Mortgage").) Pursuant to the terms of the Reverse Mortgage, Plaintiff Rosendale is the mortgagor or borrower, the mortgages were executed in favor of MetLife and HUD, and the mortgaged property was Plaintiff's residence at 4848 Route 44, Amenia, New York 12501. (*Id.*)

Plaintiff alleges that during the negotiation of the Reverse Mortgage, he objected to an inaccurate property description proposed by counsel for MetLife and that, subsequently, the Reverse Mortgage was signed without a property description. (SAC ¶ 28.) He objected to the inclusion of several acres of land (called "the abandoned road") within the property description because he did not own the abandoned road at that time. However, on June 13, 2009—almost ten-days after he signed the Reverse Mortgage and Note on June 4, 2009—the incorrect property description was allegedly added back into the operative documents, his signature was improperly notarized by Maria Greco, and the notary reflected on the recorded mortgage was actually not present when he signed the Note and Reverse Mortgage. (*Id.* ¶¶ 66; 118.)

II.       **Assignment of Reverse Mortgage to Nationstar and Related Entities**

Plaintiff alleges that MetLife sold its reverse mortgage business and assigned its interest in the Reverse Mortgage to "Nationstar" in or around April 2012. (SAC ¶ 26.) Plaintiff also acknowledges that "as assignment of mortgage was recorded with the Dutchess County Clerk from the original lender, MetLife to a Champion Mortgage Co" in or around September 2012. (*Id.* ¶

30.)  Public records, subject to judicial notice, confirm that the MetLife assigned the Reverse

Mortgage to Champion on September 7, 2012, as recorded on October 1, 2012.  (ECF No. 33-5.)

On the face of the SAC there is some uncertainty as to the particular roles of individual

entities named as defendants.[3]  Mr. Cooper is referred to as a distinct entity related to several

codefendants, and allegedly does business under the name "Nationstar Mortgage" (whether Mr.

Cooper independently holds any mortgages, provides servicing to mortgagors, or is simply a

passive parent company remains unclear to the Court).  (SAC ¶ 1 n.1.)  Codefendant Nationstar is

a separately incorporated entity that is a subsidiary of Mr. Cooper.  (ECF No. 12.)  Champion

Mortgage is apparently a trade name under which "Nationstar acts as a servicer of reverse

mortgages." (SAC ¶ 13.)  A review of documents attached and incorporated into the SAC indicates

the following: (1) Nationstar is performing business under the name Champion Mortgage.  (*See*

SAC Ex. G (stating "Nationstar Mortgage LLC d/b/a Champion Mortgage is licensed by the New

York City Department of Consumer Affairs License Number 1392003.")  (2) Mr. Cooper is a

publicly traded company that indirectly became the parent company to Nationstar when it acquired

Nationstar Mortgage Holding Inc. (a parent company of entities including Nationstar) in or around

July 31, 2018.  (*See* SAC ¶ 80 (describing, referencing, and citing the Mr. Cooper Form 10Q for

the quarterly period ended June 30, 2019 which details the transactional history leading to the

merger between WMIH Corp. (a predecessor of Mr. Cooper) and Nationstar Mortgage Holdings,

---

[3] As discussed below, Plaintiff is being granted leave to further amend his complaint.
The Court did not have occasion to address whether Plaintiff adequately alleged conduct by
certain defendants—*e.g.*, Champion, and the Unspecified Nationstar HECM Acquisition
Trusts—because Defendants did not argue that Plaintiff engaged in shotgun pleading.
Nonetheless, Plaintiff might wish to shore up his allegations as to what conduct is distinctly
attributable to each of the distinct defendants or whether he claims they conspired and acted
collectively.

Inc.).  So, read liberally, Plaintiff alleges that Nationstar is his servicer and possibly also the holder of the Reverse Mortgage.

Plaintiff also alleges that some interest in his mortgage, or the mortgage itself, was transferred from Nationstar to another related defendant, referred to throughout the SAC as the "Unspecified Nationstar HECM Acquisition Trust."  Plaintiff does not allege when the transfer occurred, what interest was transferred, or the identify of the Unspecified HECM Acquisition Trust that acquired the unspecified interest, though he speculates that it is one of the following trusts: (1) Nationstar HECM Trust 2015-1, (2) Nationstar HECM Trust 2016-1, or (3) Nationstar HECM Trust 2016-3.  (SAC ¶ 27.)  Despite the alleged transfer of the Reverse Mortgage (or some interest thereto) to the unspecified Nationstar HECM Trust, Plaintiff claims he never received notice of the assignment.  (SAC ¶ 32.)  There is also no public recording of an assignment from Champion to any other party.

### III.  Communications Between Plaintiff and Nationstar Regarding Tax Payments and Insurance Coverage

Plaintiff began to have issues with Nationstar's servicing of his loan in or around September 2018.  At that time, Nationstar withdrew $2,789 from his line of credit and used those funds towards acquiring a hazard insurance policy even though Plaintiff already had similar insurance.  (SAC ¶ 33.)  After Plaintiff advised Nationstar that he already had hazard insurance, Plaintiff was eventually credited $2,789 towards his line of credit in apparent recognition that he had not been deficient in acquiring hazard insurance.  (*Id.*)

Subsequently, in January 2019, Plaintiff received several communications indicating that his failure to imminently pay taxes prior to certain delinquency dates would constitute a default on the Reverse Mortgage.  (SAC ¶ 34.)  The letters allegedly advised him that he was to pay within 10 or 15 days.  (*Id.*)  Even though Plaintiff paid $7,226 in taxes in a timely manner, Nationstar

later withdrew $7,265.95 from his line of credit to pay the taxes Plaintiff already paid, and he received another notice in March 2019 that he was delinquent on the same taxes.  (SAC ¶¶ 27-35.)

This pattern of issues relating to taxes, withdrawals, and miscommunications continued. In May 2019, without warning, Nationstar took $7,196 from Plaintiff's line of credit to satisfy additional tax liabilities against the property.  (SAC ¶ 38.)  This created another dilemma for Plaintiff as he, for unstated reasons, assumed that the withdrawal of funds would be used to pay for a bill he had received in May 31, 2019, the funds were not used towards that bill, Plaintiff did not separately pay the bill, and he ultimately incurred a $278 penalty.  (*Id.*)

Likewise, on September 2, 2019, Plaintiff received a letter dated August 23, 2019 stating, in part:

> We previously sent you notice that we have not received proof that your property taxes and/or property insurance . . . were current. . . . Because we did not receive proof that the property taxes and/or insurance were current, we were required to advance the funds to pay them on your behalf . . . The total amount that has been advanced to date on your behalf is $0.00. You must take immediate action to resolve this matter or your loan may be declared 'Due & Payable.' If your loan is declared 'Due and Payable' it could result in a foreclosure action on your home.

(SAC ¶ 39.)

In response to the communication, also on September 2, 2019, Plaintiff sent a letter stating that he "was somewhat confused as to how to respond" because, among other things, "it is a notice of intent to accelerate [but] does not comply with the terms of the mortgage."  (SAC Ex. D.)  He advised Nationstar that he had been inappropriately billed for taxes and hazard insurance that were not due.  (SAC Ex. D.)  He also enclosed documents purportedly showing that his insurance was paid and that the county website did not indicate any taxes in default.  (SAC ¶ 40.) Notwithstanding his presentation of documentation, Nationstar had already taken another $7,473.60 from his line of credit in or around August 23, 2019.  (*Id.*)

6

Plaintiff learned more about the withdrawal when he received (on an unspecified date) a letter dated September 18, 2019, from Kauser Begum, a nonparty employee of Nationstar, indicating that $7,473.60 had been advanced and withdrawn from his line of credit pursuant to the terms of the Reverse Mortgage in order to pay delinquent taxes purportedly owed to Dutchess County for school taxes.  (SAC ¶ 42.)  The SAC asserts that this action was contrary to state law and the terms of the mortgage, and reflected Nationstar's misunderstanding of the operations of certain tax laws – *i.e.*, Nationstar failed to notify him in writing of the delinquency, failed to give him an opportunity to cure it before withdrawing the funds, and the relevant tax bills would not become delinquent until December 1, 2019.  (SAC ¶ 43.)

On September 19, 2019, Plaintiff faxed a letter to Nationstar that he characterizes as a Qualified Written Request ("QWR")—a legal term that connotes obligations to respond pursuant to RESPA—, and a letter to the New York State Department of Financial Services ("DFS") complaining about Nationstar's withdrawal of funds from his credit line.  (SAC ¶ 48.)  The letter to Nationstar reads in sum:

> Dear Sir or Madam,
>
> Pursuant to New York RPPP Law 280(a)(2)(e) and 3 NYCRR 79.9(4) you have been required to maintain an escrow account for the payment of taxes and insurance.  Please provide me an accounting of this escrow account.
>
> Sincerely,
>
> Donald P. Rosendale.

(SAC at Ex. F (the "September 19 Letter").)  Six days later, on September 25, 2019, Plaintiff claims that he received a phone call from Chandler Williams, an employee of Nationstar. Mr. Williams stated that he received an inquiry from the New York Department of Financial Services expressing concerns about advances made from the credit line. Mr. Williams acknowledged that

Nationstar acted improperly in taking funds from the line of credit, and Mr. Williams expressed his desire to resolve any issues.  (SAC ¶ 49.)

Sometime in or around September 2019, Kauser Begum called Plaintiff four times, left three voice messages, and spoke with Plaintiff on one occasion. In his messages, Begum stated that Nationstar did not have any record of Plaintiff's taxes for 2018 or 2019, that Plaintiff was delinquent on taxes, and that Nationstar intended to accelerate his loan and foreclose on the property if Plaintiff failed to produce records indicating that he had paid his taxes.  (SAC ¶ 50.) Also, in or around September 2019, Plaintiff received a letter dated September 21, 2019 from Nationstar that he characterizes as a response to his September 19, 2021 Letter.  (SAC ¶ 52.)  The letter states, in part, that "[w]e have received your request to update the account with authorizations for the Estate of the borrower(s).  This letter is to inform you that your request has been denied due to: incomplete documentation submitted."  (SAC at Ex. G.)

Plaintiff's letter writing campaign increased in activity around this time and he sent Nationstar three letters between September 25, 2019 and September 27, 2019.  The September 25, 2019 letter asserts that Nationstar improperly withdrew $7,463.60 from Plaintiff's line of credit based upon a tax delinquency that had not yet become delinquent and requests that Nationstar take action to correct the error by refunding him the amount improperly withdraw.  (ECF No 34-1 at 16-18.)  A letter addressed to Nationstar employee Chandler Williams dated September 27, 2019 purports to summarize a voice message he received from Nationstar, notes that Plaintiff left a voice message for an employee of Nationstar, and advises Nationstar that he filed a lawsuit out of fear and exasperation.  (ECF No. 34-1 at 20.)  A letter addressed to Kauser Begum of Nationstar dated September 27, 2019 repeats his "demand[ ] that you return my funds to my line of credit and use

8

this to honor my $5,000 request" but does not identify the basis for his contention that funds were

illegally withdrawn from his account.  (ECF No. 34-1 at 32.)

On October 3, 2019, Plaintiff received another letter from Nationstar, dated September 27,

2019 that stated, in sum:

Dear Borrower:

Our records show that your hazard insurance policy expired and we do not have
evidence that you have obtained new coverage.  Because hazard insurance is
required on your property, we plan to buy insurance for your property.  You must
pay us for any period during which the insurance we buy is in effect but you do not
have insurance.

You should immediately provide us with your insurance information.  Please ask
your agent to either fax us a policy declaration page at (866) 574-3980 or by mail
to the address shown below.  You may also provide the documentation via the
internet at www.imcovered.com/championmortgage by entering your unique
identifier provided in the bolded box below.  Please ensure that the documentation
references your loan number listed above and that the Mortgagee-Payee Clause
reads:

> CHAMPION MORTGAGE
> ITS SUCCESSORS AND/OR ASSIGNS
> ATTN: INSURANCE DEPARTMENT
> PO BOX 692399
> SAN ANTONIO, TX 78269-2399

The insurance we buy:

May be significantly more expensive that the insurance you can buy
yourself

May not provide as much coverage as an insurance policy you buy yourself.

If you have any questions, please contact us at (866) 646-0433, Monday through
Thursday, 7:00 a.m. to 7:00 p.m. and Friday 7:00 a.m. to 5:00 p.m. Central Time.

(SAC at Ex. H.)  Plaintiff had an emotional response to the letter, and broke down in tears in front

of a USPS rural delivery postman.  (SAC ¶ 54.)  Plaintiff was so disturbed by the prospect of losing

his home in a foreclosure that he contemplated suicide and sought out counsel from both secular

and religious practitioners.  (SAC ¶ 57.)  A few days later, on October 8, 2019, Plaintiff sent

another letter to Nationstar, this time requesting a copy of a cancellation notice that Nationstar purportedly received from Liberty Mutual which formed the basis for Nationstar acquiring lender-placed hazard insurance.  (ECF No. 34-1 at 26.)

Later, sometime in or around December 2019, Plaintiff sent a letter to Nationstar that he characterizes as a QWR asking for a breakdown and receipt of taxes paid.  (SAC ¶ 53.)  Plaintiff claims that the response "simply reiterated that [Nationstar] paid his school tax bill and did not provide receipts" and "ignored his request in another QWR [to identify] the owner of his loan." (SAC ¶ 53.)  Defendants have provided a copy of the letter referenced and described by Plaintiff, and it states in relevant part that:

> We advised [you in previous communications] that on August 20, 2019, we conducted our property tax search and it was determined the 2018 Dutchess County Taxes for the Independent School District (ISD) were delinquent of $7,473.60.  We confirmed with the local tax officials that the tax bill for the property was not paid and as of May 1, 2019, the total 2019 delinquent tax balance was turned over to Dutchess County for collection and lien.  Therefore, on August 22, 2019, funds of $7,473.60 were advanced from the Line of Credit (LOC) to Dutchess County Commissioner Office.  Upon making the payment on August 22, 2019, the local tax authorities confirmed that the 2019 delinquent taxes were paid in full.
>
> Please note, per the terms of the Loan, it is the responsibilities of the borrower to pay the property taxes in a timely manner and provide proof of payment.
>
> On October 17, 2019, our Tax Department contacted the local tax office and we received a breakdown of the taxes that Champion Mortgage advanced on your behalf.. [sic] The balance paid to Dutchess County includes the 2019 unpaid Town and County taxes, which themselves include a levy of the 2018's delinquent school taxes.  The 2018 School taxes were due originally by September 30, 2018.  When the taxes were left unpaid, the balance was levied onto 2019 Town and County tax bill at the end of November 2018.
>
> . . .
>
> As of the date of this correspondence we have not received your proof payment for the 2018 and 2019 property taxes.  As advised by the Tax Office, there is no refund due back for the payment we advanced on your behalf.  Please see enclosed a copy of the check which was disbursed to Dutchess County Commissioner Officer of $7,473.60 for your record.

(ECF No. 33-17.)

IV.     **Communications Regarding Adjustments to Interest Rate Calculation**

The Note and Reverse Mortgage identify certain terms relating to the calculation of an adjustable interest rate.  According to Plaintiff, the interest rate is "calculated at a 2.75% premium over LIBOR (London Interbank Offered Rate) 'as made available in the 'Money Rates' section of the Wall Street Journal."  (SAC ¶ 59.)  Plaintiff contends that, initially, the figures published in the Wall Street Journal were calculated only to the "second digit to the right hand side of the published number."  (SAC ¶ 112.)  However, on November 10, 2010, MetLife sent a letter to Plaintiff that purported to "correct" a clerical error in the Note by revising Paragraph 5(B) of the Note to reflect that the interest rate would be calculated based upon the "One-Month [LIBOR] as made available in the 'Money Rates' section of the Wall Street Journal **rounded to three digits to the right** of the decimal point."  (SAC at Ex. J (emphasis added).)  In other words, the "clarification" to the Note had the effect of calculating the interest rate at a higher amount given the new inclusion of the third digit to the right of the decimal point.

Since 2010, "Nationstar has [allegedly] been collecting and continues to collect interest calculated to the third figure to the right of the decimal."  (SAC ¶ 113.)  Plaintiff alleges that this represents "interest at a rate higher than agreed in the mortgage contract" and that the increased rate was not disclosed to him "until for unexplained reasons [Nationstar] sen[t] Mr. Rosendale a letter claiming a 'typographical error.'"  (SAC ¶ 115.)  It is not clear when this rate change was disclosed to Plaintiff.  On the one hand, Plaintiff SAC attaches a letter wherein MetLife discloses the interest rate change via letter addressed to Plaintiff's residence in 2010 as the rate change was occurring.  (SAC at Ex. J.)  On the other hand, Plaintiff alleges that he received that letter on an unspecified date in October 2019 from Nationstar when it was attached alongside other communications.  (SAC ¶ 58.)

11

V.        **Communications Regarding a Limited Waiver of Right to Foreclose**

Around the same time that Plaintiff was frustrated by, among other things, Defendants' servicing of his loan, use of his line of credit to prematurely satisfy tax liabilities, and the manner in which his interest rate was calculated, he identified a new issue with Defendants' conduct. Plaintiff realized that he was never provided a document entitled "Lender's Limited Waiver of the Right of Foreclosure" even though lenders licensed under New York law are required by regulation to, under certain circumstances, prepare such a form.  (SAC ¶ 103.)  The waiver form that he claims he was entitled to is described in 3 N.Y. Comp. Code R. & Regs. § 79.7(d).  Plaintiff notes that, upon requesting such a form, Defendants responded that there was no such form in his loan papers and that under certain circumstances "the Lender may do and pay whatever is necessary to protect the value of the property and other items."  (SAC ¶ 106.)  Plaintiff further contends that this failure to provide such a form is "Nationstar's policy" and "is practiced in its dealings with all borrowers in services, and not just Mr. Rosendale.  (SAC ¶ 108.)

## LEGAL STANDARD

On a Fed. R. Civ. P. 12(b)(6) motion, dismissal is proper unless the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  When there are well-pleaded factual allegations in the complaint, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."  *Id.* at 679.  The critical inquiry is whether the plaintiff has pled sufficient facts to nudge the claims "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 555.  A motion to dismiss will be denied where the allegations "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

*Pro se* complaints are to be liberally construed. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). They must be held to less stringent standards than complaints written by lawyers, and only dismissed when the plaintiff can prove "no set of facts in support of his claim which would entitle him to relief." *Estelle*, 429 U.S at 106 (quoting *Conley v. Gibson*, 335 U.S. 41, 45–46 (1957)). This "is particularly so when the *pro se* plaintiff alleges that [his] civil rights have been violated." *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008). *Pro se* complaints must be interpreted as raising the strongest claims they suggest, but "must still state a plausible claim for relief." *Hogan v. Fischer*, 738 F.3d 509, 515 (2d Cir. 2013).

## DISCUSSION

Plaintiff asserts claims for (1) violation of the RESPA Section 2605; (2) violation of the TILA Section 1641; (3) common law conversion; (4) common law gross negligence; (5) breach of the implied covenant of good faith and fair dealing; (6) violations of GBL Section 349; (7) intentional infliction of emotional distress; and (8) statutory invalidation of a recorded instrument pursuant to N.Y. Real Property Law Section 329. Defendants move to dismiss each claim. The Court addresses the arguments raised with respect to each claim in order.

I.      **Whether RESPA Section 2605(e) Claims Survive the Motion**

Though less than clear, read liberally, Plaintiff attempts to assert a RESPA claim based on allegedly inadequate responses he received from Nationstar to numerous letters sent between September 2019 and March 2020. Defendants contend that Plaintiff has failed to properly assert a RESPA claim because: (1) Defendants provided full and complete responses to certain QWRs sent by Plaintiff; (2) Plaintiff fails to adequately plead the contents of any QWR submitted in December 2019; and (3) Plaintiff fails to adequately plead damages as a result of any RESPA violation. In order to assess the viability of Plaintiff's RESPA claims, the Court *first* analyzes whether any of the letters sent by Plaintiff qualify as QWRs, *then* analyzes whether Plaintiff fails

13

to allege a violation of RESPA in light of Defendants' responses to his inquiries, and then *finally* analyzes whether Plaintiff adequately alleged damages. The Court concludes that, although Plaintiff plausibly alleges several QWRs and plausibly pleads three RESPA violations, he fails to adequately allege actual or statutory damages.

### A.      Whether Plaintiff Adequately Pled Existence of QWRs

Under, RESPA, a QWR is defined as:

> [A] written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, that—(i) includes, or otherwise enables the servicer to identify, the name and account of the borrower; and (ii) includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower.

12 U.S.C. § 2605(e)(1)(B). Relatedly, "Section 2605 obligates a loan servicer to respond to QWRs only insofar as those requests seek 'information relating to the servicing of such loan[s],' with 'servicing' defined as 'receiving any scheduled periodic payments from a borrower' and applying such proceeds to the principal, interest, and other amounts owed to the holder of the loan." *Gorbaty v. Wells Fargo Bank, N.A.*, No. 10-CV-3291 NGG SMG, 2014 WL 4742509, at *7 (E.D.N.Y. Sept. 23, 2014) (quoting 12 U.S.C. § 2605(e)(1)(A), (i)(3)).

Here, Plaintiff has adequately pled that several letters he submitted to Defendants qualified as QWRs. *First*, the September 2, 2019 letter qualifies as a QWR because it is a written correspondence providing a means of identifying the borrower and the loan number, sets forth reasons why Plaintiff believed that it was an error for Defendants to acquire hazard insurance, and requested a phone call to discuss how Defendants determined that his taxes were delinquent. *Second*, while it is a closer call, Defendants do not appear to dispute that the September 19, 2019 Letter qualifies as a QWR. (Defs' Mem at 9.) In any event, the Court concludes that it is a QWR because it is a written correspondence identifying the loan number and borrower's name and

requested "an accounting of [any] escrow account" maintained by Defendants for the purposes of satisfying tax and insurance liabilities.

*Third*, several of the letters that Plaintiff attached to his opposition to the motion to dismiss that also qualify as QWRs.[4]   A letter dated September 25, 2019 qualifies as a QWR because it identifies the borrower, references a prior communication regarding the servicing of his loan and thus enables the identification of his loan, identifies a purported error with his account—*i.e.*, that Nationstar withdrew $7,463.60 from Plaintiff's line of credit based upon a tax delinquency that had not yet become delinquent—and requests that Nationstar take action to correct the error by refunding him the amount improperly withdraw.  (ECF No 34-1 at 16-18.)  A letter dated October 8, 2019 also qualifies as a QWR because it identifies the borrower and loan number, and requests information relating to his account – *i.e.*, Plaintiff requested a copy of a cancellation notice that Nationstar purportedly received from Liberty Mutual which formed the basis for Nationstar acquiring lender placed hazard insurance.  (ECF No. 34-1 at 26.)

Certain of the letters attached to the opposition papers do not meet the statutory definition of QWRs.  For example, a letter addressed to Chandler Williams dated September 27, 2019 purports to summarize a voice message he received from Nationstar, notes that he left a voice message for an employee of Nationstar, and advises Nationstar that he filed a lawsuit out of fear

---

[4] Although the letters themselves were not attached to the SAC, the Court may consider documents attached to opposition papers because they are consistent with allegations in the SAC and Plaintiff is proceeding pro se.  *See Gayot v. Perez*, No. 16-CV-8871 (KMK), 2018 WL 6725331, at *4 (S.D.N.Y. Dec. 21, 2018); *Alsaifullah v. Furco*, No. 12-CV-2907, 2013 WL 3972514, at *4 n.3 (S.D.N.Y. Aug. 2, 2013); *Agu v. Rhea*, No. 09-CV-4732, 2010 WL 5186839, at *4 n.6 (E.D.N.Y. Dec. 15, 2010).  The additional letters attached to the opposition are consistent with the allegations of the SAC as they were expressly, though briefly, described therein.  (*See* SAC ¶ 71 ("In subsequent more formal QWR's [sic], Mr. Rosendale sought unsuccessfully to (a) Learn the identity of his lender; (b) Obtain a receipt for the check Nationstar said it had sent for his May 2019 taxes (c) obtain a copy of the 'limited waiver' of Nationstar's right to foreclose as mandated by New York law.").

and exasperation.  (ECF No. 34-1 at 20.)  Nothing in the letter requests any information or identifies an issue with the servicing of his account.  As such, the letter simply does not qualify as a QWR.  (ECF No. 34-1 at 26.)  Likewise, a second letter dated September 27, 2019 addressed to Kauser Begum does not qualify as a QWR because, although it demands remedial action—*i.e.*, the return of certain unspecified funds—it does not identify the basis for Plaintiff's contention that funds were taken in error, it simply demands the return of funds and alleges that funds were taken illegally.  (ECF No. 34-1 at 32.)

Plaintiff also does not adequately allege the existence of a December 2019 QWR.  With respect to the December 2019 QWR, Plaintiff states that "in December of 2019, Mr. Rosendale sent a QWR asking for a breakdown and receipt of taxes paid."  (SAC ¶ 53.)  This vague allegation is insufficient to meet the statutory definition of a QWR.  *See, e.g.*, *Frone v. JP Morgan Chase & Co.*, 695 F. App'x 468, 473 (11th Cir. 2017) (affirming finding that QWR was not alleged because plaintiff "did no more than vaguely assert servicing errors and generally dispute the validity of the debt, thereby failing to meet the statutory definition of a QWR."); *Fournier v. Bank of Am. Corp.*, No. 5:13-CV-00702, 2014 WL 421295, at *5 (N.D.N.Y. Feb. 4, 2014) ("Plaintiff failed to allege, in nonconclusory terms, that any of her four alleged QWRs complied with the statutory definition of a QWR.").

Likewise, Plaintiff appears to make a definitional error when he characterizes certain letters that he did not send to Nationstar as QWRs.  For example, he defines certain letters he received from Nationstar as QWRs.  (*See* Pl's Opp. at 15-21 (characterizing communications he received from Nationstar as QWRs).)  Likewise, Plaintiff seems to characterize an email he sent to DFS as a QWR.  (*See id.*; ECF No. 34-1at 42.)  None of these letters qualify as QWRs as a QWR by definition must be a communication sent from the borrower to the servicer.

Finally, exhibits submitted by Defendants suggest that there may have been additional QWRs submitted by Plaintiff that were not described in the SAC or attached to Plaintiff's opposition papers. For example, a letter sent by Nationstar on December 18, 2019 references a correspondence sent by Plaintiff to Nationstar on December 16, 2019. (ECF No. 33-17.) Accordingly, to the extent that a QWR dated December 16, 2019 exists, it is not properly before this Court. Similarly, Plaintiff also submitted a letter addressed to Nationstar dated March 3, 2020, roughly one-week after the SAC was filed, requesting further information regarding the identity of his loan servicer. (ECF No. 34-1 at 49.) Simply put, the Court will not opine on the propriety of new QWRs post-dating the SAC at this time. To the extent Plaintiff files a third amended complaint describing any new QWRs the Court will address those correspondences at that time.

In sum, the Court concludes that the following letters constitute well-pled QWRs: (1) the September 2, 2019 letter; (2) the September 19 letter; (3) the September 25, 2019 letter; and (4) the October 8, 2019 letter.

### B.    Whether Defendants Adequately Responded to QWRs

"RESPA is a consumer-protection statute . . . [that] imposes short timeframes for mortgage servicers to respond to potentially detailed inquiries." *Roth v. CitiMortgage Inc.*, 756 F.3d 178, 181 (2d Cir. 2014) (citing *Freeman v. Quicken Loans, Inc.*, 566 U.S. 624 (2012)). The purpose of RESPA is to "insure that consumers throughout the Nation are provided with greater and more timely information on the nature and costs of the settlement process and are protected from unnecessarily high settlement charges caused by certain abusive practices. . . ." 12 U.S.C. § 2601(a). Accordingly, "[w]hen a servicer receives a QWR, it must acknowledge receipt within five days and depending on the nature of the inquiry, take certain actions within thirty days." Castro, 2018 WL 4158344, at *3 (citing 12 U.S.C. § 2605(e)(1)-(2)). These actions can include making the requested corrections to the borrower's account, or, after an investigation, providing

17

written explanations as to why the servicer believes the account is correct or why the information requested by the borrower is unavailable or cannot be obtained by the servicer. *See* 12 U.S.C. § 2605(e)(2).

Courts have distinguished the adequacy of responses to QWRs based on whether the requested information was provided and whether alleged inaccuracies in the account were thoroughly addressed in responsive materials. For example, the court in *Izmirligil v. Select Portfolio Servicing, Inc.*, found that responses to requests for information as to why the servicer acquired hazard insurance and requests for information relating to payment history were adequate where defendant "explained why it had imposed a [hazard insurance] policy, what charges were made, and when those charges ceased" and "provided Plaintiff's payment history, as well as other relevant documents." No. 18CV7043PKCLB, 2020 WL 1941319, at *6 (E.D.N.Y. Apr. 22, 2020). Likewise, the statutory obligation of a servicer is to provide the borrower with "a written explanation . . . of the reasons for which the *servicer believes* the account of the borrower is correct." 12 U.S.C. § 2605(e)(2)(B)(i) (emphasis added). On this basis, the Eleventh Circuit determined that even where the lender was "confused and/or unsatisfied with" the servicer's response, no RESPA violation occurred because "the information provided an explanation to [borrower] as to what happened to her September payment and provided her with contact information for further support." *Bates v. JPMorgan Chase Bank, NA*, 768 F.3d 1126, 1135 (11th Cir. 2014). By contrast, the defendant in *Izmirligil* failed to provide an adequate response to plaintiff's inquiry as to why his payment history did not reflect certain payments made, where defendant merely asserted that it would "refrain from providing a detailed response" in light of ongoing litigation. 2020 WL 1941319, at *6.

As discussed above, there are four cognizable QWRs among the Plaintiff's allegations and submissions.  Defendants argue that they adequately responded to the September 2, 2019 letter, the September 19, 2019 letter, and the September 27, 2019 letter.  (Defs' Mem. at 5-9.)  Defendants do not address the October 8, 2019 letter in their papers.  Plaintiff responds that Defendants either did not respond to certain QWRs or that Defendants failed to respond in a satisfactory manner. (Pl's Opp. at 8-22.)

From a review of the responses attached to the SAC and Plaintiff's opposition papers, the Court concludes that certain of the responses satisfied certain of Defendants' obligations under RESPA but that, based on the current record, Plaintiff has satisfactorily alleged several RESPA violations.

With respect to the September 2, 2019 letter, Defendants mostly satisfied their obligation to timely provide Plaintiff with a written explanation of the reasons that Nationstar believed that its account was correct.  The response contains a detailed explanation of how Nationstar conducted an investigation, determined that Plaintiff had a delinquency of $7,473.60 for 2018 Dutchess County school taxes, and that Nationstar withdrew $7,473.60 against Plaintiff's line of credit to pay for the delinquency and avoid the County placing a lien against the property.  (SAC at Ex. E.) Accordingly, Plaintiff failed to plausibly allege a violation of Section 2605(e) based on the substance of Defendants' September 18, 2019 response to Plaintiff's September 2, 2019 QWR. Nonetheless, there is no record that Defendants responded within five days of receipt of Plaintiff's September 2, 2019 letter to acknowledge receipt and, accordingly, Plaintiff has plausibly alleged at least that Defendants violated RESPA with respect to their obligation to acknowledge such

receipt within five days.[5]  Accordingly, Plaintiff has plausibly pled at least one technical RESPA

violation with respect to Nationstar's obligation to acknowledge his September 2, 2019 QWR.

Relatedly, Plaintiff disputes the accuracy of Defendants' response to his September 2, 2019

QWR, argues that no taxes were delinquent, and cites N.Y. Real Prop. Tax Law §§ 902 and 981

for the position that his taxes could not have been delinquent insofar as he had not received a notice

that the taxes were declared delinquent.  (*See, e.g.*, SAC ¶ 43.)  In the first instance, it does not

appear that either of those statutory provisions are operative as to whether a delinquency exists for

county level taxes.  N.Y. Real Prop. Tax Law § 902 on its face establishes when a tax becomes a

lien rather than when it becomes delinquent.  N.Y. Real Prop. Tax Law § 981(4) expressly notes

that "[t]he provisions of this section shall not apply to tax statements prepared by the collecting

officer of a school district or a village for which the county enforces delinquent taxes," and the

relevant tax here is a county level tax for the school district.  In any event, even if it were true that

the taxes were not delinquent, the relevant obligation here under RESPA is that servicers must

explain the reasons the servicer believes the account is correct—*i.e.*, why Nationstar believed that

taxes were delinquent—and there can be no dispute that documents attached to the SAC expressly

show Nationstar thoroughly describing why it believed taxes were delinquent.

With respect to the September 19, 2019 QWR, Defendants did not provide a timely

response to Plaintiff's QWR.  *First*, there is nothing indicating that Defendants responded within

five days of receipt to confirm that they acknowledged Plaintiff's QWR.  Instead of identifying a

---

[5] Defendants state in their moving brief, without citation, that "Nationstar acknowledged receipt of Plaintiff's letter on September 6, 2019, within the five day period required for such acknowledgments." (Defs' Mem. at 13.)  The Court cannot accept this unattested representation on a motion to dismiss and finds it somewhat suspicious that Defendants were able to attach numerous other correspondences with Plaintiff yet failed to provide a copy of a purported acknowledgment.  Either no acknowledgment was sent on September 6, 2019 or Defendants' counsel simply overlooked the import of demonstrating the existence of such a document.

letter where Defendants acknowledged Plaintiff's September 19, 2019 letter, Defendants point to correspondences dated September 30, 2019 and October 2, 2019 in which Nationstar acknowledged Plaintiff's correspondences dated September 25, 2019 and September 27, 2019. (Defs' Mem at 9 (citing ECF No. 33-9, ECF No. 33-10).)   The acknowledgments cited by Defendants do not demonstrate that Nationstar appropriately acknowledged the September 19, 2019 letter because they were in fact acknowledging distinct letters.

*Second*, the Court must make inferences in favor of Plaintiff on this motion to dismiss and there simply nothing indicating that Defendants' response dated October 23, 2019 was a timely response to Plaintiff's September 19, 2019 QWR.  The October 23, 2019 letter does not reference or purport to respond to the September 19, 2019 QWR and instead only acknowledges that Nationstar "received your correspondence on September 25, 2019 and September 27, 2019, and have put together this reply with information that we hope will alleviate your concerns."  (ECF No. 33-12.)  Defendants unconvincingly advance the position that the October 23, 2019 letter was an omnibus response to Plaintiff's flurry of communications between September 19, 2019 and September 27, 2019.  Their position strains credulity given that the October 23, 2019 letter does not purport to address any letter received on September 19, 2019 while expressly citing other letters received from Plaintiff.

*Third*, notwithstanding the failure to directly reference Plaintiff's September 19, 2019 QWR in its October 23, 2019 letter, Nationstar did seem to, in part, address the concerns raised by Plaintiff in its separate October 22, 2019 letter addressed to DFS.  As discussed above, the September 19, 2019 QWR requested "an accounting of [an] escrow account" to which Plaintiff claimed he was entitled under New York law.  (SAC at Ex. E.)  In its October 22, 2019 letter to DFS, Nationstar stated that "The Loan records do not indicate that an escrow or 'set-aside' account

was established for Mr. Rosendale at origination.  In fact, Mr. Rosendale executed a Tax and Insurance Payment Notice indicating his consent and acknowledgment that he would be responsible for paying taxes and maintaining hazard insurance on the property." (ECF No. 33-15 at 2.)  As this letter was sent to the DFS rather than Plaintiff, and is in any event not properly before the Court,[6] it cannot satisfy Nationstar's obligation to respond to QWRs.

With respect to Plaintiff's September 27, 2019 letter, Defendants have demonstrated through documents Plaintiff attached in his opposition papers that they satisfied their obligation to provide a timely and thorough acknowledgment and subsequent response to Plaintiff's inquiry. Nationstar acknowledged receipt of the September 25, 2019 letter within five days on September 30, 2019.  (ECF No 34-1 at 35.)  Subsequently, Nationstar responded on October 23, 2019 with a thorough letter addressing each of the issues Plaintiff raised in his September 25, 2019 letter.  (ECF No. 34-1 at 38-40.)  In his September 25, 2019 letter, Plaintiff disputed that his taxes (described above) were delinquent when Nationstar withdrew funds to pay those taxes according to a website he accessed, recited an incident in which funds were withdrawn to inappropriately pay for taxes (and subsequently refunded) earlier that year, and demanded that the recent tax payment withdrawal be refunded.  (ECF No. 34-1 at 16-18.)  Nationstar responded by addressing each of these issues, noting that they conducted a property tax search, determined that the taxes were delinquent, confirmed same with local tax officials, and thereupon advanced funds to pay the

---

[6] Defendants submit several responses to QWRs as exhibits to their motion and contend that the Court can consider them as exhibits relied upon the complaint.  Defendants do not specifically point out where any of the numerous responses were referenced in the SAC nor explain how they were relied upon by Plaintiff.  This is insufficient to put those documents before the Court on a motion to dismiss.  *Shakespeare v. Compu-Link Corp.*, 848 F. App'x 474, 475 (2d Cir. 2021) (noting that it was inappropriate for the district court to consider certain documents on a motion to dismiss where "[plaintiff] did not rely on these documents in bringing her action; indeed, she barely referenced the first foreclosure action in her complaint.").

delinquent taxes.  (ECF No. 34-1 at 38-40.)  As discussed in more detail above, Plaintiff may dispute that the taxes were delinquent, and may be correct, but Nationstar's obligation as a servicer responding to a QWR is to provide an explanation for why it believes the account was accurate and that is exactly what it did.

With respect to Plaintiff's October 8, 2019 QWR, there is nothing suggesting that Defendants acknowledged receipt of the QWR or responded to it substantively.  In that QWR, Plaintiff asked for a copy of a notification that Nationstar allegedly received from Liberty Mutual stating that Plaintiff's insurance would be cancelled effective September 25, 2019 unless they received a payment from him.  (ECF No. 34-1 at 26.)  Though there is no response from Nationstar expressly addressing this letter, a review of other correspondences indicate that Nationstar responded to similar inquiries, repeatedly stated that Plaintiff's insurance was cancelled and that it was required to obtain Lender Placed Insurance on his behalf, and did not provide Plaintiff with a copy of the cancellation notice that he requested.  (*See, e.g.*, ECF No. 33-16.)  Accordingly, Defendant did not adequately respond to Plaintiff's October 8, 2019 QWR, and Plaintiff has adequately identified a RESPA violation here.

In sum, Plaintiff has plausibly alleged that Defendants failed to timely acknowledge his September 2, 2019, September 19, 2019, and October 8, 2019 QWRs and he has plausibly alleged that Defendants failed to adequately respond to his September 19, 2019 and October 8, 2019 QWRs.  Plaintiff has not plausibly alleged that Defendants failed to acknowledge his September 25, 2019 QWR and Plaintiff has not plausibly alleged that Defendants failed to adequately respond to his September 2, 2019 and September 25, 2019 QWRs.

### C.    Whether Plaintiff Adequately Alleged Damages

In order to adequately plead a violation of Section 2605, a plaintiff must plausibly allege one of two types of available damages: (1) "actual damages to the borrower as a result of the

failure" to respond to the QWR or otherwise comply with § 2605; or (2) statutory damages, "in the case of a pattern or practice of noncompliance with the requirements" of Section 2605. 12 U.S.C. § 2605(f)(1). Plaintiff contends that he has adequately alleged actual damages in the form of emotion damages and statutory damages based on a pattern or practice of noncompliance and Defendants argue that Plaintiff has not adequately alleged either form of damages. As discussed further below, the Court concludes that Plaintiff has failed to adequately allege actual or statutory damages.

### 1.    *Actual Damages (i.e., Emotional Harm)*

As a general matter, Section 2605 provides for damages "as a result of [the loan servicer's] failure" to comply with its provisions. 12 U.S.C. § 2605(f). Accordingly, a plaintiff seeking actual damages under § 2605 must allege that the damages were proximately caused by the defendant's violation of RESPA." *Bonadio v. PHH Mortg. Corp.*, No. 12–CV–3421 (VB), 2014 WL 522784, at *6 (S.D.N.Y. Jan. 31, 2014). Relatedly, "[s]imply saying that . . . the servicer's failure to respond to a QWR caused damages without specifying how those damages were caused, is not enough to survive a motion to dismiss." *Id.* (internal quotation marks, alterations, and citation omitted); *see also Martini v. JPMorgan Chase Bank, N.A.*, 634 Fed. App'x. 159, 164 (6th Cir. 2015) ("Even if we assume, arguendo, that Chase violated RESPA and that the Martinis' letters qualified as QWRs, the Martinis fail to adequately plead the required associated damages [because they] allege damages that are due to their inability to pay their mortgage, not the alleged RESPA violation."); *In re Griffin*, No. 10-22431-RDD, 2010 WL 3928610, at *4 (Bankr. S.D.N.Y. Aug. 31, 2010) ("[S]imply saying that, for example, the servicer's failure to respond to a QWR caused damages without specifying how those damages were caused," is not enough to survive a motion to dismiss).

24

Assuming arguendo that emotional damages are cognizable under Section 2605—*see, e.g.*, *In re Residential Capital, LLC*, 513 B.R. 446, 465 (Bankr. S.D.N.Y. 2014) (collecting cases and concluding that emotional distress damages can constitute "actual damages" under RESPA)—such harms must be directly caused by the alleged Section 2605 violations.  Courts regularly find an absence of causation between RESPA violations and claimed emotional damages where, "[e]ven if plaintiff [] suffered emotional distress from the possible loss of [his] home, plaintiff has not alleged that this injury was proximately caused by defendant's failure to comply with RESPA, *i.e.*, the form and timing of its response to plaintiff's letters."  *Roth v. CitiMortgage Inc.*, No. 12-CV-2446 SJF WDW, 2013 WL 5205775, at *8 (E.D.N.Y. Sept. 11, 2013), *aff'd*, 756 F.3d 178 (2d Cir. 2014); *see also Gorbaty v. Wells Fargo Bank, N.A.*, No. 10-CV-3291 NGG SMG, 2014 WL 4742509, at *6 (E.D.N.Y. Sept. 23, 2014) (holding that plaintiff "does not adduce sufficient factual allegations linking her purported stress and anxiety to Wells Fargo's failure to adequately respond to her QWRs in violation of § 2605").

With respect to actual damages, Plaintiff exclusively asserts emotional harms and fails to establish a nexus between his emotional distress and the any RESPA violation.  *First*, as pled, Plaintiff states that he was independently depressed and suicidal as a result of his difficult health condition and separate from the conduct of Defendants.  (*See* SAC ¶ 57 ("During this period, Mr. Rosendale was severely depressed and thought of 'ending it all.'"); SAC ¶ 130 (describing himself as "emotionally vulnerable, not just because of his age but because his emotional state after [ ] treatment for [his illness] in January of 2019.").)  Where proximate causation is a required element of the claim, suicidal acts are widely considered attenuated, not foreseeable, and not attributable to defendants.  *See, e.g., Mroz v. City of Tonawanda*, 999 F. Supp. 436, 458-61 (W.D.N.Y. 1998) (finding no causal connection existed between alleged failure to protect a minor's suicide where

he was arrested by police, cried continuously while in custody, and was then released and taken home less than one hour later); *Van Valkenburgh v. Robinson*, 225 A.D.2d 839, 840-41 (3d Dep't 1996) (holding that alleged negligence of village police and officer—allowing wife of officer to gain access to officer's service weapon—was not the proximate cause of wife's suicide, an intentional intervening act that was not reasonably foreseeable as a result of such negligence); *Watkins v. Labiak*, 282 A.D.2d 601, 602 (2d Dep't 2001) (holding that "suicide was not a foreseeable consequence of the defendants' alleged negligence," medical malpractice during a back surgery).

*Second*, to the extent that Plaintiff is claiming that his severe depression and suicidal thoughts were caused by his communications with Nationstar, he fails to allege that the aspect of those communications that caused his emotional harms were the same deficiencies that violated RESPA.  Read liberally, Plaintiff seems to contend that his emotion damages were caused by the prospects of losing his home in a foreclosure proceeding and Nationstar's insistence that certain taxes had been delinquent.  (Pl's Opp. at 13 (stating that "Nationstar's insouciance at not correcting its [unspecified] error and Ms. Begum's constant reiteration that because I 'hadn't paid (my) taxes for two years Nationstar could foreclose" caused him to become "severely depressed and [think] of ending it all.")).  However, as discussed above, the actionable aspects of Nationstar's conduct included its failure to (1) acknowledge several of Plaintiff's QWRs, (2) respond to an inquiry regarding an accounting of Plaintiff's (nonexistent) escrow account, and (3) provide a copy of a purported notice from Liberty Mutual.  Plaintiff does not claim emotion damages resulted from the tardiness of Nationstar's responses or their failure to provide responses regarding the existence of an escrow account or provide him a copy of a notice from Liberty Mutual.  Accordingly, Plaintiff has failed to plead actual damages in the form of emotional harms.

2.      *Statutory Damages*

RESPA provides that, in addition to "any actual damages," borrowers may also recover "any **additional** damages, as the court may allow, in the case of a pattern or practice of noncompliance with the requirements of this section, in an amount not to exceed $2,000." 12 U.S.C. § 2605(f)(1)(A)–(B) (emphasis added). Courts in this circuit have held that "the plain language of Section 2605 indicates that an allegation of actual damages is necessary to state a claim for liability." *Dolan v. Select Portfolio Servicing*, 2016 WL 4099109, at *5 (E.D.N.Y. Aug. 2, 2016); *see also, e.g.*, *Evans v. Select Portfolio Servicing, Inc.*, No. 18CV5985PKCSMG, 2020 WL 5848619, at *14 (E.D.N.Y. Sept. 30, 2020) ("'Although RESPA permits recovery of both actual and statutory damages, proof of actual damages is mandatory to recover on a § 2605(e) violation, and a § 2605(e) claim cannot stand on statutory damages alone.'" (quoting *Kelmetis v. Fed. Nat'l Mortg. Ass'n*, No. 16-CV-246 (MAD) (CFH), 2017 WL 395120, at *8 (N.D.N.Y. Jan. 27, 2017)); *Naimoli v. Ocwen Loan Serving, LLC*, No. 6:18-CV-06180 EAW, 2020 WL 2059780, at *15 (W.D.N.Y. Apr. 29, 2020) ("As a threshold matter, having failed to raise a triable issue of fact as to actual damages, Plaintiff's claim for statutory damages necessarily fails."); *Izmirligil*, 2020 WL 1941319, at *8 n.21 ("The word 'additional' suggests that RESPA might not permit recovery of statutory damages alone."); *Bonadio*, 2014 WL 522784 at *5 ("Although RESPA permits recovery of both actual and statutory damages, 'proof of actual damages is mandatory to recover on a § 2605(e) violation, and [ ] a § 2605(e) claim cannot stand on statutory damages alone.'"). Accordingly, as Plaintiff has failed to assert actual damages, he cannot independently premise his Section 2605 claim on statutory damages.

Even if Plaintiff had properly pleaded actual damages, Plaintiff has nonetheless failed to allege a pattern or practice of noncompliance that would entitle him to statutory damages. He has, at best, alleged RESPA violations with respect to Defendants' responses to three QWRs—*i.e.*,

Defendants failed to either acknowledge or respond to the September 2, 2019, September 19, 2019, and October 8, 2019 QWRs—and courts have previously treated three distinct Section 2605 violations as insufficient to establish a pattern or practice. *See, e.g.*, *Fournier*, 2014 WL 421295 at *4 ("[T]he Court agrees with Defendants that three instances of noncompliance with RESPA is insufficient to establish a pattern or practice of noncompliance, particularly where Defendants responded to Plaintiff's fourth alleged QWR in a timely manner."). Accordingly, as pleaded, Plaintiff fails to allege a pattern or practice of noncompliance, and has failed to plead damages as required to state a claim under Section 2605. *Roth*, 2013 WL 5205775, at *9 ("[P]laintiff has failed to allege a basis for either actual or statutory damages, and therefore her RESPA claims must be dismissed.").

*     *     *

Although Plaintiff has satisfactorily pled the existence of several QWRs and violations of Section 2605(e) with respect to three QWRs, he has failed to establish either actual or statutory damages, and thus his RESPA claim is dismissed without prejudice to repleading. The Court notes that, although the SAC exclusively premises RESPA liability upon Defendants' responses to his QWRs under Section 2605(e), he also makes passing references to potential failures by Defendants to provide statutorily required notice prior to withdrawing funds from his line of credit. Plaintiff may wish to not only replead his Section 2605(e) claims to correct deficiencies identified herein, but also to assert a claim under other related sections of RESPA or associated regulations including, but not limited to, 12 C.F.R. § 1024.36 or Section 2605(k) to the extent facts support such claim(s).

## II.    Whether Plaintiff's TILA Claim is Plausibly Alleged

The TILA provides, "not later than 30 days after the date on which a mortgage loan is sold or otherwise transferred or assigned to a third party, the creditor that is the new owner or assignee

of the debt shall notify the borrower in writing of such transfer," including the new creditor's identity, address, and telephone number; the transfer date; how to reach an agent or party with authority to act on behalf of the new creditor; where the transfer of ownership is recorded; and any other relevant information regarding the new creditor.   15 U.S.C. § 1641(g)(1) ("Section 1641(g)").

Though the parties do not point the Court to any relevant in-circuit authority, it appears that courts outside of the Second Circuit have held that Section 1641(g) plaintiffs must plead the identity of the transferee defendant that failed to disclose the assignment of plaintiff's mortgage loan, and the date when the assignment or transfer occurred.  For example, the court in *Derusseau v. Bank of Am., N.A.* held that "to state a cognizable claim, Plaintiff must allege **when** her loan was transferred to [Transferee Defendant]" and that dismissal is appropriate where "[t]he SAC does not contain any allegations regarding the timing of the purported transfer" and instead "merely speculates that at some point in time 'Defendants' attempted to securitize her loan by placing it in a trust."  No. 11 CV 1766 MMA JMA, 2012 WL 1059928, at *4 (S.D. Cal. Mar. 28, 2012); *see also Zeppeiro v. GMAC Mortg., LLC*, No. CV 12-5357 ABC (RZX), 2013 WL 12165671, at *3 (C.D. Cal. Feb. 13, 2013) (finding that Section 1641(g) claim "fail[ed] because Plaintiff has not alleged **when the transfer occurred** or why Fannie Mae is even subject to § 1641(g), especially given that Plaintiff also alleges that any transfer to Fannie Mae was invalid.") (emphasis added), *aff'd in part*, 662 F. App'x 500 (9th Cir. 2016).  Similarly, plaintiffs fail to plausibly allege a violation of Section 1641(g) where they do "not allege . . . which Defendant was the creditor or the new owner or assignee of the debt such that they were required to provide Plaintiff notice under Section 1641(g)."  *Ramirez v. Kings Mortg. Servs., Inc.*, No. 1:12-CV-01109-AWI, 2012 WL 5464359, at *12 (E.D. Cal. Nov. 8, 2012).  Though this Court has not identified any cases in this

Circuit expressly stating that it is necessary to plead the date of an assignment and the identity of the transferee defendant, the principle expressed in the aforementioned out-of-circuit cases is consistent with the general rule of pleading that "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.  Accordingly, this Court concludes that a party cannot plead a Section 1641(g) claim without, at a minimum, identifying when the at-issue assignment or transfer occurred and the identity of the transferee defendant that purportedly failed to provide adequate notice of the assignment or transfer to plaintiff.

In the instant case, Plaintiff asserts that he "has learned the names of three REMIC trusts that Nationstar sold the 2009 reverse mortgage[s] it bought from MetLife.  In mortgage assignments of some of these have been filed with various County clerks but the one concerning Mr. Rosendale has not been filed with the Dutchess clerk nor has he been notified of the assignment."  (SAC ¶ 84.)  Further, Plaintiff claims that, even though Nationstar identified Federal National Mortgage Association ("Fannie Mae") as the owner of the loan, he was advised by Fannie Mae that "Nationstar had been free to sell it to a HECM trust as alleged to one of the HECM trusts."  (SAC ¶ 87.)  Plaintiff also alleges that HUD "owned the loan as of January 24, 2018. (SAC ¶ 88.)  From these pleadings the Court cannot discern: (1) what interest was allegedly transferred – *i.e.*, although Plaintiff discusses "ownership" of the "loan" he does not make clear whether this refers to an assignment or transfer of the mortgage loan, the mortgage, the note, a different interest, or a combination of those interests; (2) the identity of the transferee defendant – *i.e.*, he asserts that the transferee is one of three "unspecified Nationstar HECM Acquisition Trusts; or (3) the date when a transfer or assignment occurred – *i.e.*, at best, Plaintiff implies that some interest in his mortgage or loan was transferred sometime before April 2, 2019 based on his reading of a SEC Form 10-Q filed.  As Plaintiff has not pled the interest that was transferred, the identity

of the transferee or assignee that failed to provide him with adequate notice, or the date of the alleged transfer or assignment, he has failed to plausibly allege a violation of Section 1641(g).

Accordingly, the Court grants Defendants' motion to dismiss with respect to Plaintiff's TILA claim, and dismisses Plaintiff's TILA claim without prejudice. To the extent Plaintiff files a third amended complaint, he may seek to cure deficiencies identified herein by obtaining information from Defendants relating to: (1) any interest that the Unspecified HECM Acquisition Trusts may have in his mortgage, mortgage loan, or note; (2) an accounting of what interest Nationstar claims to have in his mortgage, mortgage loan, or note; and, (3) how, if at all, the ownership of his mortgage, mortgage loan, or note changed since Nationstar was initially assigned his mortgage loan in 2012. To the extent that Defendants act in bad faith by not providing complete information, the Court may consider imposing the appropriate sanction, including an adverse inference. Plaintiff may also consider amending his complaint to add Fannie Mae as a defendant given that it is Defendants' representation that Fannie Mae is the owner of his mortgage loan and Fannie Mae apparently failed to make any required notifications to Plaintiff after obtaining that interest in his loan.

III.    **Whether Plaintiff's Conversion Claim is Plausibly Alleged**

"To establish a cause of action to recover damages for conversion, a plaintiff must show legal ownership or an immediate superior right of possession to a specific identifiable thing and must show that the defendant exercised an unauthorized dominion over the thing in question to the exclusion of the plaintiff's rights." *Barnet v. Drawbridge Special Opportunities Fund LP*, No. 14-CV-1376 PKC, 2014 WL 4393320, at *19 (S.D.N.Y. Sept. 5, 2014) (quoting *Nat'l Ctr. for Crisis Mgmt., Inc. v. Lerner*, 91 A.D.3d 920 (2d Dep't 2012)). "Tangible personal property or specific money must be involved." *Lerner*, 91 A.D.3d at 921 (internal citations and quotation marks omitted). Where, as here, the subject of the conversion claim is money, rather than other personal

property, there must be "a specific, identifiable fund and an obligation to return or otherwise treat

in a particular manner the specific fund in question." *Barnet*, 2014 WL 4393320, at \*21 (quoting

*Thys v. Fortis Sec. LLC.*, 74 A.D.3d 546, 547 (1st Dep't 2010)). Finally, "a plaintiff must have

either possessed the money or had a right to immediate possession of the money." *Id.* (citing

*Ehrlich v. Howe*, 848 F. Supp. 482, 492 (S.D.N.Y. 1994) (holding that to establish a claim for

conversion of money based on a purported future interest, a plaintiff must allege "that the money

converted was in specific tangible funds of which the plaintiff was the legal owner and entitled to

immediate possession")).

In their moving papers, Defendants exclusively seek dismissal on the grounds that the

withdrawal of funds at issue here—*i.e.*, (1) Defendants' use of $7,265 from Plaintiff's line of credit

to pay certain taxes, and (2) Defendants' use of Plaintiff's line of credit on May 31, 2019 to pay

other taxes—was authorized by the terms of the Reverse Mortgage, and thus cannot support a

common law conversion claim.[7]  (Defs' Mem. at 14.)

Though Defendants' argument is less than clear, the Court assumes that Defendants' claim

of authority to withdraw funds from Plaintiff's line of credit is based on Reverse Mortgage ¶¶ 2

and 5. These provisions provide that:

**PARAGRAPH 2**

Borrower shall pay all property charges consisting of taxes, ground rents, flood and
hazard insurance premiums, and special assessments in a timely manner, and shall
provide evidence of payment to Lender, unless Lender pays property charges by
withholding funds from monthly payments due to the Borrower or by charging such
payments to a line of credit as provided in the Loan Agreement.

**PARAGRAPH 5**

---

[7] Insofar as Defendants separately argue that Plaintiff's conversion claim fails because he
cannot allege damages, this argument was improperly raised for the first time in their reply brief
and is therefore not considered by the Court.

> Borrower shall pay all governmental or municipal charges, fines, and impositions that are not included in Paragraph 2 [and] [i]f Borrower fails to make these payments . . . or there is a legal proceeding that may significantly affect Lender's rights in the Property, then Lender may do and pay whatever is necessary to protect the value of the Property and Lender's rights in the Property . . . Any amounts disbursed by Lender under this Paragraph shall become an additional debt of Borrower as provided for in the Loan Agreement and shall be secured by this Security Instrument.

(*See* SAC at Ex. A.)  Plaintiff argues that these provisions only entitle Defendants to withdraw money after any taxes become delinquent and, in any event, he would be entitled to written notice and an opportunity to cure as a function of default New York law that was not superseded by the Reverse Mortgage. (Pl's Opp. 27-32.)  Defendants claim that they are not arguing that they possess an "unfettered right to seize funds from Plaintiff at any time for any reason," but fail to expressly articulate what circumstances give rise to their right to withdraw funds from Plaintiff's line of credit, and why those circumstances were triggered by the facts alleged in the SAC.  (*See* Defs' Reply at 6-7.)

The Court cannot resolve this claim in favor of Defendants at this stage.  Plaintiff's allegations in the SAC suggest that Defendants were entitled to withdraw funds to pay for tax liabilities in February 2019 and May 2019 under the circumstances.  As pled, Plaintiff was apparently entitled to notice prior to the withdrawal of funds and did not receive such notice, and no tax liabilities had ripened such that Defendants were entitled to advance funds from his line of credit to avoid impairment of Defendants' interest in the property.  Because Defendants do not point to any provision suggesting they were entitled to withdraw funds for tax liabilities that had not ripened or to withdraw funds without providing prior notice, or offer any contractual interpretation, they have failed to demonstrate that they had authority to withdraw funds and accordingly, Defendants' motion to dismiss is DENIED with respect to Plaintiff's conversion claim.

**IV.        Whether Plaintiff's Gross Negligence Claim is Adequately Alleged**

In seeking dismissal of Plaintiff's negligence claim, Defendants assert, in sum:

> Similarly, in light of the authority granted to Nationstar by paragraphs 2 and 5 of the Mortgage, Plaintiff's claim that Nationstar's conduct constituted gross negligence and a breach of a duty of good faith and fair dealing must also fail. While New York law does recognize an implied covenant of good faith and fair dealing, that covenant must be construed to be consistent with the substantive provisions of the contract, and cannot add to the contract any substantive provisions not included by the parties. *Mendez v. Bank of Am. Home Loans Servicing, LP*, 840 F. Supp. 2d 639, 652 (E.D.N.Y. 2012). Because Nationstar acted in accordance with the terms of the Mortgage, Plaintiff's claims for gross negligence and violation of the implied covenant of good faith and fair dealing must be dismissed.

(Defs' Mem at 14.)

As is apparent from the full text, Defendants seek dismissal of Plaintiff's negligence claim based on case law regarding the viability of an implied covenant claim contravening express terms of a contract. *See id.* (citing *Mendez v. Bank of Am. Home Loans Servicing, LP*, 840 F. Supp. 2d 639, 652 (E.D.N.Y. 2012) (noting that "New York law will not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when it arises from the same allegations as a breach of contract claim."). While the Court finds Plaintiff's negligence claim facially confusing,[8] and might be inclined to dismiss the claim on other grounds had they been presented, Defendants are represented by counsel, and the Court will not *sua sponte* supply them with an argument for dismissal where Defendants neglected to articulate one themselves.

Moreover, Defendants' attempt to merge or streamline their breach of implied covenant and negligence arguments misses the mark and represents a failure by counsel to actually wrestle with the facts alleged in the SAC. New York law recognizes a similar principle to the one expressed above with respect to the implied covenant – *i.e.*, that "a breach of contract will not give

---

[8] As the Court is granting Plaintiff leave to replead his complaint, Plaintiff may consider further amending allegations relating to his negligence claim to address, among other things, damages he purports to arise from Defendants' alleged negligence.

rise to a tort claim unless a legal duty independent of the contract itself has been violated." *Bayerische Landesbank, New York Branch v. Aladdin Cap. Mgmt. LLC*, 692 F.3d 42, 58 (2d Cir. 2012). However, read liberally, Plaintiff asserts that Defendants, as his servicer, have an independent duty to, among other things, "[s]afeguard and account for any money handled for the borrower" and "[a]ct with reasonable skill, care and diligence," pursuant to New York State Department of Financial Security Rule § 419.2. (SAC ¶ 95; *see also* Pl's Opp. At 38.) Defendants ignore Plaintiff's assertion that an independent legal duty supports his negligence claim and as a consequence have not met their burden to demonstrate entitlement to dismissal under Fed. R. Civ. P 12(b)(6).

Accordingly, Defendants' motion to dismiss is DENIED with respect to Plaintiff's negligence claim.

**V.      Whether Plaintiff's Implied Covenant of Good Faith
          and Fair Dealing Claim is Plausibly Pled**

As already recited, Defendants argue that Plaintiff's claim for breach of the implied covenant of good faith and fair dealing fails because Defendants acted in accordance with the terms of the Reverse Mortgage and Plaintiff cannot use the implied covenant to supply additional obligations that would contradict the express terms of that agreement. (Defs' Mem. at 14.) Read liberally, Plaintiff argues in response that the implied covenant can supply an obligation upon the contracting counterparty not to exercise discretion in an arbitrary or irrational way and that Defendants behaved in such a manner when they seized money from his line of credit without supplying him with notice or an opportunity to cure. (Pl's Opp. at 36-37.)

Implicit in every contract is a covenant of good faith and fair dealing, which encompasses any promise that a reasonable promisee would understand to be included. *Michaan v. Gazebo Horticultural, Inc.*, 117 A.D.3d 692, 693, 985 N.Y.S.2d 601, 603 (2d Dep't 2014). The covenant

is breached "where one party to a contract seeks to prevent its performance by, or to withhold its benefits from, the other." *Collard v. Inc. Vill. of Flower Hill*, 427 N.Y.S.2d 301, 302 (2d Dep't 1980), *aff'd*, 52 N.Y.2d 594(1981). "[A] court may not imply a covenant inconsistent with terms expressly set forth in an agreement; in other words, where an express covenant exists, a court may not find an implied covenant on the same subject." *Trireme Energy Holdings, Inc., et al., v. Innogy Renewables US LLC, et al.*, No. 20-CV-5015 (VEC), 2021 WL 3668092, at *5 (S.D.N.Y. Aug. 17, 2021) (citing *Hartford Fire Ins. Co. v. Federated Dep't Stores, Inc.*, 723 F. Supp. 976, 991 (S.D.N.Y. 1989); *Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293, 304 (1983)). Nevertheless, "an explicitly discretionary contract right may not be exercised in bad faith so as to frustrate the other party's right to the benefit under the agreement." *Legend Autorama, Ltd. v. Audi of Am., Inc.*, 954 N.Y.S.2d 141, 143–44 (2d Dep't 2012) (quoting *Richbell Info. Servs., Inc. v. Jupiter Partners, L.P.*, 765 N.Y.S.2d 575, 587 (1st Dep't 2003)).

The issues presented to the Court are whether: (1) an implied obligation to provide Plaintiff with ten days' notice prior to withdrawing funds from his line of credit would either contradict express terms of the Reverse Mortgage or provide Plaintiff with a benefit for which he did not bargain, and (2) Plaintiff has plausibly alleged that Defendants' discretion to "pay property charges" was exercised in a manner that frustrates Plaintiff's right to benefit under the agreement.

As to the first question, the Court concludes that an implied obligation to provide Plaintiff with ten days' notice does not explicitly contradict any provision in the Reverse Mortgage insofar as the Reverse Mortgage is silent as to whether any notice is to be provided prior to Defendants' withdrawal of funds to satisfy any property liabilities. Nonetheless, the Court concludes that implying a right to notice and an opportunity to cure into Paragraph 2 of the Reverse Mortgage would "require the court to add a substantive provision for which the parties did not bargain."

*Hartford Fire Ins. Co.*, 723 F. Supp. at 992.  The parties have notice and cure provisions built into the Reverse Mortgage with respect to other scenarios – *e.g.*, pursuant to Paragraph 9(d) of the Reverse Mortgage, Defendants must notify Plaintiff whenever the loan becomes due and payable and cannot commence foreclosure until Plaintiff has had thirty days to cure the relevant deficiency. (*See* SAC at Ex. B.)  Given that the parties did include express notification and cure provisions with respect to other scenarios, the Court is especially reluctant to rewrite the Reverse Mortgage and add substantive provisions that could have been easily included in the first instance.  *Hartford Fire Ins. Co.*, 723 F. Supp. at 992 (noting that attempts to add substantive provisions through the implied covenant are "especially troublesome in light of the fact that the [agreement] could easily have been drafted to incorporate expressly the terms the Plaintiffs now urge this court to imply.").

  With respect to the second issue, the Court likewise concludes that Plaintiff has failed to identify a contractual benefit that he is being denied through Defendants' exercise of discretion. While the Court, crediting Plaintiff's allegations, would reach the conclusion that Defendants acted in an irrational manner when they withdrew funds from Plaintiff's line of credit despite the absence of any tax liabilities, the Court nonetheless cannot conclude that this exercise of discretion deprived Plaintiff of a benefit under the Reverse Mortgage.  Indeed, Plaintiff affirmatively alleged that the benefit he was deprived of stems from extracontractual duties.  (*See* Pl's Opp. at 36 (arguing that he was deprived of notice that he was entitled to "as delineated in New York law"); SAC ¶ 101 ("The allegations here are essentially the same as those in the Third Cause Of action, as above, also noting that the DFS imposes such a requirement – that Nationstar has a duty to 'safeguard' his funds.").)  In sum, because Plaintiff has not plausibly alleged that Defendants' (albeit irrational) exercise of discretion deprived him of a benefit stemming from the Reverse Mortgage, he has failed to plausibly allege a claim for breach of the implied covenant.

Accordingly, Defendants' motion to dismiss is GRANTED with respect to Plaintiff's implied covenant claim, and Plaintiff's claim for breach of the implied covenant is dismissed without prejudice. If Plaintiff seeks to replead this claim he should attempt to cure the operative deficiency identified herein, *i.e.*, he should plead what benefit, stemming from the contract, he was deprived of as a result of Defendants' exercise of discretion. To the extent that Plaintiff's position is that Defendants affirmatively breached the express terms of the Reverse Mortgage because they withdrew funds even though no liabilities had arisen, he might also, or instead, plead a breach of contract claim.

**VI.   Whether Plaintiff's N.Y. Gen. Bus. Law § 349 Claims are Plausibly Pled**

Section 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." N.Y. Gen. Bus. Law § 349(a). A plaintiff asserting a cause of action under Section 349 "must [demonstrate] three elements: first, that the challenged act or practice was consumer-oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act." *Rephen v. Gen. Motors Corp.*, 2016 WL 4051869, at *4 (S.D.N.Y. July 26, 2016) (internal quotation marks and citations omitted). The deceptive act may be a representation or omission. *Braynina v. TJX Companies, Inc.*, 2016 WL 5374134, at *4 (S.D.N.Y. Sept. 26, 2016). Defendants seek dismissal of Plaintiff's Section 349 claims on the grounds that Plaintiff has not adequately pleaded the first two elements.

**A.   Consumer Oriented Activity**

In New York, consumer oriented conduct refers to conduct which has "a broader impact on consumer at large." *Shapiro v. Berkshire Life Ins. Co.*, 212 F.3d 121, 126 (2d Cir. 2000) (quoting *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, 85 N.Y.2d 20, 25 (N.Y. 1995)). Though a plaintiff need not demonstrate a repetition or pattern of deceptive conduct,

"New York courts have recognized that 'private contract disputes' between the parties do not 'fall within the ambit of the statute.'" *WorldHomeCenter.com, Inc. v. PLC Lighting, Inc.*, 851 F. Supp. 2d 494, 498 (S.D.N.Y. 2011) (quoting *Oswego*, 85 N.Y.2d at 25). The "consumer-oriented requirement is to be liberally construed." *Id.* at 499.

A review of relevant caselaw illustrates some of the operative factors for assessing whether conduct should be characterized as consumer oriented or a private transactions including whether the operative transaction: (1) affected a broad swath of consumers, (2) consisted of standard practices that necessarily affect numerous consumers, or (3) is unique to the parties. Thus, for example, a defendant bank engaged in consumer-oriented behavior when it provided standard documents to a customer plaintiff that it used upon opening all accounts. *Oswego*, 85 N.Y.2d at 26. Likewise, sellers of a professional textbook directed to legal professionals engaged in consumer-oriented behavior even though legal professionals are a subclass of all consumers. *Himmelstein, McConnell, Gribben, Donoghue & Joseph, LLP v. Matthew Bender & Co., Inc.*, 37 N.Y.3d 169, 178 (2021). Even where "allegations that Defendant's notices were transmitted broadly to consumers is thin; however, they are sufficient to substantiate 'consumer-oriented conduct' at the motion to dismiss stage." *Rephen*, 2016 WL 4051869 at *4. Thus, a plaintiff's allegation that customers of a car manufacturer, including him, received false communications from the car manufacturer was sufficient to plead consumer-oriented conduct. *Id.*

Here, Plaintiff brings two claims under Section 349 that Plaintiff artfully describes as "GBL allegations . . . in two flavors." (Pl's Opp. at 33.) The Court concludes that, read liberally, Plaintiff has plausibly alleged consumer-oriented conduct, in part, with respect to one of his GBL flavors. *First*, Plaintiff contends that Defendants violated Section 349 by failing, as a matter of standard practice, to include a "Limited Waiver of Right to Foreclose" such as the one described

in 3 N.Y. Comp. Code R. & Regs. § 79.7(d) (stating that "All lenders must prepare a form entitled 'Lender's Limited Waiver of the Right of Foreclosure.' This document shall. . . identify every event . . . would give the mortgagee authority to terminate the loan, and shall be provided to and signed by the mortgagor at the closing of every loan.").  At the outset, the Court notes that the record supporting Plaintiff's contention that other consumers similarly failed to receive the waiver is indisputably thin.  Nonetheless, his allegation that others also did not receive the required waiver is sufficient to plead consumer-oriented conduct at this stage.  Liberally construed, Plaintiff is arguing that this is not just a feature of his distinct mortgage loan agreement with Nationstar, but a standard practice engaged in by Nationstar writ large.   Such a theory is viable under *Oswego*, 85 N.Y.2d at 26.[9]

*Second*, Plaintiff contends that Defendants violated Section 349 by deceptively charging excessive interest based on a self-serving contention that the Reverse Mortgage contains a typographical error with respect to how his adjustable mortgage interest rate is calculated.  Though Plaintiff nominally contends that this conduct "violated at a minimum consumers who had taken mortgage with MetLife which were subsequently brought by Nationstar, not just Mr. Rosendale" his pleadings demonstrate that the at-issue conduct concerns a unique private contract dispute.  In a similar transactional setting—*i.e.*, where a mortgagor sued a mortgagee under Section 349 for originating a loan with a commercially suspect debt to income ratio—it was determined that the mortgagor failed to assert deceptive consumer-oriented conduct insofar as that claim derives "from

---

[9] Defendants do not dispute for the purposes of the motion whether they are obligated to provide a Limited Waiver of Right to Foreclose under New York regulations or whether in this case, and in other similar loans, they would be exempted from providing such a form.  Accordingly, the issue was not before the Court.  Nonetheless, Plaintiff is being granted leave to further amend his complaint, and may wish to further clarify whether his loan possesses certain characteristics that would render it subject to the regulations he identifies as operative.

the particular circumstances of this loan, namely, whether their unique debt to income ratio was appropriate, and whether the nature of any advice allegedly given them regarding how to proceed during the loan modification application process was misleading." *Silverman v. Household Fin. Realty Corp. of New York*, 979 F. Supp. 2d 313, 318 (E.D.N.Y. 2013).  Similarly, Plaintiff directly alleges that the deceptive practice consisted of "noting a 'typographical error'" with respect to his mortgage agreement as a basis to improperly "collect interest calculated to the third figure to the right of the decimal" from him.  (SAC ¶ 113.)  By definition, a typographical error in a unique mortgage agreement and a dispute over how to calculate a person's adjustable interest rate in light of the typographical error is a "'private' contract dispute over [calculation of an adjustable interest rate],' which does not 'affect[ ] the consuming public at large,' and therefore falls outside the purview of General Business Law § 349."  *Carlson v. Am. Int'l Grp., Inc.*, 30 N.Y.3d 288, 309, 89 N.E.3d 490, 503 (2017) (quoting *New York Univ. v. Cont'l Ins. Co.*, 87 N.Y.2d 308, 321 (1995)).

## B.      Materially Misleading

"As to the second element [of Section 349], whether a representation or an omission, the deceptive practice must be likely to mislead a reasonable consumer acting reasonably under the circumstances." *Heskiaoff v. Sling Media, Inc.*, 719 F. App'x 28, 31 (2d Cir. 2017) (summary order) (internal quotation marks, alterations, and citation omitted). "It is not necessary under [Section] 349 that a plaintiff establish the defendant's intent to defraud or mislead." *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 124 (2d Cir. 2017) (internal quotation marks, alterations, and citation omitted).  "Rather, the term 'deceptive practice' in Section 349 [has been] interpreted to mean acts which are dishonest or misleading in a material respect." *Kelly v. Cmty. Bank, N.A.*, No. 819CV919MADCFH, 2020 WL 777463, at *9 (N.D.N.Y. Feb. 18, 2020). "[C]ourts have generally held that since the materially misleading conduct factor requires a reasonableness analysis best suited for a jury, it cannot be resolved on a motion to dismiss."

41

*Kronenberg v. Allstate Ins. Co.*, No. 18-CV-6899 (NGG) (JO), 2020 WL 1234603, at *3 (E.D.N.Y. Mar. 13, 2020).

At this stage of the litigation, Plaintiff has sufficiently alleged that Defendants' omission of a limited waiver of lender's right to foreclose constitutes a materially misleading representation to survive a motion to dismiss. *First*, Defendants only contend that Plaintiff's "argument that he was materially misled regarding the calculation of interest on his loan also fails." (Defs' Mem. at 16.) Because Defendants do not affirmatively argue that Plaintiff's Section 349 claim with respect to the omission of a limited waiver of lender's right to foreclose fatally lacks a material misrepresentation, the issue is not properly before the Court. *Second*, even if Defendants argued that Plaintiff failed to articulate a material misrepresentation, that argument would fail. Plaintiff has contended, with some force, that a reasonable borrower would "believe that, as Ms. Begum asserts, there are no restrictions on Nationstar's right to foreclose if it believes its security is at risk" notwithstanding contrary restrictions imposed under New York law and regulations. (SAC ¶ 105.)

Accordingly, Defendants' motion to dismiss is GRANTED with respect to Plaintiff's Section 349 claim predicated upon Defendants' alleged imposition of an excessively high interest rate with respect to his unique loan and DENIED with respect to Plaintiff's Section 349 claim predicated upon Defendants' omission of a limited waiver of a the right to foreclose pursuant to New York law. Count Seven of Plaintiff's SAC—*i.e.*, his Section 349 claim predicated upon Defendants' imposition of an excessively high interest rate—is dismissed without prejudice, and Plaintiff may replead in an attempt to cure the defects identified herein.

**VII.      Whether Plaintiff's Infliction of Emotional Distress Claim is Plausibly Pled**

To assert a claim of intentional infliction of emotional distress under New York law, plaintiff must allege: (1) extreme and outrageous conduct, (2) intent to cause severe emotional

distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress. *See Bender v. City of New York*, 78 F.3d 787, 790 (2d Cir. 1996); *Cuellar v. Love*, 11-CV-3632 NSR, 2014 WL 1486458 (S.D.N.Y. Apr. 11, 2014) (quoting *Howell v. N.Y. Post Co.*, 81 N.Y.2d 115, 121 (1993)). Because the claim of intentional infliction of emotional distress is so disfavored, a plaintiff must typically show that the defendant's conduct has been "so extreme in degree" as to exceed "all possible bounds of decency." *See Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293, 303 (1983). Any allegations of suffering from severe emotional distress must be supported with objective evidence and not speculative claims. *See Allam v. Meyers*, 906 F. Supp. 2d 274, 282 (S.D.N.Y. 2012) (citing *Roche v. Claverack Coop. Ins. Co.*, 59 A.D.3d 914, 919 (3rd Dept. 2009)); *Cusimano v. United Health Servs. Hosps., Inc.*, 91 A.D.3d 1149, 1152 (3rd Dept. 2012); *Walentas v. Johnes*, 257 A.D.2d 352, 353 (1st Dept. 1999); *Christenson v. Gutman*, 249 A.D.2d 805, 808-09 (3rd Dept. 1998)).

Plaintiff alleges no facts to demonstrate that Defendants performed an intentional act with the purpose of causing or disregarding a substantial probability of causing severe emotional distress. As alleged, Defendants inflicted emotional distress by: (1) repeatedly withdrawing funds to pay for taxes that were not yet delinquent and (2) advising Plaintiff that foreclosure may result from his failure to timely address taxes or remedy other issues. While Plaintiff argues that these taxes were not due, he has not alleged that Defendants engaged in these withdrawals or notifications regarding foreclosure for the purpose of causing emotional distress or with the substantial probability that it would result in distress. Instead, documents attached to the SAC demonstrate that Plaintiff was refunded where Defendants determined that funds were withdrawn in error, which strongly cuts against the notion that they were intentionally seeking to distress Plaintiff. (*See, e.g.*, SAC at Ex. E.) Accordingly, and particularly because claims for intentional

infliction of emotional distress are highly disfavored, the Court finds that Plaintiff's complaint is not sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S at 555.

Defendants' motion to dismiss is GRANTED with respect to Plaintiff's claim of intentional infliction of emotional distress.  Plaintiff's claim of intentional infliction of emotional distress is dismissed without prejudice.

**VIII.       Whether Plaintiff's N.Y. Real Property Law § 329 Claim is Plausibly Pled**

Plaintiff seeks a declaratory judgment that the Reverse Mortgage does not secure his note due to alleged alterations to the property description contained in the Reverse Mortgage and because it was not properly notarized.  (SAC ¶¶ 116-125.)  Defendants argue that the Court should dismiss this claim because: (1) the mortgage was properly recorded, and (2) it is improper to invalidate a recorded mortgage under New York based upon an inaccurate property description. (Defs' Mem. at 16-17.)

Pursuant to N.Y. Real Property Law § 329 ("Section 329"):

> An owner of real property or of any undivided part thereof or interest therein or an owner of rent to accrue from a tenancy or subtenancy thereof, may maintain an action to have any recorded instrument in writing relating to such real property or interest therein, other than those required by law to be recorded, or any recorded assignment of rent to accrue from a tenancy or subtenancy of such property or interest therein declared void or invalid, or to have the same canceled of record as to said real property, or his undivided part thereof or interest therein, or as to the rent to accrue therefrom belonging to him.

N.Y. Real Prop. Law § 329.  Under this section "an owner of real property may maintain an action to have any instrument in writing relating to such real property which has been improperly recorded cancelled of record." *Sobel v. Wolf*, 216 N.Y.S.2d 132, 133 (Sup. Ct., Westchester Cty. 1961).  Plaintiffs have successfully sued for invalidation of defective mortgages where they have proven "a fundamental defect with the underlying record." *Plotch v. Wells Fargo Bank, N.A.*, No. 17CV00309NGRER, 2018 WL 3642625, at *3 (E.D.N.Y. Aug. 1, 2018) (citing *Greenpoint Bank*

*v. Parissi*, 256 A.D.2d 548, 549 (2d Dep't 1998) (mortgage signed pursuant to forged power of attorney); *Drago v. Flemwellin*, 33 A.D.2d 570, 571 (2d Dep't 1969) (parties' acknowledgment not before a notary); *Griffith v. Bergstol*, 23 A.D.2d 686, 687 (2d Dep't 1965) (memorandum not acknowledged by the parties and signatures of witnesses defective); *Newpar Estates, Inc. v. Barilla*, 4 A.D.2d 186, 187 (1st Dep't 1957) (contract not signed by mortgagor); *Pape v. Pape*, 39 Misc. 2d 268, 269 (Sup. Ct. Nassau Cty. 1963) (agreement not signed by property owner); *Sobel v. Wolf*, 216 N.Y.S. 2d 132, 133 (Sup. Ct. Westchester Cty. 1961) (notary did not witness mortgage execution); *Puglisi v. Belasky*, 118 Misc. 336, 337 (Sup. Ct. Kings Cty. 1922) (executory contract unacknowledged); *cf. South Point, Inc. v. John*, 140 A.D.3d 1150, 1150 (2d Dep't 2016) (process server's affidavit did not demonstrate execution before notary)).

Plaintiff has alleged just such a fundamental defect here – *i.e.*, he alleges that: (1) at the closing of the Reverse Mortgage in June 2009 he noticed and objected to an improper description of the property contained in the agreement, (2) the lender's counsel acknowledged his objection and modified the Reverse Mortgage to remove the property description, (3) he signed a version of the mortgage that did not contain the improper property description, (4) a version of the Reverse Mortgage containing the improper property description was notarized by a person that was not present at the closing, and the improperly notarized and described version was recorded.  (SAC ¶¶ 116 – 125.)  Defendants appear to misconstrue the operative alleged facts here by arguing that Plaintiff's "unsupported allegation that the Mortgage was altered after closing cannot overcome the fact that the recorded version of the Mortgage contains the property description he claims was added after the fact."  (Defs' Mem at 16.)  The existence of a recorded version of the Reverse Mortgage containing the improper property description is consistent with his allegation of the improper notarization, and is not a basis to dismiss his claim.  If the existence of a recording were

a basis to dismiss a Section 329 claim, it is hard to see how any Section 329 could be actionable insofar as the action is predicated upon invalidating a recorded mortgage.

The Court notes that, by Plaintiff's admission, he was the owner of part of the property described in the Reverse Mortgage and signed a mortgage that was intended to encumber that property. (Pl's Opp. at 40 ("in fact I did sign such a mortgage . . . in a different form than eventually notarized").) While this admission does not doom Plaintiff's Section 329 claim, he may consider instead seeking reformation. Indeed, even if he prevailed on his Section 329 claim "[a] proven, unrecorded mortgage is still enforceable against the owner/mortgagor." *In re Broadway Equity Holdings LLC*, 617 B.R. 777, 792 (Bankr. S.D.N.Y. 2020). Accordingly, the mortgage that he admits to having executed would likely still be enforceable even if Plaintiff prevailed in having the recorded version cancelled.

Defendants' motion to dismiss is DENIED with respect to Plaintiff's Section 329 claim. As Plaintiff is being granted leave to amend other claims that have been dismissed without prejudice, Plaintiff may consider seeking reformation of his mortgage rather than, or in addition to, invalidation of the recorded mortgage.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants' motion to dismiss the Complaint is GRANTED, in part, and DENIED in part. Plaintiff's claims for violation of RESPA, violation of TILA, breach of the implied covenant of good faith and fair dealing, intentional infliction of emotion distress claims, and his Section 349 claim predicated upon excessive interest rates are dismissed without prejudice. Plaintiff's surviving claims are his: (1) conversion, (2) gross negligence, (3) Section 349 claim predicated upon Defendants' failure to communicate any limited waiver of right to foreclose consistent with New York law, and (4) Section 329 claims. Plaintiff is granted leave to file a Third Amended Complaint to address deficiencies with respect to the claims that the Court

has identified, including with respect to the claims that the Court has dismissed without prejudice. If he chooses to do so, Plaintiff will have until October 22, 2021 to file a Third Amended Complaint consistent with this order.  Plaintiff is advised that the Third Amended Complaint will replace not supplement the Second Amended Complaint so any claims, facts, or attachments that Plaintiff wishes the Court to consider must be within or attached to the Third Amended Complaint. Defendants are then directed to answer or otherwise respond by November 12, 2021.

If Plaintiff fails to file a Third Amended Complaint within the time allowed, and he cannot show good cause to excuse such failure, those claims dismissed without prejudice by this order will be deemed dismissed with prejudice.

Finally, the parties are also directed to submit a Case Management Plan (attached) by September 22, 2021.

The Clerk of Court is respectfully directed to terminate the motion at ECF No. 32.  The Clerk is also respectfully directed to mail a copy of this Opinion and Order to Plaintiff at the address listed on ECF and to file proof of service on the docket.

Dated: September 7, 2021
White Plains, New York

SO ORDERED:

_____
NELSON S. ROMÁN
United States District Judge

UNITED STATES DISTRICT COURT                        Rev. Jan. 2012
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x

                                    Plaintiff(s),        **CIVIL CASE DISCOVERY PLAN**
                                                         **AND SCHEDULING ORDER**
            - against -


                                    Defendant(s).        _____ CV _____ (NSR)
----------------------------------------------------------x

            This Civil Case Discovery Plan and Scheduling Order is adopted, after consultation with
counsel, pursuant to Fed. R. Civ. P. 16 and 26(f):

    1.     All parties [consent] [do not consent] to conducting all further proceedings before
           a Magistrate Judge, including motions and trial, pursuant to 28 U.S.C. § 636(c).
           The parties are free to withhold consent without adverse substantive consequences.
           (If all parties consent, the remaining paragraphs of this form need not be
           completed.)

    2.     This case [is] [is not] to be tried to a jury.

    3.     Joinder of additional parties must be accomplished by
           _____.

    4.     Amended pleadings may be filed until _____.

    5.     Interrogatories shall be served no later than _____, and responses
           thereto shall be served within thirty (30) days thereafter.  The provisions of Local
           Civil Rule 33.3 [shall] [shall not] apply to this case.

    6.     First request for production of documents, if any, shall be served no later than
           _____.

    7.     Non-expert depositions shall be completed by _____.

           a.      Unless counsel agree otherwise or the Court so orders, depositions shall not
                   be held until all parties have responded to any first requests for production
                   of documents.

           b.      Depositions shall proceed concurrently.

           c.      Whenever possible, unless counsel agree otherwise or the Court so orders,
                   non-party depositions shall follow party depositions.

8.      Any further interrogatories, including expert interrogatories, shall be served no later than _____.

9.      Requests to Admit, if any, shall be served no later than _____.

10.     Expert reports shall be served no later than _____.

11.     Rebuttal expert reports shall be served no later than _____.

12.     Expert depositions shall be completed by _____.

13.     Additional provisions agreed upon by counsel are attached hereto and made a part hereof.

14.     **ALL DISCOVERY SHALL BE COMPLETED BY** _____.

15.     Any motions shall be filed in accordance with the Court's Individual Practices.

16.     This Civil Case Discovery Plan and Scheduling Order may not be changed without leave of Court (or the assigned Magistrate Judge acting under a specific order of reference).

17.     The Magistrate Judge assigned to this case is the Hon. _____.

18.     If, after entry of this Order, the parties consent to trial before a Magistrate Judge, the Magistrate Judge will schedule a date certain for trial and will, if necessary, amend this Order consistent therewith.

19.     The next case management conference is scheduled for _____, at _____.  (The Court will set this date at the initial conference.)

SO ORDERED.

Dated: White Plains, New York
       _____

                                        _____
                                        Nelson S. Román, U.S. District Judge