EXHIBIT 13

Page 1

1

2      UNITED STATES DISTRICT COURT

3      SOUTHERN DISTRICT OF NEW YORK (White Plains)

4      ------------------------------------------X

5      DONALD P. ROSENDALE,

6                                    Plaintiff,

7             -against-

8                            File #: 19-CV-9263(NSR)

9      MR. COOPER GROUP INC.,
       NATIONSTAR MORTGAGE,

10     NATIONSTAR MORTGAGE D/B/A
       CHAMPION MORTGAGE and

11     MORTGAGE ASSETS MANAGEMENT LLC,

12                                    Defendants.
       ------------------------------------------X

13

       DATE:   October 25, 2022

14             Amenia, New York
               9:58 A.M. - 5:03 P.M.

15

               Laura Evans, Reporter

16

17

18         REMOTE VIDEOCONFERENCE DEPOSITION

19                       OF

20              DONALD P. ROSENDALE

21

22

23

24

25

Page 11

ROSENDALE

1
2      From there, I went back to Norton Simon
3   and Pepsi as a consultant.  And basically,
4   since 2000, have been a freelance writer.
5      Q.     Thank you.  Have you reviewed
6   any documents in preparation for your
7   deposition today?
8      A.     I have reread the complaint and
9   I reread the answers to the interrogatories,
10  and I have reread a supplemental
11  interrogatory which I wrote yesterday.
12     Q.     And you're the owner of -- I
13  believe you said your address is 4848 Route
14  44 in Amenia.  Correct?
15     A.     That's correct.
16     Q.     Do you own any other properties
17  other than 4848 Route 44?
18     A.     I'm the heir to a property in
19  Ireland.  I don't own anything else.  I've
20  sold everything else to consolidate into
21  Amenia.
22     Q.     Are you familiar with what the
23  section block and lot number of your property
24  is in the Town of Amenia tax records?
25     A.     No.

```
 1                      ROSENDALE
 2           going to -- let's mark a copy of your
 3           deed from 1982 as Defendant's Exhibit
 4           2.
 5           (DOCUMENT ELECTRONICALLY MARKED AS
 6        DEFENDANT'S EXHIBIT 2 FOR IDENTIFICATION)
 7           Q.    So Mr. Rosendale, do you
 8      recognize this document as the deed by which
 9      you took title to your property?
10           A.    Yes.
11           Q.    And if we look at the
12      description --
13           A.    She's scrolling too fast, but it
14      looks like the document that I'm familiar
15      with, yes.
16           Q.    In the center of the first page,
17      we see a description, "Beginning at the
18      northeast corner of said farm in the south
19      line of the Turnpike and in the west line of
20      Egbert Barton's land."  Do you see that
21      description?
22           A.    Yes.
23           Q.    And you see how the description
24      is written in chains and links?
25           A.    Yes.
```

Page 18

1                        ROSENDALE

2           Q.      And to your knowledge, is this

3      an accurate description of your property?

4           A.      Well, this describes that I own

5      the old road, and I do believe that I own the

6      old road today.  But at the time that Mr.

7      Manning and I went after -- after the

8      surveyor in Millbrook told me he knew, for

9      some reason, I didn't own the old road, it

10     had never been transferred, we went to the

11     Department of Transportation in Poughkeepsie

12     and we met a very senior guy who I thought

13     was very old.  He was probably younger than I

14     am today.  And he pulled out a piece of paper

15     that said there was a deed and they were

16     planning to transfer to me, but it had never

17     been done.  And in the eyes of him and the

18     DOT or whoever, I did not own the old road.

19          Q.      And the Department of

20     Transportation said this to you in 2006, you

21     think?

22          A.      2008.

23                  BY MS. ELLIOTT:  We'll show

24          Mr. Rosendale the 2003 deed, if you

25          could mark that, please.

Page 24

1                        ROSENDALE
2              A.     On the tax records, as far as I
3        can go back, and I went over them all the way
4        back to 1985 at the town clerk yesterday,
5        it's always -- between 1985 and 2018, it was
6        always shown as 100 acres.
7              Q.     Okay.  Have you ever had
8        occasion to subdivide your property?
9              A.     No.
10             Q.     Have you ever made an
11       application to the town for the approval of a
12       subdivision?
13             A.     I·made an application to the
14       town to sell 5 acres with a lot line changed
15       to Bernard Parker, which did not go through.
16             Q.     And why didn't that go through?
17             A.     Mr. Manning found out from me --
18       Mr. Parker was my neighbor.  He's a nice guy.
19       And he hayed my fields for me, and when my
20       car broke down, drove me around.  And he came
21       to me with a sob story about, he had no land
22       for his kid, living on his mother's property,
23       which is adjacent to mine.  Could I, as a
24       good friend and neighbor, sell him 5 acres?
25       And I said fine.  The going price for acreage

Page 34

1                                      ROSENDALE

2                   Q.     So Mr. Rosendale, I'm showing

3          you what we've marked now as Exhibit 5, and

4          this is a 2007 mortgage.  I represent to you

5          that was given by you in favor of MetLife, if

6          you want to take a moment to look through

7          that.  It's dated May 25, 2007.  On the last

8          page, you'll see what is going to be your

9          signature, if you could verify that?

10                  A.     It's my signature.

11                  Q.     And if we look here on the

12         second page of the document, behind the

13         recording page from the clerk's office --

14         behind the recording page is the first page

15         of the mortgage, and it's entitled,

16         "Adjustable rate home equity conversion

17         mortgage."

18                  A.     Yes.

19                  Q.     And on the next page, it says,

20         "See attached Schedule A."  And it says --

21         which has the address of 4848 Route 44, and

22         then it gives a description.  It's the third

23         page of the mortgage document where it says

24         the Schedule A description.

25                  A.     Okay.  Now it's showing Schedule

Page 35

ROSENDALE

1

2    A.

3        Q.    To your knowledge, is this

4    description the same description that's

5    contained in your deed?

6        A.    I don't have the deed in front

7    me to show them side by side, but I have no

8    reason to doubt it is.

9        Q.    And this description is also

10   written in chains and links.  Is that right?

11       A.    Yes.

12       Q.    And at the bottom, we have the

13   paragraph that we were just speaking about

14   that describes the abandoned road.  Correct?

15       A.    That's right.

16       Q.    And when you gave this mortgage

17   to MetLife in 2007, did you have any

18   objection to this description being included?

19       A.    No, I did not.  As I have just

20   testified, I did not learn that Mr. Bly had

21   raised the issue, and Mr. Manning and I had

22   not gone to the Department of Transportation

23   until 2008.

24            BY MR. VAUGHN:  Ms. Elliott, if

25        we could just look at the first page

1                              ROSENDALE

2              A.      I have no idea.

3              Q.      Was that because the appraisal

4       that you got in 2007 appraised your property

5       at 500,000?

6              A.      I have no idea.

7              Q.      Do you see anywhere in this

8       application -- strike that.  Above, under

9       property information, where it says subject

10      property address, 4848 Route 44, Amenia, New

11      York 12501, Dutchess, is there any place in

12      writing where you say that you want to give a

13      mortgage against less than the whole of the

14      property?

15             A.      No.

16             Q.      Do you know of any writing where

17      either you or Mr. Caltagirone informed the

18      lender that you wanted to give a mortgage

19      against less than the whole of your property?

20             A.      Not that I can recall, no.

21             Q.      Is it correct that the funds

22      that you received from the 2009 mortgage paid

23      off the 2007 mortgage that was against the

24      whole of your property; correct?

25             A.      Let me back up to your question

```
 1                      ROSENDALE
 2        of whether or not -- it was very clear that,
 3        because the trust had a mortgage that
 4        described the old road, and I did not own the
 5        old road at that point in time, or did not
 6        believe that I owned the old road at that
 7        point in time, I wanted it taken off the 2009
 8        mortgage.  That was the whole principal point
 9        of taking the 2009 mortgage.
10             Q.    But the effect of taking the
11        2009 mortgage is that it paid off the 2007
12        mortgage; correct?
13             A.    That's correct.
14             Q.    And it gave you some additional
15        cash available to you?
16             A.    Yes.
17             Q.    And the 2007 mortgage was
18        against the whole of the property; correct?
19             A.    That's correct.
20             Q.    And did -- to your knowledge,
21        did --
22             A.    Again -- hold on a second.
23        You're asking questions of me that I have no
24        moment to think about.  I don't have the 2007
25        mortgage application.  I expect it probably
```

Page 78

ROSENDALE

1

2      we wanted to clear it out, exclude the old

3      road.

4           Q.     And excluding the old road

5      wouldn't take out any more than the couple of

6      acres, correct?

7           A.     That's right.

8           Q.     And when we looked at the 2007

9      mortgage earlier, we saw that the description

10     that was contained in that mortgage covered

11     your entire acreage.  Correct?

12          A.     At the time, I thought Alan did

13     it all.  I had not been to the Department of

14     Transportation and told I didn't own it.

15          Q.     And did you -- in the 2007

16     mortgage, it wasn't limited to the 5 acres,

17     was it?

18          A.     No.

19          Q.     And it wasn't limited to

20     10 acres, was it?

21          A.     No.

22          Q.     It was just the description that

23     was contained in your deed; correct?

24          A.     Yes.

25          Q.     So why now would you think, two

Page 79

1                          ROSENDALE

2          years later, that the loan was going to be

3          limited to your house and 5 acres?  Who told

4          you that?

5               A.     I don't know that I actually

6          ever said that.  I think you're putting words

7          in my mouth.

8               Q.     Did someone tell you that the

9          house would be -- the mortgage would be

10         limited to the house and 5 acres?  Did

11         someone within this transaction -- Lorraine

12         Geraci, did she tell you that your house and

13         5 acres would be the only property that was

14         covered by the mortgage?

15              A.     No.

16              Q.     And did Mr. Caltagirone tell you

17         that your house and 5 acres would be the only

18         property that was covered by this mortgage?

19              A.     What I understood from Ms.

20         Geraci, what I understood from Mr.

21         Caltagirone, what I understood from my

22         understanding of the law at the time, is that

23         the appraisal would be based on the house and

24         5 acres or 10 acres.  If the -- the loan was

25         granted based on the appraisal of $575,000.

Page 103

ROSENDALE

1
2          the 2009 mortgage.
3          (DOCUMENT ELECTRONICALLY MARKED AS
4      DEFENDANT'S EXHIBIT 16 FOR IDENTIFICATION)
5          Q.    So we can scroll down.  We're
6      going towards the signature page slowly.
7      Let's stop here.  We have the Schedule A.
8      Now, Mr. Rosendale, if we look at this
9      Schedule A, is this the same description
10     that's contained in your deed?
11         A.    I think we've been over this,
12     and as far as I can tell without seeing them
13     side by side, yes.
14         Q.    And below the abandoned road, we
15     have an extra sentence, correct?  And that
16     sentence says, "Less than and excepting
17     therefrom any portion of the property
18     acquired via appropriation by the People of
19     the State of New York in notice of
20     appropriation dated 8/29/03, recorded 8/29/03
21     in document number 02-2008-7040.  And do you
22     know, did this language satisfy Mr.
23     Caltagirone's concern that you were including
24     the abandoned road?
25         A.    As I think I described, and also

Page 105

1                          ROSENDALE
2              A.      I don't know.
3              Q.      Is that your signature?
4              A.      Yes.
5              Q.      So you did sign it, correct?
6    You testified you have signed it.
7              A.      Yes.
8              Q.      Judge Roman found that you had
9    signed it, correct?
10             A.      Right.
11             Q.      There's no question that you
12   signed this mortgage.
13             A.      I don't deny that I signed the
14   mortgage.
15             Q.      And now we see that same date
16   language that's written into the copy that
17   you showed us as an attachment to your
18   initial complaint.  Correct?
19             A.      Right.
20             Q.      That's Dutchess, 4th June, 2009.
21   And then we see Maria Greco.  This is the
22   same signature we saw on the settlement
23   statement, correct, on the HUD-1A settlement
24   statement; correct?
25             A.      Right.

Page 111

1                          ROSENDALE
2          It reports the date this document was
3          recorded was July 13, 2009.
4                A.    Right.
5                Q.    Did you ever ask Mr. Caltagirone
6          to collect for you a copy of the recorded
7          mortgage against your property?
8                A.    No.  Why would I?
9                Q.    Were you concerned that you had
10         left the closing without signing -- strike
11         that.  Did you leave the closing having
12         signed the mortgage?
13               A.    I signed -- my signature is
14         there, obviously, and I've admitted that I
15         signed the mortgage.
16               Q.    But on what day did you sign the
17         mortgage; did you sign it on the day of the
18         closing?
19               A.    Yes.
20               Q.    And so Mr. Caltagirone didn't
21         notarize it when you signed it?
22               A.    Mr. Caltagirone would have
23         notarized it because he is a notary -- was a
24         notary.
25               Q.    He could have notarized, right,

Page 115

1              ROSENDALE
2                   BY MS. ELLIOTT:  We'll just take
3              a moment's break.
4                   (BREAK TAKEN)
5         BY MS. ELLIOTT:
6              Q.    So Mr. Rosendale, when was the
7         first time that you came to learn that the
8         2009 mortgage burdens all of your property?
9              A.    The 2009 mortgage does cover all
10        of my property, I don't dispute that.  I only
11        dispute that, at the time I signed the 2009
12        mortgage, I did not believe, and I have
13        evidence, that the old road was not part of
14        it.
15             Q.    Now, going back to the concern
16        that you had about giving a mortgage only
17        against your house and 5 acres, did you ask
18        the lender to change the Schedule A to only
19        include your house and 5 acres?
20             A.    No.
21             Q.    Did you ask the lender's
22        attorney at the closing?
23             A.    No.
24             Q.    And was that because you wanted
25        a codicil attached to the mortgage that said

Page 116

ROSENDALE

1
2       you could sell that property.

3              A.     I could sell parts of the

4       property as long as they did not reduce the

5       value below 525,000.

6              Q.     And did the attorney for the

7       lender at the closing, that man that you

8       don't know his name, did he agree to attach

9       that codicil to the mortgage on behalf of the

10      lender?

11             A.     He said -- he didn't agree to

12      the codicil.  He said one would be created.

13             Q.     He said one would be created?

14             A.     I don't -- yes.  That the

15      mortgage would be adjusted to allow me to

16      sell property as long as it did not reduce

17      the value of the mortgage, the property.

18             Q.     And did he put that in writing?

19             A.     No.

20             Q.     But you signed the mortgage even

21      though he hadn't put that in writing?

22             A.     I signed the mortgage and then

23      discovered that the property description was

24      wrong.

25             Q.     But the property description was

Page 124

ROSENDALE

1
2        reflects your understanding that the bank has
3        a lien against all of your acreage?
4              A.    It has a lien against all of my
5        acreage except -- hold on.  I have to think
6        about this answer.  It is my understanding
7        that the bank has a lien on 90 acres above
8        and beyond the ten, yes.  I don't dispute
9        that.  What I do dispute is that it was
10       changed after I signed it to reinsert the old
11       road, which I did not agree to sell.  If you
12       want to sort of -- I said fine, take the lien
13       on everything else and I'll sell you the
14       2 acres involved in the old road.  The point
15       here is you do have a lien; your client does
16       have a lien on the whole farm.  That's
17       inequitable if you won't let me sell pieces
18       of it.
19             Q.    But you agreed to give a lien
20       against the whole farm.
21             A.    That's true.
22             Q.    So you claim that you and the
23       bank's attorney agreed at the closing that
24       you could have a codicil to the mortgage that
25       would allow you to sell property.  Is that

Page 126

1                           ROSENDALE
2          was not included when we got to the closing.
3                  Q.     And you haven't produced any of
4          that correspondence because your Dell
5          computer is on the kaputz and you need to
6          regenerate it?
7                  A.     Yes.
8                  Q.     That's your testimony?
9                  A.     Yes.
10                 Q.     And I can represent to you that
11         the lender's file doesn't have any
12         correspondence of that nature in it.  Does
13         that surprise you?
14                 A.     No.
15                 Q.     Why not?
16                 A.     Why would it?
17                 Q.     Well, did you ever write to Ms.
18         Geraci, Lorraine Geraci, that you wanted this
19         codicil included?
20                 A.     No.
21                 Q.     Did you ever mention it to her?
22                 A.     No.
23                 Q.     And you wrote a letter saying
24         that you had spoken with Ms. Greco at one
25         point about the judgment lien that you were

ROSENDALE

1
2          please, back to page 1.  It says the
3          total amount that has been advanced to
4          date on your behalf is $000.  That's
5          not true.  Because of the date at that
6          time, I had already taken $7,000 out of
7          my line of credit and applied it.  So
8          it was an untrue statement which was
9          creating an attempt to frighten me,
10         which it did.  It's inaccurate.  That's
11         all I have to say further about that
12         point.
13              BY MR. VAUGHN:  Can we go back
14         to the document you were marking, 21?
15         Q.   Mr. Rosendale, showing you a
16    document that's been marked as Defendant's 21
17    for this afternoon's deposition.  It's a
18    letter from you dated September 2, 2019 to
19    Champion Mortgage.  My first question for you
20    after you have a chance to look at it is if
21    you recognize it?
22         A.   Yes.
23         Q.   You can see in the first
24    paragraph, it makes reference to the letter
25    dated August 23, 2019.  Do you see that?

Page 155

1                          ROSENDALE
2          that?
3               A.    Yes.
4               Q.    Have you ever seen such a notice
5          from Geico?
6               A.    Yes.  Hold on a second.  I never
7          seen a letter from Geico to Nationstar saying
8          my policy would be canceled if I didn't pay
9          in the future.  I have received letters from
10         Geico directly to me saying my policy would
11         be canceled at some point in the future.
12              Q.    Okay.  Now, if I could direct
13         your attention to -- I don't have any more
14         for this letter.
15                   BY MR. VAUGHN:  Can we mark
16                   number 4 in the RESPA folder, please?
17                   (DOCUMENT ELECTRONICALLY MARKED AS
18              DEFENDANT'S EXHIBIT 24 FOR IDENTIFICATION)
19              Q.    Mr. Rosendale, I'm showing you
20         what's been marked as Defendant's Exhibit 24
21         for identification.  It's a letter from you
22         to Champion Mortgage dated September 19,
23         2019.  Do you see that?
24              A.    Yes.
25              Q.    Do you recognize this letter?

Page 156

1                            ROSENDALE
2              A.      Yes.
3              Q.      In this letter, you state, just
4      to paraphrase, you're assisting asking for an
5      accounting of your escrow account.  Do you
6      see that?
7              A.      Yes.
8              Q.      If you look at the top of the
9      letter, where it says page 1 of 1, it has a
10     date, 9/19/2019, to the right there's a phone
11     number, and then it says from Donald P.
12     Rosendale.  Do you see that?
13             A.      Yes.
14             Q.      Do you recognize that 917
15     number?
16             A.      Yes.
17             Q.      Whose number is that?
18             A.      That is a virtual number.
19             Q.      What do you mean by virtual
20     number?
21             A.      I subscribe to a service that
22     provides fax services.  In other words, I
23     write to them and they send the faxes.
24             Q.      So was this particular 917
25     number assigned to your account?

Page 158

                              ROSENDALE
1
2       Mr. Rosendale, do you recall at any point in
3       time receiving a response to this letter,
4       either an acknowledgment or written response?
5              A.    Yes.
6              Q.    And when -- as you sit here
7       today, do you have an independent
8       recollection of when you received the letter?
9              A.    No, not independent, but I know
10      I received a letter from them; an
11      incomprehensible letter.
12                     BY MR. VAUGHN:  We can put that
13                down, please, Ms. Concierge.  And can
14                we pull up Defendant's 25, please?
15             Q.    All right, Mr. Rosendale,
16      showing you a letter from you to Ms. Kauser
17      Begum dated September 25, 2019.  For purposes
18      of identification, this is Defendant's 25.
19      And I'd ask you to take a look at it.  My
20      first question is, do you recognize this
21      document?
22             A.    Yes.
23             Q.    Do you need to see -- do you
24      want to see the entire letter before I ask
25      you questions?

Page 174

ROSENDALE

1
2    letter, says "will be canceled." So it's not
3    a cancellation notice, because there hadn't
4    been a cancellation.
5         Q.    These notices that you're
6    referring to, who prepared these notices?
7         A.    A computer at Liberty Mutual.
8         Q.    Correct. And what was the title
9    of those notices?
10        A.    Cancellation notices.
11        Q.    Okay. So I understand what it
12   states. I'm just referring to what they
13   labeled it as. I can't read the content. I
14   understand your position. I'm not arguing
15   what it says in the substance of the
16   cancellation notice. I'm just referring to
17   the document as labeled by Liberty Mutual and
18   as referenced in this letter marked as
19   Defendant's 27. My question is, did you
20   receive such a notice in or about August of
21   2018 indicating that it will be canceled due
22   to nonpayment?
23        A.    I don't know, but I do know that
24   my insurance was never canceled.
25        Q.    Okay. Was there any particular

Page 175

1                          ROSENDALE
2        reason why you would not make a hazard
3        insurance premium payment on time?
4               A.     Yes.
5               Q.     What was the reason?
6               A.     Not in this particular instance,
7        but I went back over them.  I paid my hazard
8        insurance from my Social Security.  My Social
9        Security check arrives on the fourth
10       Wednesday of the month.  In this case, now,
11       it will be paid tomorrow.  The Liberty Mutual
12       Insurance payments were always on the 24th of
13       the month.  So when the fourth Wednesday of
14       the month falls beyond of 24th, I didn't have
15       the money because my Social Security didn't
16       go in.  I found the two letters that you got
17       from Liberty Mutual.  There were only two in
18       the disclosure you sent.  In both cases, the
19       notices came when the Social Security payment
20       was after the 24th of the month.
21              Q.     Did you have an occasion to
22       notify Liberty Mutual of your circumstances
23       concerning paying for your hazard insurance
24       premiums out of your Social Security check?
25              A.     Yes.

Page 183

ROSENDALE

1
2    Q.    My question is, do you agree
3    with the statement that, at origination,
4    there was no escrow or set aside account
5    established?
6    A.    There was no escrow or set aside
7    account established.
8    Q.    The next question has to do with
9    the limited right to foreclose.  What were
10   you referring to there?
11   A.    I believe this is covered in
12   Judge Roman's order, in which he references,
13   in fact, the paragraph in the New York Senior
14   Citizen's tax laws that says that there had
15   to be a letter describing the right to
16   foreclose, and spelled out -- and there is no
17   such letter, and acknowledging there is no
18   such letter.  At that time, in his order, he
19   said that it was a violation.
20   Q.    Okay.  Did you -- so is it your
21   testimony that you received no such limited
22   right to foreclose notice from Liberty
23   Mutual -- I'm sorry, from Nationstar?
24   A.    That's correct.
25   Q.    Okay.

Page 185

ROSENDALE

1
2        foreclosure and I better pack my bags.  And I
3        was tired of having her call me.  And my
4        understanding is that, once I brought the
5        lawsuit, only you should be contacting me,
6        and that the company should not be contacting
7        me directly.  That was my understanding.
8               Q.     But I think you would agree that
9        your mortgage servicer has an obligation to
10       continue servicing the loan during the
11       pendency of a lawsuit; correct?
12              A.     Right.  But it doesn't give the
13       right to have some Muslim lady screaming at
14       me.
15              Q.     This Muslim lady, is that
16       referring to Ms. Begum?
17              A.     Yes.
18              Q.     On how many occasions did you
19       have a conversation with Ms. Begum?
20              A.     I had one conversation in which
21       I told her to stop calling me.  I believe
22       there were four attempts of her to call me.
23              Q.     You said four attempts, but you
24       believe there was one conversation with her?
25              A.     Yes.  The others were left on my

1                          ROSENDALE

2          Q.    Mr. Rosendale, I'm showing you

3    Defendant's 28, which is a letter from you to

4    Ms. Kauser Begum dated October 8, 2019.  My

5    first question is, do you recognize that

6    document?

7          A.    Yes.

8          Q.    I'll direct your attention to

9    the top of the page.  You'll see it appears

10   to have been faxed from that same virtual fax

11   number you identified earlier today.

12         A.    Yes.

13         Q.    If we scroll down into the

14   letter, you say, "On reviewing your letter of

15   September 18th, I see a statement that your

16   insurance department, on September 13, 2019,

17   received a cancellation notice from Liberty

18   Mutual stating that my coverage will be

19   canceled effective September 25, 2019 unless

20   I make a payment."  You wrote, "I have

21   checked my email where I get all my Liberty

22   Mutual notices between August 25, 2019 (which

23   I received an email notice that my payment

24   was due that day) and today, and I find no

25   such notice.  Contacting the insurance

Page 201

1                          ROSENDALE
2             Q.     What were the circumstances for
3        not making the payment in December of 2018?
4             A.     There was a man, now deceased,
5        who was driving my car, which I obviously
6        needed a car.  He was doing it without my
7        permission and he demolished it.  It was an
8        $8,000 car, but I didn't have collision
9        insurance -- I had liability insurance --
10       because we never drove the car any further
11       than down the hill to the train station or to
12       the feed store.  He was driving it outside of
13       his permission.  I had trouble collecting
14       from -- not from Liberty Mutual, but the
15       insurance company.  He was not at fault.  A
16       girl had driven out in front of him without
17       warning.  So it was determined that the other
18       insurance company, Progressive, I believe,
19       Insurance Company, was liable.  They offered
20       me $1,000 for the car.  In the meantime, I
21       had to spend $4,000 to $5,000 to buy a car so
22       we could keep operating and I could get to
23       the post office and the food store.  That
24       left me short of cash.  It took me until
25       December to get the right money.  I had to

Page 203

1                          ROSENDALE
2          payment for the delinquent 2017 property
3          taxes.  Please note, at the time we conducted
4          our final tax search on February 7, 2019,
5          Mr. Rosendale had not yet paid his 2017
6          property taxes and reflected the account as
7          delinquent, which is why we issued payment.
8          Our payment was refunded by the county tax
9          office on March 25, 2019, and a full refund
10         of $7,265.95 was applied back to the loan."
11         Do you see that?
12                  A.    Yes.
13                  Q.    Do you dispute that, in or about
14         March of 2019, the full refund of $7,265.95
15         was applied back to the loan?
16                  A.    They paid it on the 15th and
17         they didn't return it until the 25th of
18         March.
19                  Q.    Okay.  As a result of -- okay.
20         You've made some allegations that -- back to
21         the RESPA letters for a moment.  You made
22         some allegations that several of the letters
23         were either not acknowledged or responded to
24         timely.  Correct?
25                  A.    That's correct.

1                        ROSENDALE
2            Q.      And did any of these letters,
3    this failure to either acknowledge or
4    formally respond to your QWRs, cause you any
5    damages, any kind of harm?
6            A.      No.
7            Q.      Do you understand my question?
8            A.      I understand your question and I
9    understand what you're driving at.
10           Q.      So when you -- okay.  Withdraw
11   the question.  This next statement in the
12   next paragraph at the top of the page makes
13   reference to a tax search that was conducted
14   on May 21, 2019, which reflected that the
15   2019 town district taxes were coming due on
16   May 31, 2019.  Now, again, stop there for a
17   moment.  If I understand your testimony, the
18   2019 town district taxes, those would not be
19   due, at least to your understanding, until
20   December of 2019.  Is that right?
21           A.      That's correct.  The May 31st
22   was a checkpoint in it.  In other words, in
23   March, if you didn't pay March, you paid a
24   little more in May.  If you didn't pay in
25   May, you had until December in which you

Page 217

1                        ROSENDALE
2        you did not timely respond to my September
3        19, 2019 QWR."  Do you see that?
4              A.    Yeah.
5              Q.    Now, I'm telling you that I've
6        gone through the productions and discovery,
7        and I was unable to identify a letter dated
8        February 8, 2022 concerning the subject
9        matter as outlined in this interrogatory
10       response.  Number one.  So then if I go back
11       to the document that we have just marked as
12       Defendant's 35, the only letter that I could
13       find that remotely met the criteria outlined
14       in your interrogatory response was this
15       letter dated February 24, 2022, where you ask
16       questions such as who owns my loan, who will
17       be the servicer.  So I guess this begs the
18       question, is this the letter that you
19       intended to refer to in your interrogatory
20       response?
21             A.    No.
22             Q.    You believe there is a separate
23       letter dated February 8, 2022?
24             A.    Yes.
25             Q.    Even though you said 2002,

Page 218

1                          ROSENDALE
2        again, I'll acknowledge I assume you meant
3        2022.  But is that the correct date you
4        intended?
5                A.    Yes.
6                      BY MR. VAUGHN:  You can close
7                out of that exhibit.  Could we open up
8                Defendant's 18 again, please?
9                A.    Before we go, I want to finish
10       responding to your questions about the
11       additional RESPA violations.  Can we put that
12       letter back up on the screen?
13               Q.    Sure.  It's Defendant's 35.
14               A.    Now, we were talking about the
15       additional RESPA allegation in the complaint.
16                     BY MR. VAUGHN:  That would be
17               Defendant's 19, please.
18                     BY THE WITNESS:  Yes.  That's
19               what we were talking about.
20                     BY MR. VAUGHN:  It's going to be
21               toward the bottom.
22                     BY THE WITNESS:  Don't go too
23               fast.  You're going too fast for me
24               here.  I had seen something and I want
25               to get back to it.

Page 232

```
                            ROSENDALE
1
2        very frustrated guy at Liberty Mutual that he
3        had been trying to advise your client that
4        there was no cancellation, that Liberty
5        Mutual was picking up my policy.  But he had
6        been given the wrong phone numbers and the
7        wrong people and was getting the runaround.
8               Q.     Looking at the first paragraph,
9        it says, "The cancellation will be effective
10       at 12:01 a.m. on 8/26/18 unless the amount
11       due of $239.82 is received."  Do you see
12       that?
13              A.     Yes.
14              Q.     So that's referring to in the
15       future, not that it had been canceled;
16       correct?
17              A.     Yes.
18                     BY MR. VAUGHN:  That's my last
19                     question on that one.  Can we move on
20                     to number 2, please, in the hazard
21                     insurance folder?
22              (DOCUMENT ELECTRONICALLY MARKED AS
23          DEFENDANT'S EXHIBIT 40 FOR IDENTIFICATION)
24              Q.     Mr. Rosendale, for purposes of
25       identification, Defendant's Exhibit 40 is a
```

Page 233

ROSENDALE

 1

 2     copy of a letter that you had E-filed on or

 3     about August 11, 2022 in connection with this

 4     lawsuit.

 5          A.     Right.

 6          Q.     And I'm asking the concierge to

 7     scroll down because I want to direct your

 8     attention to a couple of the exhibits that

 9     you attached to the letter.  Earlier, you

10     testified that you would occasionally receive

11     notices from Liberty Mutual concerning

12     payment due by email to your AOL account.  Do

13     you see that?

14          A.     Um-hum.

15          Q.     Is this an example -- I'm

16     showing you right now this email to you dated

17     August 7, 2018.  It says, "Final reminder.

18     We have not received your payment."  Is this

19     an example of one of those types of emails

20     you have received in the past?

21          A.     Yes.

22          Q.     And this is concerning the same

23     period that was referenced in the prior

24     exhibit with regard to the notice of a future

25     cancellation; correct?

Page 244

ROSENDALE

please?

(DOCUMENT ELECTRONICALLY MARKED AS

DEFENDANT'S EXHIBIT 46 FOR IDENTIFICATION)

Q.    Mr. Rosendale, I'm showing you

what's been marked as Defendant's Exhibit 46.

It appears to be a letter from Liberty

Mutual -- or actually, withdrawn.  It appears

to be a declaration page from Liberty Mutual

concerning your policy dated August 5, 2018.

Do you see that?

A.    Correct.

Q.    And then you see, policy period:

8/5/2018 through 8/5/2019.  Do you see that?

A.    Yes.

BY MR. VAUGHN:  Ms. Concierge,

could you scroll down, please?  You can

keep going.

Q.    So this appears to be the second

page.  It was a cover page sent to you.  Was

this faxed to you at your request, if you

know?

A.    I'm looking.  It doesn't have my

fax number on there.  It looks like it was

faxed to somebody else, sent to a fax server.

Page 254

ROSENDALE

1

2    previously marked.

3          A.    Okay.

4          Q.    I don't have any questions.

5          A.    That's fine.

6                BY MR. VAUGHN:  Can you mark the

7          next one, please, which will be number

8          16?

9          (DOCUMENT ELECTRONICALLY MARKED AS

10    DEFENDANT'S EXHIBIT 53 FOR IDENTIFICATION)

11                BY MR. VAUGHN:  And if possible,

12          can you mark 17 as well?

13                BY THE CONCIERGE:  Yes.

14                BY MR. VAUGHN:  Thank you.

15          (DOCUMENT ELECTRONICALLY MARKED AS

16    DEFENDANT'S EXHIBIT 54 FOR IDENTIFICATION)

17          Q.    So Mr. Rosendale, I'm showing

18    you what's been marked as Defendant's Exhibit

19    53.  It's a copy of the notice from Liberty

20    Mutual of a future cancellation, which is

21    dated February 5, 2020.  Do you see that?

22          A.    Yes.

23          Q.    I'm also going to show you

24    Defendant's Exhibit 54, which is a similar

25    notice from Liberty Mutual sent to your

Page 255

```
 1                    ROSENDALE
 2    attention, dated February 5, 2020 as well.
 3    Do you see that?
 4          A.    Yes.
 5          Q.    Do you recall receiving this
 6    notice from Liberty Mutual?
 7          A.    Probably.
 8          Q.    So you don't have a specific
 9    recollection; is that your testimony?
10          A.    No, because I never ever ever
11    ever failed to pay my insurance, even when it
12    was late.  If it was late, I paid it.  There
13    was never a cancellation on my policy.  And
14    because these are prepaid, I wasn't even
15    late.  The policy was running and the
16    insurance was paid during this time.  And
17    also, Mr. Vaughn, it's five o'clock.  You
18    have been deposing me since ten o'clock this
19    morning, which is seven hours.  I'm not
20    required to be deposed for more than seven
21    hours in one day.  Thank you.
22                BY MR. VAUGHN:  I still have
23          another half hour, sir, because we took
24          a half hour break.
25                BY THE WITNESS:  I did not agree
```

Page 269

```
 1
 2      UNITED STATES DISTRICT COURT
        SOUTHERN DISTRICT OF NEW YORK
 3      -----------------------------------X
                                           :
 4      DONALD P. ROSENDALE,
                                           :Civil Action
 5                    PLAINTIFF,            No. 7:10-cv-
                                           :09263
 6           -against-
                                           :
 7      MR. COOPER GROUP, INC., d/b/a
        NATIONSTAR MORTGAGE LLC Directly   :
 8      and as Loan Servicer for an
        Unspecified Nationstar HECM        :
 9      Acquisition Trust, Champion
        Mortgage and Dr. Ben Carson in his :
10      capacity as Secretary of the U.S.
        Department of Housing and Urban    :
11      Development,
                                           :
12                    DEFENDANTS.
        -----------------------------------X
13                    November 22, 2022
                      2:00 p.m.
14
15
16           Examination Before Trial of the Plaintiff,
        DONALD P. ROSENDALE, in the above-captioned
17      matter, held via Zoom Video, before Howard
        Breshin, a Notary Public of the State of New
18      York.
19
20
21
22
23
24
25      Job No. CS5595210
```

1          ROSENDALE

2          Q.    Okay.   In Paragraph 56 through 60, you

3     have identified the factual basis for it appears

4     to be an emotional distress claim that you

5     presented in this case and in particular I want

6     to direct your attention to Paragraph 57 where

7     you make reference to a series of nightmares that

8     you began you were having in December of 2019, do

9     you see that?

10         A.    Yes, I do.

11         Q.    All right.  Now, in this Paragraph you

12    make reference to an individual with the last

13    name Begum.  Have you ever met a Ms. Begum in

14    person?

15         A.    I have only talked to her on the phone

16    and had phone messages from her.

17         Q.    On how many occasions did you speak to

18    Ms. Begum?

19         A.    One.  I spoke to her for one time

20    personally.

21         Q.    And do you recall how long that

22    conversation lasted?

23         A.    Probably five or 10 minutes.

24         Q.    And today do you recall the sum and

25    substance of that conversation?