USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _4/05/2024___

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DONALD P. ROSENDALE,

                              Plaintiff,

        -against-

MR. COOPER GROUP INC. d/b/a
NATIONSTAR MORTGAGE /d/b/a/ Champion
Mortgage & NATIONSTAR MORTGAGE LLC
Directly and as Loan Servicer for an Unspecified
Nationstar HECM Acquisition Trust,
                              Defendants.

No. 19-cv-9263 (NSR)
**OPINION & ORDER**

NELSON S. ROMÁN, United States District Judge:

*Pro se* Plaintiff, Donald Rosendale ("Plaintiff") brings this action against the remaining defendants, Mr. Cooper Group, Inc. d/b/a Nationstar Mortgage d/b/a Champion Mortgage and Nationstar Mortgage LLC, directly and as a Loan Servicer for an Unspecified HECM Acquisition Trust (collectively, "Defendants"). Plaintiff's asserts claims sounding in: (1) the Real Estate Settlement Procedures Act ("RESPA") 12 U.S.C. § 2605(e) ("Section 2605"); (2) common law conversion; (4) common law gross negligence; (5) violation of N.Y. Gen. Bus. Law ("GBL") § 349 ("Section 349"); (6) common law breach of contract; (7) reformation or extinguishment of a reverse mortgage; and (8) negligent and intentional infliction of emotional distress.

Presently before the Court is Defendants' motion for summary judgment seeking dismissal of Plaintiff's Third Amended Complaint, ("TAC", ECF No. 75), in its entirety. For the reasons articulated below, the Court GRANTS the motion and dismisses the Complaint.

## FACTUAL BACKGROUND

The facts below are taken from Defendants' Local Rule 56.1[1] Statement ("Def. 56.1", ECF No. 223, Ex. 2), Plaintiff's Response to Defendants' Local Rule 56.1 Statement ("Pl. Resp. 56.1", ECF No. 238), affidavits, declarations, and exhibits,[2] and are not in dispute except where so noted.

Before proceeding, the Court notes at the outset that Plaintiff has also submitted a document titled "VOLUME II: Sworn affidavit with Exhibits" ("Pl. Affidavit", *see* ECF No. 239). This document, unlike Pl. Resp. 56.1, is made under penalty of perjury. (Pl. Affidavit p.14). The Court further notes that "[w]here a party wishes to have a court consider documents which are not yet part of the court's record, the documents must be attached to and authenticated by an appropriate affidavit and the affiant must be a competent witness through whom the documents could be received into evidence at trial." *New York ex rel. Spitzer v. Saint Francis Hosp.*, 94 F. Supp.2d 423, 426 (S.D.N.Y.) (citing *Crown Heights Jewish Community Council, Inc. v. Fischer*, 63 F. Supp.2d 231 (E.D.N.Y. 1999)).

The purpose of Pl. Affidavit is also unclear. It contains a "Preliminary Statement" and runs through Plaintiff's entire history on the property in question because "[t]o fully grasp [Plaintiff's]

---

[1] Local Rule 56.1 requires the moving party to submit a concise statement consisting of numbered paragraphs laying out the material facts of the case. *See* S.D.N.Y. Loc. R. 56.1(a). Such facts will be deemed admitted unless "*specifically controverted* by a correspondingly numbered paragraph in the statement required to be served by the opposing party. S.D.N.Y. Local Rule 56.1(c) (emphasis added).

[2] Citations to "Pl. Ex." Refer to Exhibits attached to the Declaration of Donald P. Rosendale in Opposition to Defendants' Motion for Summary Judgment (ECF No. 238). Citations to "Defs. (D) Ex." refer to Exhibits attached to the Declaration of Daniel Delpesche in Support of Defendants' Motion for Summary Judgment (ECF No. 235). Citations to "Defs. (V) Ex." refer to Exhibits attached to the declaration of Anthony W. Vaughn in Support of Defendants' Motion for Summary Judgment (ECF No. 236).

The Court notes that with respect to Pl. Exs., there appears to be misnumbering on the docket. For instance, linked at Pl. Ex. 5 is actually Pl. Ex. 6, and so on such that each subsequent link provides the exhibit one number ahead of what is purportedly provided. In sum, all of the Plaintiff's exhibits are present except for Pl. Ex. 5. The Court will refer to Pl. Exs. by the number that appears in the file (e.g., the document located at the link for Pl. Ex. 5 is actually Pl. Ex. 6, and so forth).

Citations to the "Relevant Pages" of the Deposition of Donald P. Rosendale ("Rosendale Tr.") refer to Def. (A) Ex. 13.

injuries in this action, [it is necessary to] start at the beginning . . . ." (Pl. Affidavit p.1). For purposes of a motion for summary judgment, not so—as Local Rule 56.1 requires, the parties are to provide "a separate, <u>short and concise</u> statement, in numbered paragraphs, of . . . <u>material facts</u> as to which it is contended that there exists a <u>genuine issue to be tried</u>." *See* S.D.N.Y. Loc. R. 56.1(a), (c) (emphasis added). Finally, appended to Pl. Affidavit are the same exhibits attached to Pl. Resp. 56.1. (*Compare* Pl. Affidavit pp.16-63 *with* Pl. Resp. 56.1 pp.13-58).

Despite these failings and in light of Plaintiff's *pro se* status, the Court will consider both Pl. Resp. 56.1 and Pl. Affidavit to the extent they elucidate facts that are genuinely in dispute, material, and supported by evidence.

### *The Property*

Plaintiff is the owner of real property located at 4848 Route 44, Amenia, New York 12501 (the "Property"). (Defs. 56.1 ¶ 1). Plaintiff took title to the Property by deed dated December 9, 1982 (the "Deed").[3] (*Id.*; *see also* Defs. (V) Ex. 14). Included within the description of the Property is parcel of land described as an "abandoned road". (*Id.*; *see also* Defs. (V) Ex. 14). The Property is not subdivided. (Pl. Resp. 56.1 ¶ 2).

### *The Reverse Mortgages*

Plaintiff obtained a mortgage from BNY Mortgage Company LLC on May 23, 2007 (the "2007 Mortgage"). (Defs. 56.1 ¶ 4). The property description for the 2007 Mortgage is largely the same in the Deed, though it omits "thence on said Barton's Line, South 8 ½ [degrees] West 22

---

[3] Plaintiff contends that the Deed "[l]eft out of the title . . . a description of about one quarter mile of road front." (P. Resp. 56.1 ¶ 1). He attempts to point to a 2005 Amended Mortgage to Title and 2005 Stipulation between Plaintiff and JPMorgan Chase, purported located at Pl. Exs. 1 and 7, respectively. (*Id.*) Neither the 2005 Amended Mortgage to Title nor the 2005 Stipulation are located at either exhibit. Pl. Ex. 1 does contain, however, an indenture from 1969 that matches the property description contained in the Deed. (*Compare* Pl. Ex. 1 *with* Defs. Ex. (V) 14). The Court was unable to identify the 2005 Amended Mortgage to Title or the 2005 Stipulation in any of Plaintiff's exhibits. The Court was able to identify a Loan Modification Agreement made between JPMorgan Chase and Plaintiff in 2003 that appears to provide a parcel of property including that described in the Deed and more. (See Pl. Ex. R-3). The significance of this agreement is not clear and, in any event, it does not override the Deed.

chains 95 links . . . ." (*Compare* Defs. Ex. (V) 15, p.5 *with* Defs. Ex. (V) 14, p.1). Plaintiff nevertheless did not object to the property description in the 2007 Mortgage. (Defs. 56.1 ¶ 4).

Plaintiff gave a reverse mortgage to MetLife Home Loans ("MetLife") on June 4, 2009 (the "2009 Reverse Mortgage"). (*Id*. ¶ 5). The 2009 Reverse Mortgage contains the same property description as the Deed. (*Id*. ¶ 6; *compare* Defs. Ex. (D) B, p.3 *with* Defs. Ex. (V) 14, p.1). Plaintiff did not request that Schedule A to the 2009 Reverse Mortgage only apply to his house and five acres. (*Id*.). MetLife received a lien against the entire farm under the 2009 Reverse Mortgage. (*Id*.). At no point was Plaintiff aware of any writing from himself or his attorney intended to inform MetLife that he only intended the 2009 Reverse Mortgage to cover five acres and Plaintiff's home. (*Id*. ¶ 10). The 2009 Reverse Mortgage loan officer never indicated as such, either. (*Id*. ¶ 10). No escrow or set-aside account was established at the closing of the 2009 Reverse Mortgage. (*Id*. ¶ 12).

Plaintiff gave a second reverse mortgage to the Secretary of Housing and Urban Development ("HUD") on June 4, 2009 (the "HUD Reverse Mortgage"). (*Id*. ¶ 7). The same day, Plaintiff executed a Home Equity Conversion Loan Agreement ("HECLA"). (*Id*. ¶ 8). The 2009 Reverse Mortgage was used to pay off the 2007 Mortgage. (Defs. 56.1 ¶ 9). MetLife assigned the 2009 Reverse Mortgage to Champion Mortgage Company on September 7, 2012. (*Id*. ¶ 13). On October 20, 2022, Nationstar assigned the 2009 Reverse Mortgage to Mortgage Assets Management, LLC. (*Id*. ¶ 14). The ultimate owner of the 2009 Reverse Mortgage, however, is the Federal National Mortgage Association. (*Id*. ¶ 15).

Defendants serviced Plaintiff's reverse mortgage from July 1, 2012 through March 1, 2022. (*Id*. ¶ 3). On the latter date, Defendants transferred the servicing rights to Plaintiff's reverse mortgage to PHH Mortgage Services. (*Id*.).

_Plaintiff's RESPA Claim_

On August 23, 2019, Defendants sent Plaintiff a letter requesting proof of payment with respect to property taxes and hazard insurance. (_Id_. ¶ 16; _see also_ Defs. Ex. (D) BB). The letter indicated that failure to resolve the issue could lead the 2009 Reverse Mortgage becoming due and payable, potentially resulting in a foreclosure action. (_Id_.) Even so, the letter indicated that Defendants and HUD would prefer to avoid foreclosure in favor of a solution that would result in Plaintiff keeping his home. (_Id_.). Plaintiff disputed he owed any taxes in a letter dated September 2, 2019. (_Id_. ¶ 17; Defs. Ex. (V) 16). The parties dispute whether Plaintiff received a letter from Defendants dated September 6, 2019, which acknowledged receipt of Plaintiff's September 2, 2019 letter. (_See_ Defs. 56.1 ¶ 18, Pl. Resp. 56.1 ¶ 18).

Defendants sent a substantive response on September 18, 2019, stating that their records indicated Plaintiff's hazard insurance expired on August 5, 2018. (_Id_. ¶ 19; Defs. Ex. (D) FF). Plaintiff responded to this letter on September 25, 2019, again disputing that his taxes and insurance were delinquent. (_Id_. ¶ 21; Defs. Ex. (V) 18). Defendants acknowledged receipt of this letter on September 30, 2019. (_Id_. ¶ 22; Defs. Ex. (D) II). In the interim, Plaintiff wrote to Defendants requesting an accounting of an escrow account on September 19, 2019. (_Id_. ¶ 20).

Plaintiff again responded to the September 18 letter on October 8, 2019 and requested a copy of the Cancellation Notice issued by Liberty Mutual. (_Id_. ¶ 23; Defs. Ex. (V) Ex. 19). Defendants acknowledged receipt of this letter in a response dated October 10, 2019. (_Id_. ¶ 24). On October 23, 2019, Defendants responded substantively to Plaintiff's letter dated September 25, 2019. (_Id._ ¶ 25; Defs. Ex. (D) MM). That letter summarized information regarding reverse mortgage lending, the terms of the mortgage, loan servicing, an escrow account, the appraisal procured at loan origination, and Plaintiff's obligations to timely pay property taxes and hazard

insurance premiums. (*Id.*; Defs. Ex. (D) (MM)). Defendants then obtained a Lender Placed Insurance policy on October 29, 2018. (*Id.* ¶ 19; Defs. Ex. (D) MM).

The parties dispute whether Defendants alleged failure to either acknowledge or formally respond to Plaintiff's letters caused Plaintiff harm. (*See* Defs. 56.1 ¶ 26; Pl. Resp. 56.1 ¶ 26).

### *Hazard Insurance*

On July 5, 2018, Liberty Mutual issued Plaintiff a bill in the amount of $239.82 for his hazard insurance premium. (Defs. 56.1 ¶ 27). Liberty Mutual issued a notice of non-payment to Plaintiff, and sent a Cancellation Notice to Defendants, on August 6, 2018. (*Id.* ¶¶ 27-28). A copy of the Cancellation Notice was also sent to Plaintiff. (*Id.* ¶ 28; Defs. Ex. (D) K). On August 7, 2018, Liberty Mutual emailed Plaintiff notifying him that his homeowner's insurance was at risk of cancellation for failure to pay. (*Id.* ¶ 29; Defs. Ex. (V) 20).

Defendants sent a letter to Plaintiff on August 8, 2018 requesting proof of hazard insurance. (*Id.* ¶ 30). Plaintiff paid the outstanding $239.82 balance on August 17, 2018. (*Id.* ¶ 31). Defendants assert that they sent a second letter to Plaintiff requesting proof of hazard insurance on August 29, 2018 (*Id.* ¶ 32); Plaintiff contends he "has no record of receiving" such a record. (Pl. Resp. 56.1 ¶ 32).

On September 5, 2018, Liberty Mutual sent Plaintiff a bill in the amount of $265.91 for his hazard insurance premium. (Defs. 56.1 ¶ 33). Defendants sent Plaintiff another letter requesting proof of hazard insurance on September 28, 2018. (*Id.* ¶ 34). Liberty Mutual assessed Plaintiff a late payment fee on October 1, 2018. (*Id.* ¶ 34; Defs. (V) Ex. 20). On October 5, 2018, Plaintiff paid Liberty Mutual $265.91. (*Id.* ¶ 36; Defs. (V) Ex. 20).

Defendants acquired Lender Placed Insurance for Plaintiff in the amount of $2,789.00 on October 29, 2018. (*Id.* ¶ 37; Defs. Ex. (D) Exs. G, O). Defendants again sent Plaintiff a request for

proof of hazard insurance on November 1, 2018. (*Id.* ¶ 38). On November 5, 2018, Liberty Mutual sent Defendants a Cancellation Notice with respect to Plaintiff's homeowner's insurance policy. (*Id.* ¶ 39; Defs Ex. (D) P).[4] The Cancellation Notice asserts that a copy was also sent to Plaintiff for failure to pay his premium. (*Id.*).

On November 8, 2018, Liberty Mutual faxed Plaintiff a Declarations page stating that his annual premium was $2,583.00. (*Id.* ¶ 40; Defs. Ex. (V) 13). That same day, Liberty Mutual sent Defendants Plaintiff's proof of insurance. (*Id.* ¶ 41). Defendants then credited Plaintiff's account for $2,789.00 and sent Plaintiff a letter on November 14, 2018 stating as much. (*Id.* ¶¶ 41-42).

Liberty Mutual sent Defendants another Cancellation Notice on September 5, 2019. (*Id.* ¶ 44; Defs. Ex. (D) DD). The Cancellation Notice asserts that a copy was also sent to Plaintiff for failure to pay his premium. (*Id.*; Defs. Ex. (D) DD). Defendants sent Plaintiff a letter dated September 18, 2019 in response to Plaintiff's September 2, 2019 letter, advising Plaintiff they had received the Cancellation Notice from Liberty Mutual, requesting Plaintiff pay his hazard insurance premium by September 25, 2019, and to send proof of Payment to Defendants. (*Id.*, ¶ 46; Defs. Ex. (D) FF). In a letter dated September 27, 2019, Defendants requested proof of hazard insurance from Plaintiff. (*Id.* ¶ 47; Defs. Ex. (D)).

Defendants sent a letter to the New York State Department of Financial Services ("DFS") in response to inquires made regarding the servicing of Plaintiff's reverse mortgage. (*Id.* ¶ 42; Defs. Ex. (D) LL). This letter included copies of the HUD guidelines, the 2009 Reverse Mortgage, and the Home Equity Conversion Loan agreement. (*Id.*).[5] Defendants sent a second letter to DFS

---

[4] Plaintiff contends that this notice was with respect to an "old" policy with Liberty Mutual, which expired, Plaintiff asserts, on August 5, 2018. (Pl. Resp. 45.1 ¶ 39). However, upon review of the Cancellation Notice in question, it plainly states that it relates to policy with a term running from August 5, 2018 through August 5, 2019. (Defs. Ex. (D) P).

[5] Plaintiff asserts that the copy of the 2009 Reverse Mortgage attached to Defendants' letter is not a "true copy" because it contains the "deficient" Deed. (Pl. Resp. 56.1 ¶ 48).

on October 31, 2019, providing a timeline of dates of correspondence with Plaintiff and amounts withdrawn and repaid to Plaintiff. (*Id*. ¶ 49; Defs. Ex. (D) AA). This second letter specifically cited provisions of the 2009 Reverse Mortgage authorizing Defendants to advance funds on Plaintiff's behalf and provides the reason why no escrow account was set up at origination. (*Id*.).

Liberty Mutual sent Defendants a Cancellation Notice with respect to Plaintiff's homeowner's insurance policy on February 5, 2020. (*Id*. ¶ 47; Defs. Ex. (D) PP). That Cancellation Notice indicated that a copy would be sent to Plaintiff for failure to pay his premium. (*Id*.)

*Property Taxes*

On December 19, 2018, Defendants sent Plaintiff a letter notifying him that his taxes were not paid and requesting that he pay those taxes immediately. (*Id*. ¶ 52; Defs. Ex. (D) T). The letter warns that failure to pay those taxes will result in Defendants advancing funds to pay the tax bill. (*Id*.).

Defendants sent Plaintiff a second letter on January 23, 2019 indicating that his bill relating to 2017 property taxes was delinquent. (*Id*. ¶ 53; Defs. Ex. (D) U). This letter warned that failure to pay could result in the 2009 Reverse Mortgage entering default and becoming due and payable. (*Id*.). The letter further warned that if the 2009 Reverse Mortgage did become due and payable, it could result in foreclosure on Plaintiff's home. (*Id*.)

Plaintiff wrote to Defendants on January 24, 2019 and, citing to the terms of the HECLA, stated that the proper procedure when Plaintiff is late paying his taxes is for Defendants to pay them and add the relevant amount to the balance of his line of credit. (*Id*. ¶ 54; Defs. Ex. (D) V). Defendants responded to this letter, and another letter dated January 28, 2019 from Plaintiff, on January 31, 2019. (*Id*. ¶ 55; Defs. Ex. (D) W). Defendants' letter noted that it was Plaintiff's obligation to pay his taxes and that Defendants simply had the option, but not the obligation, to

pay on Plaintiff's behalf with funds from Plaintiff's line of credit. (Defs. Ex. (D) W).[6] This letter cites to specific provisions of the 2009 Reverse Mortgage and the HECLA. (Defs. 56.1 ¶ 55). The letter also disclaims Plaintiff's allegations that Defendants' December 19, 2018 letter was a threat to accelerate Plaintiff's debt. (*Id*.).

On February 11, 2019, the Duchess County Commissioner issued Plaintiff a tax receipt reflecting payments made by Plaintiff toward property taxes that were due in 2017. (*Id*. ¶ 56). The receipt indicates that Plaintiff's payment was overdue and assessed $225.40 for interest and penalties. (Defs. Ex. (D) X).

Defendants wrote to Plaintiff on February 12, 2019 requesting proof of payment of his property taxes and/or insurance premiums and indicated that Defendants advanced funds to pay his property taxes and/or insurance on Plaintiff's behalf. (*Id*. ¶ 58; Defs. Ex. (D) Y). The next day, the County of Dutchess issued a check to Defendants' vendor in the amount of $7,265.95 as a refund for Plaintiff's property taxes. (*Id*. ¶ 59). Defendants then credited Plaintiff's account in the amount of $7,265.95 on March 25, 2019. (*Id*. ¶ 60).

Defendants advanced funds in the amount of $7,196.88 on May 21, 2019 on Plaintiff's behalf to pay certain 2019 taxes. (*Id*. ¶ 61; (Defs. Ex. (D) R). Defendant refunded that same amount to Plaintiff's line of credit on July 5, 2019, covering fees, interest, and "MIP".[7] (*Id* ¶ 62).

On August 22, 2019, Defendants advanced funds from Plaintiff's line of credit in the amount of $7,473.60 to pay Plaintiff's 2018 property taxes. (*Id*. ¶ 63).

Plaintiff faxed a letter to Defendants on September 27, 2019 in regard to a voicemail he received from one of Defendants' employees. (*Id*. ¶ 64). Plaintiff sent a second fax on October 18, 2019 requesting Defendants cease contacting him in light of his filing this action. (*Id*. ¶ 65).

---

[6] Plaintiff asserts that Defendants' letter is inaccurate. (Pl. Resp. 56.1 ¶ 55).
[7] The Court takes "MIP" to mean "Mortgage Insurance Premium".

Plaintiff next corresponded with Defendants on December 10, 2019: he requested by letter information regarding the payment of property taxes in August 2019 in the amount of $7,473.60. (*Id.* ¶ 45; Defs. Ex. (D) NN). On December 18, 2019, Defendants responded to Plaintiff's letter stating that the amount paid was to cover 2019 Town and County taxes, which included certain 2018 school taxes that were marked as delinquent. (*Id.* ¶ 67; Defs. Ex. (D) OO).

### *Interest Rate Date*

The parties dispute whether MetLife sent Plaintiff a letter dated November 10, 2010 stating that it had discovered an error in "Adjustable Rate Note" associated with the 2009 Reverse Mortgage with respect to the date used to determine index rate adjustments. (*Id.* ¶ 68; Pl. Resp. 56.1 ¶ 68; *see also* Defs. Exs. (D) F & G).

### *Emotional Distress*

The parties dispute how many conversations Plaintiff had with Kauser Begum, one of Defendants' employees. (Defs. 56.1 ¶ 69; Pl. Resp. 56.1 ¶ 69).

## PROCEDURAL HISTORY

Plaintiff initiated this action on October 17, 2019, (ECF No. 1), and filed an Amended Complaint on November 4, 2019. (ECF No. 7). Defendants requested leave to file a motion to dismiss the Amended Complaint on December 13, 2019. (ECF No. 11). The Court ordered the parties to appear for a pre-motion conference, (ECF No. 17), which was held on January 23, 2020. At that conference, Plaintiff was granted leave to file a Second Amended Complaint, (*id.*), which he did on February 26, 2020. (ECF No. 25).

Defendants filed their motion to dismiss the Second Amended Complaint on May 18, 2020. (ECF No. 32). The Court issued an Order & Opinion granting, in part, and denying, in part, Defendants' motion to dismiss on September 7, 2021. *See Rosendale v. Mr. Cooper Group*

*Inc.*, No. 19-cv-9263 (NSR) 2021 WL 4066821 (S.D.N.Y. 2021) ("*Rosendale I*"); (*see also* ECF No. 63). *Rosendale I* also granted Plaintiff leave to file a Third Amended Complaint ("TAC") (*id.*), which he did on January 24, 2022. (ECF No. 75).

Defendants answered the TAC on February 24, 2022. (ECF No. 78). After a protracted discovery period, the parties filed their respective motion for summary judgment papers on August 1, 2023 consisting of, among others: (1) Defendants'(a) Motion for Summary Judgment (ECF No. 234); (b) Memorandum of Law in Support of Motion for Summary Judgment ("Defs. Mem.", ECF No. 237); and (c) Reply Memorandum in Support of Motion for Summary Judgment (ECF No. 242); and (2) Plaintiff's Response in Opposition to Motion for Summary Judgment ("Pl. Opp.", ECF No. 240).

## LEGAL STANDARD

### I.    Fed. R. Civ. P. 56

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of pointing to evidence in the record, "including depositions, documents . . . [and] affidavits or declarations," *see* Fed. R. Civ. P. 56(c)(1)(A), "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may support an assertion that there is no genuine dispute of a particular fact by "showing . . . that [the] adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). If the moving party fulfills its preliminary burden, the onus shifts to the nonmoving party to raise the existence of a genuine issue of material fact. Fed. R. Civ. P. 56(c)(1)(A); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; a*ccord Gen. Star Nat'l Ins. Co. v. Universal Fabricators, Inc*., 585 F.3d 662, 669 (2d Cir. 2009); *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008); *Benn v. Kissane*, 510 F. App'x 34, 36 (2d Cir. 2013) (summary order).  Courts must "draw all rational inferences in the non-movant's favor," while reviewing the record.  *Kirkland v. Cablevision Sys*., 760 F.3d 223, 224 (2d Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)).  Importantly, "the judge's function is not himself to weigh the evidence and determine the truth of the matter," nor is it to determine a witness's credibility.  *Anderson*, 477 U.S. at 249; *see also Kaytor v. Elec. Boat Corp*., 609 F.3d 537, 545 (2d Cir. 2010).  Rather, "the inquiry performed is the threshold inquiry of determining whether there is the need for a trial." *Anderson*, 477 U.S. at 250.  Summary judgment should be granted when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322.

Critically, in an opposition to a motion for summary judgment "[s]tatements that are devoid of any specifics, but replete with conclusions" will not suffice.  *Bickerstaff v. Vassar Coll*., 196 F.3d 435, 452 (2d Cir. 1999); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986) (nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *FDIC v. Great Am. Ins. Co*., 607 F.3d 288, 292 (2d Cir. 2010) (nonmoving party "may not rely on conclusory allegations or unsubstantiated speculation") (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)).

When dealing with summary judgment motions in *pro se* cases, courts in this Circuit must "read the pleadings of a *pro se* plaintiff liberally and "raise the strongest arguments that they suggest." *McPherson v. Coombe*, 17 F.3d 276 (2d Cir. 1999) (quoting *Burgos v. Hopkins*, 214

F.3d 787, 790 (2d. Cir. 1994)).  Pleadings drafted by *pro se* plaintiffs moving for summary judgment are not held to the same "stringent standards" as "formal pleadings drafted by lawyers." *Shariff v. Poole*, 689 F.Supp.2d 470, 476 (S.D.N.Y. January 20, 2010).  On the other hand, *pro se* plaintiffs cannot overcome a motion for summary judgment by simply making "bald" assertions that are unsupported by the evidence.  *Id.*

## DISCUSSION

Plaintiff's asserts claims under: (1) RESPA Section 2605; (2) common law conversion; (4) common law gross negligence; (5) GBL Section 349; (6) common law breach of contract; (7) reformation or extinguishment of a reverse mortgage; and (8) negligent and intentional infliction of emotional distress. The Court will address each in turn

### I.        RESPA Claims

Plaintiff's first cause of action alleges that Defendants did not adequately respond to Qualified Written Requests ("QWRs") such that Plaintiff can sustain a private right of action under Section 2605.

RESPA defines a QWR as

> [A] written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, that—(i) includes, or otherwise enables the servicer to identify, the name and account of the borrower; and (ii) includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower.

12 U.S.C. § 2605(e)(1)(B). Even so, a loan servicer is only obligated to respond to QWRs when "those requests seek information relating to the servicing of such loans, with 'servicing' defined as 'receiving any scheduled periodic payments from a borrower' and applying such proceeds to the principal, interest, and other amounts owed to the holder of the loan." *Rosendale I*, 2021 WL

4066821, at *8 (S.D.N.Y. Sept. 7, 2021) (quoting *Gorbaty v. Wells Fargo Bank, N.A.*, No. 10-CV-3291 NGG SMG, 2014 WL 4742509, at *7 (E.D.N.Y. Sept. 23, 2014) (cleaned up).

Service providers are required to acknowledge receipt of a QWR within five days (excluding legal public holidays, Saturdays, and Sundays). 12 U.S.C. § 2605(e)(1)(A). Service providers are then required to respond substantively "[n]ot later than 30 days (excluding public holidays, Saturdays, and Sundays) . . . ." 12 U.S.C. § 2605(e)(2). The content of the service providers substantive response depends on the content of the QWR, and must:

> (A) make corrections in the account of a borrower, including the crediting of any late charges or penalties, and transmit to the borrower a written notification of such correction (which shall include the name and telephone number of a representative of the servicer who can provide assistance to the borrower);
>
> (B) after conducting an investigation, provide a written explanation or clarification that includes (i) to the extent applicable, a statement of the reasons for which the servicer believes the account of the borrower is correct as determined by the servicer; and (ii) the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower; or
>
> (C) after conducting an investigation, provide the borrower with a written explanation or clarification that includes (i) information requested by the borrower or an explanation of why the information requested is unavailable or cannot be obtained by the servicer; and (ii) the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower.

12 U.S.C. §§ 2605(e)(2)(A)-(C).

The TAC identifies a number of QWRs.[8] (TAC ¶¶ 68-77).  It first identifies three QWRs initially raised in his Second Amended Complaint: letters sent on September 2, 2019, September 19, 2019, and October 8, 2019. (*Id*. ¶ 69). Quoting *Rosendale I*, Plaintiff alleges all of these letter were not timely acknowledged by Defendants and, with respect to the September 19 and October

---

[8] For purposes of this Opinion & Order, the Court will presume that each of Plaintiff's claimed QWRs actually qualify as QWRs.

8 letters, Defendants failed to adequately respond. (*Id.*). Plaintiff then asserts that a letter dated March 3, 2020 requesting to know who owned his mortgage qualifies as QWR. (TAC ¶ 70). Plaintiff does not assert whether this letter was untimely acknowledged or responded to, or whether any substantive response was deficient.[9] The Court will address each of the timeliness of Defendants' response to each of these letters in turn.

### Plaintiff's September 2, 2019 Letter

Defendants acknowledged Plaintiff's September 2, 2019 letter on in a response dated September 6, 2019. (Defs. 56.1 ¶ 18; Defs. Ex. (D) (EE)). Plaintiff only makes the bald statement that he disputes ever receiving such letter. (Pl. Resp. 56.1 ¶ 18).  Defendants then sent a substantive response on September 18, 2019. (Defs. 56.1 ¶ 19; Defs. Ex. (D) EE). Plaintiff does not dispute receiving this letter. (Pl. 56.1 ¶ 19). Defendants' provided evidence prevails over Plaintiff's bare conclusions that the September 2, 2019 letter was responded to untimely. Accordingly, Plaintiff has no basis to assert a RESPA claim with respect to the September 2, 2019 letter.

### Plaintiff's September 19, 2019 Letter

Defendants did not acknowledge receipt nor substantively respond to Plaintiff's September 19, 2019 letter. (*See* Defs. Mem. p.5).

### Plaintiff's October 8, 2019 Letter

Defendants acknowledged Plaintiff's October 8, 2019 letter in a response dated October 10, 2019. (Defs. 56.1 ¶ 24; Defs. Ex. (D) JJ). Plaintiff does not dispute Defendants'

---

[9] Plaintiff also asserted in his Further Responses to Interrogatories dated July 21, 2022 that he sent a letter amounting to a QWR on "February 8, 202 [sic]." (Defs. Ex. (V) 9, p.2). There is no reference to this letter in the TAC. In his opposition, Plaintiff seems to indicate this letter was actually dated January 2, 2019. (Pl. Opp. p.10, n.3). The Court was unable to locate any letters dated February 8 of any year or a letter dated January 2, 2019 in any of the parties' exhibits. Therefore, the Court will not consider this alleged QWR in its analysis.

acknowledgement. (Pl. Resp. 56.1 ¶ 24). Defendants assert their substantive response to this letter was addressed to DFS and sent on October 22, 2019. (Def.s 56.1 ¶ 48; Defs. Ex. (D) LL). A response to a third-party does not satisfy the requirements of RESPA. Of the three actions required of a loan servicer upon receipt of a QWR, each requires a response to the "borrower". 12 U.S.C. § 2605(e)(2)(A)-(C). By the statute's plain language and Defendants' own admission, they did not comply with RESPA. Accordingly, they were delinquent in responding substantively to Plaintiff's October 8, 2019 letter.

*Plaintiff's March 3, 2020 Letter*

Defendants did not acknowledge receipt or respond substantively to Plaintiff's March 3, 2020 letter. (Def. Mem. p.5).

*Actual & Statutory Damages Under RESPA*

Given the Defendants failed to respond substantively to Plaintiff's September 19, 2020, October 8, 2019, and March 3, 2020 letters, the question becomes whether Plaintiff is entitled to any damages under 12 U.S.C. § 2605(f)(1). Subsection (f)(1) provides that individual claimants are entitled to "any actual damages to the borrower as a result of the failure . . ." and "any additional damages, as the court may allow, in the case of a pattern or practice of noncompliance with the requirements of this section, in an amount not to exceed $2,000 [. . .]" for each failure to comply. 12 U.S.C. § 2605(f)(1).

Proceeding in reverse order, this Court previously held that "three distinct Section 2605 violations as insufficient to establish a pattern or practice." *Rosendale I*, 2021 WL 4066821, at *14 (S.D.N.Y. Sept. 7, 2021) (citing *Fournier v. Bank of Am. Corp.*, No. 5:13-CV-00702, 2014 WL 421295 at *4 (N.D.N.Y. Feb. 4, 2014)). The Court sees no reason to depart from its previous position now. Plaintiff is therefore not entitled to statutory damages.

Plaintiff asserts that he incurred actual damages due to "lost time an[d] expended printing and postage funds in responding to inadequate responses . . ." and mental health issues [arising] as a result of Defendants' "inadequate and untruthful responses to [Plaintiff's] QWR[s] . . . ." (TAC ¶¶ 77.II.(a)-(b)).

An award of actual damages is only appropriate when the plaintiff alleges that his damages were proximately caused by the defendant's violation of RESPA. *Rosendale I*, 2021 WL 4066821 (S.D.N.Y. Sept. 7, 2021) (quoting *Bonadio v. PHH Mortg. Corp.*, No. 12-CV-3421 (VB), 2014 WL 522784, at *6 (S.D.N.Y. Jan. 31, 2014)). Proceeding again in reverse order, Defendants' violations of RESPA have no causal connection to Plaintiff's asserted sources of mental anguish.[10] The Court has found that Defendants' RESPA violations arose out of their *failure to respond* to Plaintiff's September 19, 2020, October 8, 2019, and March 3, 2020 letters. As such, Defendants' failures cannot be the "inadequate and untruthful *responses* . . ." causing Plaintiff's mental health issues. (*See* TAC ¶¶ 77.II.(a)-(b)) (emphasis added). Moreover, Plaintiff asserts that his physician wrote in 2022 that "[Plaintiff's] PTSD stemmed from 'how traumatic the 2 years this threat of losing his home.'" (Pl. Opp. p.10). The Court has reviewed a letter written by Herbert L. Gould, M.D., FACS (retired), dated August 31, 2022, who was board certified as an Ear Nose & Throat physician, indicating that Plaintiff's mental health issues arise from his fear over losing his home. (Pl. Ex. R-13). This letter does not contain the language quoted in Plaintiff's opposition. (*Compare* Pl. Opp. p.10 *with* Pl. Ex. R-13). In any event, the evidence indicates Plaintiff's mental health issues are traceable to the stressful situation he finds

---

[10] The Court will again assume, *arguendo*, that emotion damages are cognizable under Section 2605. *Rosendale I*, 2021 WL 4066821, at *12 (S.D.N.Y. Sept. 7, 2021) (citing *In re Residential Capital, LLC*, 513 B.R. 446, 465 (Bankr. S.D.N.Y. 2014) (collecting cases and concluding that emotional distress damages can constitute "actual damages" under RESPA)).

himself in with respect to a potential foreclosure and not to Defendants' three violations of RESPA.

Turning to Plaintiff's allegations regarding his "lost time an[d] expended printing and postage [expenses,]" (TAC ¶ 77.II.(a)), Plaintiff's claim similarly fails. As another court has held in this District, "[t]o permit a cause of action based on incidental costs would transform virtually all unsatisfactory borrower inquiries into RESPA lawsuits, and, in so doing, would subvert the very reason for the damages requirement in the first place." *Sutton v. CitiMortgage, Inc.*, 228 F. Supp.3d 254, 274-75 (S.D.N.Y. 2017) *Cf. Marais v. Chase Home Fin., LLC*, 24 F. Supp.3d 712, 727 (S.D. Ohio 2014) (noting that courts in the Southern District of Ohio routinely hold that the costs of preparing and sending a QWR do not satisfy the actual damages requirement.)) Further, in Plaintiff's own deposition testimony, he plainly states the he suffered no damages when Defendants failed to acknowledge or formally respond to his QWRs—and doubled down on that position when the questioner followed-up to confirm Plaintiff understood the question. (Rosendale Tr. P.204, 2-9).

Accordingly, Defendants motion with respect to Plaintiff's RESPA claims is GRANTED and the claims are DISMISSED.

## II.    Conversion Claims

Plaintiff asserts that Defendants' unlawfully converted his property when they withdrew funds from his line of credit to pay his property taxes on the following occasions: (1) February 2019, in the amount of $7,265; (2) May 31, 2019, though also alleges the Defendants failed to pay his taxes and therefore Plaintiff incurred a penalty; and (3) August 23, 2019 in the amount of $7,473.60. (TAC ¶¶ 37, 79-83).[11]

---

[11] Defendants, acting out of caution, also respond to potential claims regarding their advancement of funds out of Plaintiff's line of credit to pay Plaintiff's hazard insurance premiums. (Defs. Mem. pp.11-14). Plaintiff does indeed

Conversion arises under New York law when "any unauthorized exercise of dominion or control over property by one who is not the owner of the property which interferes with and is in defiance of a superior possessory right of another in the property." *Regions Bank v. Wieder & Mastroianni, P.C.*, 526 F. Supp.2d 411, 413 (S.D.N.Y. 2007) (quoting *Schwartz v. Capital Liquidators, Inc.*, 984 F.2d 53, 53-54 (2d Cir. 1993)). To successfully plead a claim of conversion, plaintiffs are required to show "legal ownership of a specific identifiable piece of property and the defendant's exercise of dominion over or interference with the property in defiance of the plaintiff's rights." *Id.* (quoting *Ahles v. Aztec Enters., Inc.*, 120 A.D.2d 903, 502 N.Y.S.2d 821, 822 (App. Div. 1986). A defendant's wrongful or mistaken intent is irrelevant to the analysis. *Id.* at 413-14 (collecting cases).

The 2009 Reverse Mortgage obligates Plaintiff to "pay all property charges consisting of taxes . . . in a timely manner, and shall provide evidence of payment to Lender, unless Lender pays property charges by withholding funds from monthly payments due to the Borrower or by charging such payments to a line of credit as provided for in the Loan Agreement." (Defs. Ex. (D) B p.4, ¶ 2). Failure to pay allows the "Lender [to] do and pay whatever is necessary to protect the value of the Property and Lender's rights in the Property, including payment of taxes [as] mention[ed] in Paragraph 2." (*Id.* at p.4, ¶ 5).

---

note that the Defendants withdrew $2,789 from his line of credit in September 2018 to pay his hazard insurance premium, though also that he was eventually credited for that amount (TAC ¶ 30). Plaintiff makes two other stray references to Defendants' paying his hazard insurance premiums. (*Id.* ¶¶ 48-49). Even reading Plaintiff's TAC liberally, the Court does not construe these references to arise to the level of separate causes of action for conversion. Plaintiff clearly read this Court's prior opinion in *Rosendale I* carefully and relied on it to craft his conversion cause of action. (*See* TAC ¶ 79 ("Judge Rom[á]n denied Nationstar's motion to dismiss this cause of action and thus it is re-pled as before[.]")). In *Rosendale I*, Plaintiff only asserted conversion claims with respect to the February 2019 and May 2019 advances from Plaintiff's line of credit. *Rosendale I*, 2021 WL 4066821, at *15 (S.D.N.Y. Sept. 7, 2021). The Court will thus only analyze the February 2019, May 2019, and August 2019 advances made to pay Plaintiff's property taxes.

Similarly, the HECLA provides "[i]f Borrower fails to pay the property charges in a timely manner, and has not elected to have Lender make the payments, Lender shall pay the property charges as a Loan Advance as required under Section 2.16." (Defs. Ex. (D) D § 2.10.5). Such payments will be made from a line of credit when possible. (Defs. Ex. (D) D § 2.16). Therefore, both of these agreements expressly give Defendants the right to pay Plaintiff's property taxes from a line of credit if payment of such taxes is delinquent.

Dutchess County issued a tax receipt on February 11, 2019 indicating that Plaintiff's 2017 taxes were delinquent and he owed $7,226.85. (Defs. Ex. (D) X). On February 12, 2019, Defendants sent Plaintiff a letter requesting proof that he paid his property taxes. (Defs. Ex. (D) Y). That letter also indicates that Defendants had advanced funds to pay Plaintiff's taxes. (*Id.*) Given Defendants were told that Plaintiff's taxes were delinquent, they lawfully exercised their rights under both the 2009 Reverse Mortgage and the HECLA to pay Plaintiff's taxes.

Similarly, Defendants performed tax searches in May and August 2019, which indicated that Plaintiff was delinquent on his taxes. (Defs. Ex. (D) AA pp.1-2). In response, Defendants advanced funds from Plaintiff's line of credit to pay those taxes. (*Id.*).

In each of these instances, it appeared to Defendants that Plaintiff was delinquent on his taxes and, acting in accordance with the grants of authority contained in the 2009 Reverse Mortgage and HECLA, advanced funds from Plaintiff's line of credit to pay those taxes. In other words, Defendants did not undertake an "unauthorized exercise of dominion or control over property by one who is not the owner of the property which interferes with and is in defiance of a superior possessory right of another in the property." *Regions Bank,* 526 F. Supp.2d at 413. Rather, they acted in accordance with the legal grant of rights given to them by Plaintiff in accordance with the 2009 Reverse Mortgage and the HECLA.

Consequently, Defendants motion with respect to Plaintiff's conversion claims is GRANTED and the claims are DISMISSED.

### III. Gross Negligence Claims

Plaintiff asserts that Defendants were grossly negligent when they advanced funds from his lines of credit. (TAC ¶¶ 84-90). Plaintiff argues that Defendants failed to safeguard his money in accordance with New York State Department of Financial Security Rule § 419.2. ("Rule 419.2"). (*Id.* ¶ 86); *see also* 3 N.Y. Admin. Code 419.2.

"To state a claim for gross negligence under New York law, [a plaintiff] must establish four elements: (1) the existence of a duty; (2) a breach of that duty; (3) injury as a result thereof; and (4) conduct that evinces a reckless disregard for the rights of others or smacks of intentional wrongdoing . . . ." *Purchase Partners, LLC v. Carver Federal Sav. Bank*, 914 F. Supp.2d 480, 497 (S.D.N.Y. 2012) (quoting *Farash v. Cont'l Airlines, Inc.*, 574 F. Supp.2d 256, 267-68 (S.D.N.Y. 2008)). A claim for gross negligence must be independent from any duty arising from contract; i.e., the gross negligence claim cannot be duplicative of a breach of contract claim. *Id.* (quoting *Clarendon Nat'l Ins. Co. v. Health Plan Adm'rs*, No. 08 Civ. 6279(GBD), 2009 WL 3053736, at *3 (S.D.N.Y. Sept. 24, 2009). A lender is not in a fiduciary relationship with a borrower and, accordingly, owes the borrower no special duties. *Scalercio-Isenberg v. Goldman Sachs Mortgage Company*, 2022 WL 3227875, at *17 (S.D.N.Y. Aug. 9, 2022) (quoting *Miyamoto v. Bank of America, N.A.*, No. 19 Civ. 445 (FB) (ST), 2020 WL 5577730, at *3 (E.D.N.Y. Sept. 17, 2020)).

Plaintiff fails to allege any duty owed by Defendants that was breached. Plaintiff appears to allege that Rule 419.2 gave rise to a duty. (*See* TAC ¶ 86). He further alleges that Defendants breached that duty by failing to safeguard the monies available within his line of credit. (*Id.* ¶

90). Even assuming, *arguendo*, Rule 419.2 does give rise to a duty, the Court has already found that Defendants did not act unlawfully convert Plaintiff's monies when it advanced funds from his line of credit to pay Plaintiff's taxes. Rather, Defendants acted in accordance with their rights under the 2009 Reverse Mortgage and HECLA. Defendants were therefore not grossly negligent.

In light of the foregoing, Defendants motion with respect to Plaintiff's gross negligence claims is GRANTED and the claims are DISMISSED.

### IV. GBL Claims

Plaintiff asserts two claims under GBL Section 349: (1) that Defendants failed to provide a copy of the "Lender's Limited Waiver of the Right of Foreclosure" ("Limited Waiver") required by 3 N.Y. Admin. Code § 79.7 ("Section 79.2") and (2) alleging that Defendants sent misleading correspondence. (TAC ¶¶ 92-100, 123-25). The Court takes the latter allegations to be with respect to the notices Defendants sent informing Plaintiff that Defendants advanced, or were planning to advance, funds to pay Plaintiff's taxes.

Section 349 prohibits "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in th[e] state." N.Y. Gen. Bus. L. § 349(a). To sustain a claim under GBL § 349, a plaintiff must show: (1) that the defendant's acts were consumer oriented; (2) that the acts or practices are "deceptive or misleading in a material way"; and (3) the plaintiff has been injured as a result. *Goldemberg v. Johnson & Johnson Consumer Companies, Inc.*, 8 F. Supp.3d, 467, 478 (S.D.N.Y. 2014) (citing *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 25 (1995)).

A consumer oriented act is one "[that] has a broad impact on consumers at large." *Consumer Fin. Prot. Bureau v. RD Legal Funding, LLC*, 332 F. Supp.3d 729, 781 (S.D.N.Y. 2018) (citing *Bennet v. State Farm Fire and Casualty Co.*, 161 A.D.2d 926, 928 (2018)). For

conduct to be materially misleading, it must be "likely to mislead a reasonable consumer acting reasonably under the circumstances." *Id.* at 782 (citing *Orlander v. Staples, Inc.*, 802 F.3d 289, 300 (2nd Cir. 2015))

With respect to Plaintiff's first GBL claim, Defendants were under no obligation to provide a Limited Waiver. Section 79.7 provides that "[a]ll lenders must prepare a form entitled Lender's Limited Waiver of the Right of Foreclosure[, which] shall be provided to and signed by the mortgagor at the *closing* of every loan." 3 N.Y. Admin. Code § 79.7(d) (emphasis added). An executed copy is also required to be provided to the mortgagor. *Id*. The 2009 Reverse Mortgage originated with MetLife, not Defendants. (Defs. Ex. (D) B). Accordingly, any obligation to provide and maintain the Limited Waiver applies to MetLife and not Defendants.

The Court agrees with Defendants that Plaintiff's second GBL claim conflates his conversion claims with a GBL claim. (*See* Defs. Mem. pp.18-19; *see also* TAC ¶ 125). He complains again of Defendants advancement of his funds to pay his taxes. (TAC ¶ 125).

Moreover, Plaintiff does not specifically identify notices he claims were deceptive or examples of deceptive language. (*See Id*.). Plaintiff does point to Assurance No.21-006 issued by New York State Attorney General Letitia James, which memorialized an agreement between the Attorney General and Defendants, wherein the Defendants agreed to pay a fine for alleged deceptive practices. (*Id*. ¶ 123). Notably, the parties did not engage in litigation to reach a concrete resolution to the Attorney General's claims and Defendants did not admit or deny the Attorney General's findings. NYS Attorney General's Assurance No.21-006 ¶¶ 15-16. At issue was Defendants' practice to send pre-foreclosure letters stating "[i]f you fail to respond to the summons and complaint in this foreclosure action, you may lose your home." *Id*. ¶ 10.

Even assuming Plaintiff may piggyback off the Attorney General's allegations,[12] they are inapt. The Court has reviewed the notices sent to Plaintiff prior to advancing monies from his line of credit to pay Plaintiff's taxes. (Defs. Exs. (D) T, U, & Y). Each states that failure to pay taxes "could lead to foreclosure on your home" or "could result in a foreclosure *action* on your home." (Defs. Exs. (D) T & U; Defs. Ex. (D) Y). This language is materially different than complained of in Assurance No.21-006, which gives the impression a foreclosure action is already ongoing. NYS Attorney General's Assurance No.21-006 ¶ 10.

The notices Defendants sent informing or warning Plaintiff that Defendants advanced funds to pay his premiums are not deceptive business practices in violation of GBL Section 349. Defendants motion with respect to those claims is GRANT and Plaintiff's Section 349 claims are DISMISSED.

## V.      Breach of Contract Claims

Plaintiff asserts two breach of contract claims, though they appear to be duplicative. Plaintiff alleges that Defendants improperly calculated the interest rate applicable to promissory note (the "Note") attended to the 2009 Reverse Mortgage. (TAC ¶¶ 101-05, 121-22).  Defendants are in error, says Plaintiff, because the London Inter-Bank Offered Rate ("LIBOR") published daily in the Wall Street Journal only goes to two decimal places, while Defendants calculated the rate to a third decimal place. (*Id*. ¶¶ 102-02, 122).

Plaintiff relies on a letter he claims to have first received as part of batch of documents from DFS in 2019. (*Id*. ¶ 61). That letter was written by MetLife and is dated November 2010. (*Id*. ¶¶ 61; *see* Defs. Ex. (D) F). That letter was sent to Plaintiff to correct a "clerical error" as to the date for determining the index rate for adjustments to the interest rate. (Defs. Ex. (D) F). A

---

[12] The Court reiterates that these allegations were never litigated on the merits. NYS Attorney General's Assurance No.21-006 ¶¶ 15-16

revised provision in that letter provides, "'Index' means the One-Month London Interbank Offered Rate ("LIBOR") as made available in the 'Money Rates' section of the Wall Street Journal rounded to three digits to the right of the decimal point." (*Id.*). Whether a clerical error or not, this is a significant departure from the initial terms of the Note: those terms only provide that Plaintiff's interest rate is based on the LIBOR published in the Wall Street Journal. (*See* Defs. Ex. (D) TT § 5(b)).

Even so, there is no breach of contract. While it does appear MetLife attempted to unilaterally modify Plaintiff's note when it sent its letter in November 2010, Plaintiff has ratified that modification by acquiescing to it. "Ratification is a waiver of existing rights." *John Hancock Life Insurance Company of New York v. Solomon Baum Irrevocable Family Life Insurance Trust, et al*, 357 F. Supp.3d 209, 218 (E.D.N.Y. 2018) (citing *In re Levy*, 69 A.D.3d 630, 632 (2d Dep't 2010)). "When a party with full knowledge, or with sufficient notice of his rights and of all the material facts, freely does what amounts to a recognition or adoption of a contract or transaction as existing, or acts in a manner inconsistent with its repudiation, . . . he acquiesces in and assents to it and is equitably estopped from impeaching it, although it was originally void or voidable." *Id.* (quoting *Rothschild v. Title Guarantee & Tr. Co.*, 204 N.Y. 458, 464 (N.Y. 1912). Ratification must be clearly established, but it can be inferred from "acquiescence or silence . . . ." *Id.* (citing *Cammeby's Mgmt. Co., LLC v. Alliant Ins. Servs., Inc.*, 720 F. App'x 18, 22 (2d Cir. 2017)).

Here, Plaintiff could have rejected MetLife's unilateral contract modification upon receipt of MetLife's letter in 2010. Instead, Plaintiff waited until he filed the TAC in January 2022 to raise this issue—notably, against a party who did not initiate the unilateral modification. Plaintiff does dispute ever receiving this letter. (Pl. 56.1 ¶ 68). However, he provides no

affirmative evidence to buttress this claim. Without more, the evidence indicates MetLife did, in fact, mail the November 2010 letter to Plaintiff. Further, as the November 2010 modification expressly contemplates that Plaintiff's interest rate will be calculated to a third decimal point and the fact that Plaintiff performed his obligations and received the benefits of the Note for over eleven years from the date of the November 2010 letter, he is estopped from claiming breach of contract now. Consequently, Defendants motion is GRANTED with respect to Plaintiff's breach of contract claims, which are DISMISSED.

### VI.    Reformation of Mortgage

Plaintiff seeks either a reformation or recission of the 2009 Reverse Mortgage. (TAC ¶¶ 113.I-III). Plaintiff also seeks a declaratory judgment that the 2009 Reverse Mortgage is null and void. (*Id*. ¶ 113.III) Plaintiff asserts that after he signed the 2009 Reverse Mortgage, it was modified to include property he did not intend to commit to the 2009 Reverse Mortgage. (*Id*. ¶ 113.I). Plaintiff also alleges that 2009 Reverse Mortgage contains property in excess of that used to calculate the maximum loan benefit and includes land he did not own in 2009. (*Id*.)

Plaintiff admits he signed the 2009 Reverse Mortgage. (TAC ¶ 113.I; Rosendale Tr. p. 105, 3-14, p.111, 9-19). The 2009 Reverse Mortgage contains the same description of the Property as the Deed. (*Compare* Defs. Ex. (V) 14 *with* Defs. Ex. (D) C). Plaintiff does not dispute that he took title to the Property via the Deed. (Pl. 56.1 ¶ 1). Plaintiff does dispute that Deed is accurate. (*Id*). Plaintiff indicates that a 2005 Amended Mortgage to Title, purportedly located at (Pl. Ex. R-1), corrects the Deed's errors. He further states that a 2005 Stipulation between Plaintiff and JPMorgan Chase indicates an agreement that the correct description of the property is not found in the Deed. (*Id*.) This stipulation is purportedly located at (Pl. Ex. R-7). Plaintiff's first exhibit is an indenture from 1969 that reflects the property description in the

Deed, excepting the Deed's inclusion of an "abandoned road". (*See* Pl. Ex. R-1). Plaintiff's seventh exhibit is an indenture from 1959 associated with the "abandoned road" parcel that appears in the Deed. (Pl. Ex. R-7). The Court was able to identify a Loan Modification Agreement made between JPMorgan Chase and Plaintiff in 2003, not 2005, that appears to provide for a parcel of property that includes the property described in the Deed and more. (*See* Pl. Ex. R-3). Even so, this agreement does not legally supersede the title conferred by the Deed. Moreover, Plaintiff did not request that the 2009 Reverse Mortgage only cover his house and five acres, thus implicitly acknowledging it covered the entirety of the Property. (Rosendale Tr. p.115, 15-23). In sum, then, Plaintiff has provided no evidence—only allegations—that the Deed is inaccurate or that the 2009 Reverse Mortgage was intended to convey anything other than the property described in the Deed.

Moreover, in New York, a "plaintiff's right to recission or reformation, if any, accrued at the time of the execution of the agreement." *Campione v. Campione*, 942 F. Supp.2d 279, 284 (E.D.N.Y. 2013) (internal quotations omitted). Claimants must initiate actions based upon a mistake in a deed or mortgage document within six years of the execution of the mortgage. *See* N.Y. CPLR § 213(6); *see also, Investors Savings Bank v. Cover,* 187 A.D.3d 868, 130 N.Y.S.3d 371, 372 (2d Dept. 2020)). The 2009 Reverse Mortgage was recorded in the Dutchess County Clerk's Office in July 2009. (Defs. Ex. (D) B). As such, Plaintiff's claim has been time-barred since July 2015. Further, the Court accords with the Eastern District in *Campione* in denying Plaintiff's action for declaratory judgment as parallel to his state law claims and seeking the same rights and obligations as those claims. *See Campione*, 942 F. Supp.2d at 285.

Plaintiff's reformation or recission claims are DISMISSED and Defendants' motion with respect to those claims is GRANTED.

### VII.    Negligent & Intentional Infliction of Emotional Distress Claims

Plaintiff's last causes of action sound in negligent and intentional infliction of emotional distress. (TAC ¶¶ 114-20). With respect to the former, Plaintiff alleges that Defendants breached their duty by failing to provide a properly trained employee to respond to Plaintiff's QWRs. (*Id.* ¶¶ 116-18). As to the latter, Plaintiff again raises Defendants advancing funds from his line of credit to pay Plaintiff's tax bills and falsely threatened foreclosure. (*Id.* ¶ 119).

*Negligent Infliction of Emotional Distress*

"To plead a negligent infliction of emotional distress claim under New York law, a plaintiff must allege (1) a breach of a duty owed to the plaintiff; (2) emotional harm; (3) a direct causal connection between the breach and the emotional harm; and (4) circumstances providing some guarantee of genuineness of the harm." *Francis v. Kings Park Manor, Inc.*, 992 F.3d 67 81 (2d Cir. 2021) (collecting cases). The fourth element is usually satisfied by a showing that the breach endangered the claimant's physical safety or put the claimant in fear for his physical safety. *Id.* n.57 (citing *Taggart v. Costabile*, 131 A.D.3d 243, 253 (2d Dep't 2015). A mental injury may sustain a claim of emotional distress so long is it contains "some guarantee of genuineness." *Taggart*, 131 A.D.3d at 253. For example, genuine distress arises in incidents involving the mishandling of a corpse or the transmission of false information that a parent or child has died. *Id.* (collecting cases). The bar is set high to avoid opening a "wide door not only to fictitious claims, but to litigation in the field of trivialities and mere bad manners." *Id.* (cleaned up).

Assuming, *arguendo*, Defendants owe Plaintiff a duty, his complaint that one of Defendants' employees only received some "pre college" training abroad and was thus not a "trained" person within the meaning of 3 N.Y. Admin. Code 419.6(2) is insufficient to sustain a claim of negligent infliction of emotional distress. (*See* TAC ¶¶ 116-18). Plaintiff asserts that employee in question called him multiple times, leaving voicemails, and that he had one phone conversation with her, during which the employee indicated that if Plaintiff did not pay his taxes, Defendants would accelerate his loan and foreclose. (*Id.* ¶ 45). The Court does not minimize the emotional tumult that can arise from such news, but it nevertheless falls well below the bar set by physical danger and mishandling of a corpse. Plaintiff cannot sustain a claim for negligent infliction of emotional distress.

### *Intentional Infliction of Emotional Distress*

To sustain a claim of intentional infliction of emotional distress, claimants must plead: (1) extreme and outrageous conduct; (2) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and injury; and (4) severe emotional distress. *Taggart*, 131 A.D.3d at 249. The first element is designed to be "rigorous[] and difficult to satisfy", and is only met when the conduct "go[es] beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* at 249-50 (cleaned up). Further, the New York Court of Appeals has found this first element "the most susceptible to determination as a matter of law." *Id.* at 250 (quoting *Howell v. New York Post Co.*, 81 N.Y.2d 115, 121 (N.Y. 1993)).

Nothing in Defendants' conduct rises to the sufficient level of outrageousness. The Court has already found that Defendants acted in accordance with their rights under the 2009 Reverse Mortgage and the HECLA to advance funds when Plaintiff failed to pay his taxes. Acting within

the bounds of the law inherently cannot be "utterly intolerable to civilized community." *Taggart*,

131 A.D.3d at 249-50. Further, accepting, *arguendo*, as true that Defendants "falsely threatened

[Plaintiff] with foreclosure," (TAC ¶ 199), such actions do not rise to the level of outrageous

conduct. Rather, it is more akin to the "bad manners" that are not for the courts to punish and

thus falls into the bounds of decency and not into the realm of atrociousness. *Taggart*, 131

A.D.3d at 249-50.

      In light of the foregoing, Defendants' motion is GRANTED with respect to Plaintiff's

negligent and intentional infliction of emotional distress claims, which are DISMISSED.

## CONCLUSION

      For the aforementioned reasons, Defendants' motion for summary judgment is

GRANTED, and all claims in this action are DISMISSED against ALL Defendants. The Clerk of

the Court is directed to terminate the motion at ECF No. 234.

      The Clerk of the Court is directed to terminate the case and all Defendants, and to enter

judgment in favor of the Defendants. The Clerk of the Court is respectfully directed to mail a copy

of this Opinion and Order to Plaintiff at his address listed on ECF and show service on the docket.


Dated:   April 5, 2024                    SO ORDERED:
        White Plains, New York



_____
                        NELSON S. ROMÁN
                 United States District Judge